IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DARRYL HOWARD,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )        1:17cv477
                                  )
CITY OF DURHAM, et. al.,          )
                                  )
            Defendants.           )


**<u>MEMORANDUM OPINION AND ORDER</u>**

THOMAS D. SCHROEDER, District Judge.

Plaintiff Darryl Howard brings this action against the City of Durham and various officers of the Durham Police Department ("DPD") and Durham Fire Department (collectively, the "Individual Defendants") for claims arising out of his arrest, conviction, and imprisonment for over twenty-three years until his exoneration and release in 2016. Howard alleges violations of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983; obstruction of justice; negligence; intentional infliction of emotional distress; malicious prosecution; and a violation of the North Carolina Constitution. (Doc. 1 ¶¶ 120–75.) Before the court is the motion to dismiss certain claims against the Individual Defendants. (Doc. 13.) The motion has been fully briefed and is ready for consideration. (Docs. 14, 19, 21.) For the reasons set forth below, the motion will be granted in part and denied in part.

## I. BACKGROUND

Viewed in the light most favorable to Howard as the non-moving party, the operative facts are as follows:[1]

### A. Factual History

On November 27, 1991, Doris Washington and her 13 year-old daughter, Nishonda, were brutally raped, sexually assaulted, strangled, beaten, and murdered, and their apartment was then set on fire. (Doc. 1 ¶ 24.) Although there was evidence implicating others, Howard was arrested and charged with these murders on November 12, 1992. (Id. ¶ 65.) From the beginning of the investigation, there was clear evidence that both Doris and Nishonda were the victims of sexual assault, and both bodies were tested with a rape kit. (Id. ¶¶ 28, 69.) The results initially revealed that sperm was found on Nishonda, but not on Doris. (Id. ¶ 69.) The DNA found on Nishonda was not tested before Howard was charged with both murders. (Id.)

In February of 1993, Howard's trial counsel requested DNA testing of the rape kits. (Id. ¶ 70.) The testing was conducted and conclusively excluded Howard as the source of the sperm found on Nishonda. (Id. ¶ 71.) Regardless, on March 31, 1995, Howard

---

[1] Howard's complaint describes two distinct sets of actions: first, that DPD officers missed, ignored, and fabricated evidence, as well as coerced witnesses leading to his arrest and conviction; and second, that DPD officers intentionally failed to disclose subsequently discovered, exculpatory evidence. As the motion to dismiss primarily addresses the latter, the court addresses the former only to the extent necessary to resolve the motion before it.

was convicted of two counts of second-degree murder and one count of first-degree arson, and he was sentenced to eighty years in prison. (Id. ¶ 84.)

In 1997, Howard filed a pro se motion for appropriate relief in North Carolina Superior Court. That motion was denied, as was a petition for discretionary review to the North Carolina Supreme Court. (Id. ¶ 87.)

In 2009, after North Carolina created a statutory right to post-conviction DNA testing, N.C. Gen. Stat. § 15A-270, Howard filed an unopposed motion for DNA testing on Doris and Nishonda's rape kits, which was granted in 2010. (Doc. 1 ¶ 88.) The testing of the rape kits confirmed that Howard was properly ruled out as the source of the sperm found on Nishonda's body but also found previously unidentified sperm on Doris's body. (Id. ¶¶ 89–91.) Testing of this sperm also conclusively ruled out Howard as the source but did identify Jermeck Jones, a convicted felon, as a possible match. (Id. ¶¶ 91–93.)

On August 25, 2011, the North Carolina State Bureau of Investigation crime lab informed the DPD that Jones was a possible match for the newly discovered DNA. (Id. ¶ 94.) On September 15, 2011, apparently upon application by Howard, a North Carolina Superior Court judge entered an order directing the DPD to "immediately share with counsel for Mr. Howard any information it possesses about the man whose DNA was detected in Doris W.'s sexual

assault kit." (Id. ¶ 95.) On December 14, 2011, Michele Soucie,[2] as directed by her sergeant, Scott Pennica, obtained a warrant to collect a DNA sample from Jones. (Id. ¶ 96.)

After taking Jones into custody but before collecting the DNA sample from him, Soucie and Pennica met with him in an interview room to question him about the Washington murders. (Id. ¶ 97.) During and directly after this interview, Jones made a number of incriminating, contradictory, and inconsistent statements (some of which were made to Soucie and Pennica and some of which were recorded by a device that was hidden in the interview room). (Id. ¶¶ 97-99.) These include: a statement that Doris had been his girlfriend but that he did not kill her; once he was informed that his DNA would be taken, his contradictory statement that he did not know Doris (despite the fact that his DNA was subsequently found on her); a statement that he had consensual sex with Nishonda (despite the fact that she was 13 years old and his DNA was not found on her); the fact that when he was in the interview room alone, he made a series of calls from his cell phone in which he implicated himself in the crimes and indicated that he had just lied to Soucie and Pennica, including statements that he did not want to "rat on anybody," that "I ain't said nothing," that "ain't

---

[2]  Soucie was, at all relevant times, a DPD police investigator who investigated whether the crimes Howard was convicted of were committed by someone else. (Doc. 1 ¶¶ 17, 93-101.)

nothing they going to learn without my attorney", and that he had visited the Washington apartment. (Id. ¶ 99)

Subsequent testing of the DNA sample from Jones found him to be a conclusive match for the newly-discovered DNA. (Id. ¶ 93.)

Howard alleges, and the court accepts as true for purposes of the present motion, that in a written report on this encounter Soucie misrepresented the interview she had with Jones and intentionally failed to report Jones's contradictory statements or disclose the recording. (Id. ¶ 98.) Howard also alleges that although Soucie and Pennica knew that Jones was not being truthful when they questioned him, they did not conduct any follow-up investigation on Jones's involvement in the crimes. (Id. ¶ 101.)[3]

On March 19, 2014, Howard's defense counsel filed a motion for appropriate relief in North Carolina Superior Court requesting a new trial based on newly discovered evidence, including, among other things, the new DNA evidence. (Id. ¶ 105.) The Superior Court granted the motion for appropriate relief and ordered a new trial, and the state appealed. (Id. ¶ 106.) Howard's counsel then filed a separate motion for a new trial, arguing that North Carolina General Statute § 15A-270 entitled Howard to a new trial.

---

[3] There is a discrepancy on this issue: in December of 2011 Soucie swore under oath that the DPD needed Jones's DNA for an investigation that was ongoing, but in August of 2016 Soucie swore under oath that no follow-up investigation was conducted on Jones in 2011 because that investigation was not active at the time. (Doc. 1 ¶ 101.) Either way, the inculpatory recording was not disclosed pursuant to the 2011 court order, and Howard remained in prison. (Id. ¶¶ 103-04.)

5

(Doc. 1 ¶ 108.)  In August of 2016, the Superior Court held an evidentiary hearing on the motion.  (Id. ¶ 109.)  At this hearing, Howard's counsel presented the recording of Jones, which had only been disclosed to counsel the month before.  (Id. ¶ 110.)  Jones was called as a witness at this hearing but refused to testify and invoked his Fifth Amendment right against self-incrimination.  (Id.)  At the end of the hearing, the Superior Court ruled from the bench in favor of Howard.  (Id. ¶ 111.)  In a subsequent written order, the Superior Court found that the DNA test results showed that Howard was innocent of the Washington murders.  (Id.)  On August 21, 2016, Howard was released from prison.

### B. Procedural History

On March 24, 2017, Howard filed his complaint in this court. (Doc. 1.)  The Individual Defendants and the City of Durham each filed an answer on August 29, 2017.  (Docs. 12, 14.)  On the same day, the Individual Defendants, but not the City of Durham, moved to dismiss many of Howard's claims.  (Doc. 13.)  Apparently persuaded by some of the Individual Defendants' arguments, Howard stipulated to the dismissal of several of his claims and responded to the arguments as to remainder. (Doc. 20.)  As a result of this stipulation, only the following claims are challenged on substantive grounds: third cause of action (§ 1983 claim under the Fourteenth Amendment for falsifying and withholding evidence) against Soucie and Pennica; fourth cause of action (common law

6

obstruction of justice) against Soucie and Pennica; and fifth cause

of action (negligence) against Soucie and Pennica.  In addition,

the Individual Defendants contend that the fourth, fifth, sixth

(intentional infliction of emotional distress against Darrel Dowdy

and Milton Smith)[4], and seventh (common law malicious prosecution

against Dowdy and Smith) causes of action against the Individual

Defendants in their official capacity should be dismissed as

duplicative of the second cause of action against the City of

Durham.  (Docs. 13, 20.)  Each claim is addressed below.

## II.  ANALYSIS

### A.  Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6) challenges the legal sufficiency of a

complaint.  Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir.

2009).  A complaint that does not contain "sufficient factual

matter, accepted as true, 'to state a claim to relief that is

plausible on its face'" must be dismissed.  Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S.

544, 570 (2007)).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the

---

[4]  Dowdy was, at the relevant times, a corporal in the DPD and the lead
investigator in the case against Howard.  (Doc. 1 ¶¶ 16, 27.)  Smith was
a fire marshal and investigator for the Durham Fire Department.  (Id.
¶ 19.)

misconduct alleged." Id. "The plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" Giacommelli, 588 F.3d at 193 (quoting Iqbal, 556 U.S. at 678.) In assessing the legal sufficiency of a complaint, the factual allegations must be construed in the light most favorable to the plaintiff. Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009). However, "'[t]he presence [] of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint' cannot support the legal conclusion." Gladden v. Winston Salem State Univ., 495 F. Supp. 2d 517, 521 (M.D.N.C. 2007) (quoting Young v. City of Mount Ranier, 238 F.3d 567, 577 (4th Cir. 2001)).

**B.   Section 1983 Claims**

The third cause of action alleges that Soucie and Pennica violated Howard's liberty interest in proving his innocence under North Carolina's post-conviction relief statutes by suppressing evidence. (Doc. 1 ¶¶ 144–48.) Soucie and Pennica argue that they are protected from liability by qualified immunity. (Doc. 14 at 10–13.)

Qualified immunity shields government officials performing discretionary functions from personal liability for civil damages under § 1983, so long as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.  Ridpath v. Bd. of Governors Marshall U., 447 F.3d 292, 306 (4th Cir. 2006).  Officials are entitled to immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right, and (2) the right was "clearly established" such that a reasonable person would have known his acts or omissions violated that right.  Id.  For an alleged constitutional right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This determination is to be assessed as of "the time an action [or inaction] occurred."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Fourth Circuit recently noted that in order to be clearly established, the "exact conduct at issue need not previously have been deemed unlawful" and that, instead, the question is "whether pre-existing law makes apparent the unlawfulness of the officer's conduct."  Sims v. Labowitz, No. 16-2174, 2018 WL 1312259, at *5 (4th Cir. Mar. 14, 2018) (internal citations and quotation marks omitted).  Despite the protection that it offers officials, qualified immunity does not exist to act as a shield for those who "knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  Instead, it exists to protect public officials from liability "for reasonable mistakes as to the

legality of their actions." <u>Merchant v. Bauer</u>, 677 F.3d 656, 661 (4th Cir. 2012) (citation omitted). Once a defendant raises a qualified immunity defense, the plaintiff bears the burden of showing that the defendant's alleged conduct violated the law. <u>Henry v. Purnell</u>, 501 F.3d 374, 377–78 (4th Cir. 2007). If the plaintiff meets that burden, then the defendant bears the burden of proof as to whether he is entitled to qualified immunity. <u>Id.</u> at 378.

In 2009, the Supreme Court acknowledged that convicted individuals "have a liberty interest in demonstrating [their] innocence with new evidence under state law." <u>Dist. Attorney's Office for Third Judicial Dist. v. Osborne</u>, 557 U.S. 52, 68 (2009). While <u>Osborne</u> recognizes that a "criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man," it also makes clear that conduct that "transgresses any recognized principle of fundamental fairness in operation" can cause a violation of a convicted individual's right to demonstrate his innocence with new evidence. <u>Id.</u> at 68-69 (internal citations and quotation marks omitted); <u>see also</u> <u>Burgess v. Baltimore Police Dep't</u>, No. CV RDB-15-0834, 2016 WL 795975, at *7-8 (D. Md. Mar. 1, 2016) (finding allegations that police officers intentionally concealed knowledge of an alternate perpetrator in a murder, after plaintiff was convicted of that murder, to be a plausible due process violation.)

Several courts have found that these state post-conviction relief statutes that create a liberty interest carry with them a corresponding right to receive reasonably accurate and truthful information from state actors who respond to requests for evidence. See, e.g., Dail v. City of Goldsboro, No. 5:10-CV-00451-BO, 2011 WL 2837067, at *5 (E.D.N.C. July 14, 2011) ("[T]he Osborne court held that when a State enacts a statute providing postconviction defendants a right to access evidence and a procedure to do so, the state creates an entitlement that is itself protected by the Due Process Clause."); Newton v. City of New York, 779 F.3d 140, 147–48 (2d Cir. 2015); Morrison v. Peterson, 809 F.3d 1059, 1064–65 (9th Cir. 2015). Additionally, in 2014, the Fourth Circuit held "our precedent unmistakably provides that, by 1988, a police officer violates clearly established constitutional law when he suppresses material exculpatory evidence in bad faith," though the suppression at issue there took place pre-conviction. Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 399–401 (4th Cir. 2014).

Soucie and Pennica argue that it was not a violation of Howard's rights for them to fail to disclose exculpatory evidence, because the Brady requirement to disclose exculpatory evidence does not continue post-conviction. (Doc. 14 at 11 (citing Osborne, 557 U.S at 69 (noting that a "criminal defendant found guilty after a fair trial does not have the same liberty interests as a free

11

man" and that those who have been found guilty at a fair trial have "only a limited interest in postconviction relief")).) Further, if their actions were in violation of Howard's rights, they argue, their conduct did not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known." (Doc. 14 at 11–12) (quoting Simmons v. Poe, 47 F.3d 1370, 1385 (4th Cir. 1995).)

Howard, citing Osborn and Dail, argues that persons convicted of crimes in North Carolina have a liberty interest, protected by the Due Process Clause, in pursuing post-conviction relief. (Doc. 19 at 15, 18.) He contends he had a constitutionally protected liberty interest in exercising his right to seek post-conviction relief and that by "intentionally obstructing [his] attempts to pursue post-conviction relief, violating the court order to disclose evidence proving [his] innocence, and affirmatively misrepresenting the nature of the newly discovered evidence, Defendants Soucie and Pennica violated the basic principles of fundamental fairness, depriving [him] of his right to due process of law." (Id. at 18.) Howard also argues that Soucie and Pennica are not entitled to qualified immunity because "[q]ualified immunity does not act as a shield for individuals who 'knowingly violate the law,'" and a reasonable officer would have known that it was unlawful to intentionally violate a court order in suppressing exculpatory evidence. (Id. at 19.) Thus, Howard

argues, his liberty interest in his right to pursue post-conviction relief was clearly established at the time of Soucie and Pennica's alleged misconduct, and qualified immunity should not protect the officers. (Id. at 20.)

While Soucie and Pennica are correct that the Brady duty to disclose exculpatory evidence does not continue post-conviction, Osborne established, in 2009, that convicted individuals have a liberty interest in demonstrating their innocence with new evidence under state law. Osborne, 557 U.S. at 68; Burgess, 2016 WL 795975, at *7–8. Further, while the officers' conduct took place before the Owens decision, that decision recognized that bad faith suppression of evidence was a violation of a clearly established right as of 1988. Id. at 401. It is true that Owens involved suppression of evidence before conviction, but its statement that "a police officer violates clearly established constitutional law when he suppresses material exculpatory evidence in bad faith" applies here because Howard alleges that Soucie and Pennica intentionally suppressed the recording of Jones in violation of a specific court order requiring its production. Id. Thus, at the time of Soucie and Pennica's alleged post-conviction conduct, it was clearly established that in states like North Carolina whose laws provide post-conviction DNA testing, convicted persons have a liberty interest in their ability to pursue post-conviction relief through DNA testing.

Howard represents, and the officers do not dispute, that the 2011 court order directed the DPD to "immediately share with counsel for Mr. Howard any information it possesses about the man whose DNA was detected in Doris W.'s sexual assault kit." (Doc. 1 ¶ 95.) Howard further alleges that Soucie and Pennica intentionally suppressed the recording of Jones and its contents, despite that order. (Id. ¶¶ 95, 98, 102.) The recording was plausibly key evidence, as Howard was exonerated at the hearing when it was presented to the state court. (Id. ¶¶ 109–112.) As such, the court finds that a reasonable person in the position of Soucie and Pennica should have known that suppression of the recording would violate the court's disclosure order and Howard's right to post-conviction relief, pursuant to his liberty interest. See Owens, 767 F.3d 379, 399–401. Moreover, that Soucie and Pennica acted intentionally in violation of the order is plausibly alleged, given the detailed allegations regarding their involvement in the case and that they provided a written report that allegedly misrepresented their interactions with Jones and omitted the fact that Jones made incriminating, contradictory, and inconsistent statements. (Doc. 1 ¶¶ 94-99.)

Consequently, given the deference afforded Howard's claim at this stage of the litigation, the fact that a convicted person enjoys a liberty interest in pursuing relief under North Carolina's post-conviction remedies law, and the plausible allegations that

Soucie and Pennica intentionally violated a court order in failing to disclose key exculpatory evidence, the court finds that Howard has plausibly stated a claim that a constitutional violation has occurred in violation of his clearly established right to pursue a statutory post-conviction remedy to demonstrate his innocence. As such, Soucie and Pennica have not met their burden of showing that they are entitled to qualified immunity, and the motion to dismiss will be denied.

### C. Common Law Obstruction of Justice

With Howard's voluntary dismissal of certain Defendants, the fourth cause of action's allegations of obstruction of justice under North Carolina common law remain against only Soucie and Pennica. The officers contend that "[t]here is no common law obstruction of justice claim in North Carolina against a police officer based upon acts that occurred 'solely in the course of an officer's criminal investigation . . . .'" (Doc. 21 at 6 (quoting Braswell v. Medina, 805 S.E.2d 498, 510 (2017)).)

In North Carolina, "it is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice." In re Kivett, 309 N.C. 635, 670, 309 S.E.3d 442, 462 (1983). "The common law offense of obstructing public justice may take a variety of forms," id., and encompasses acts taken to "destroy or conceal" evidence, Henry v. Deen, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984). See Blackburn v. Carbone, 208 N.C. App. 519, 527, 703

S.E.2d 788, 795 (2010) (noting that any action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice).

As Soucie and Pennica note (Doc. 14 at 13–14; Doc. 21 at 6–7), the North Carolina Court of Appeals has suggested that police officers may be held liable for obstruction of justice based on conduct taken in the course of their employment, but no North Carolina court has found an obstruction of justice claim for actions taken by a police officer as part of a criminal investigation. See Jones v. City of Durham, 183 N.C. App. 57, 59, 643 S.E.2d 631, 633 (2004) (holding obstruction of justice claim properly stated against officer who misplaced or destroyed dash-cam footage of a car accident that was potentially relevant to a civil claim); Evans v. Chalmers, 703 F.3d 636, 658 (4th Cir. 2012) ("we have not found – and plaintiffs have not offered – any case from any jurisdiction recognizing a common-law obstruction of justice claim against a police officer for his actions relating to a criminal proceeding"); Massey v. Ojaniit, 759 F.3d 343, 358 (4th Cir. 2014) (noting that there "has been a dearth of North Carolina case law developed since Evans was decided," and that it was "unrealistic that North Carolina would uphold an obstruction of justice claim in that context"); Haynes v. City of Durham, No.

12CV1090, 2014 WL 2864470, at *10 (M.D.N.C. June 24, 2014) ("Plaintiffs have not offered any case in which a court has found a claim for obstruction of justice against a police officer for actions undertaken in a criminal proceeding. Thus, the claim will be dismissed.").

Howard argues that while no North Carolina court has found a police officer liable for common law obstruction of justice for actions taken as part of a criminal proceeding, the North Carolina Court of Appeals' recent explication of the law in Braswell suggests it would allow for an obstruction claim in this case. In Braswell, the plaintiff filed a civil action after having been acquitted of criminal charges in connection with an investment scheme. Braswell claimed that law enforcement officers misled the grand jury to indict him based on fabricated and concealed evidence. In surveying the case law on the obstruction claim, the court distinguished between cases based on conduct by law enforcement during a criminal proceeding against a defendant, on the one hand, and a claimant's action to pursue some type of legal remedy, on the other. The court noted multiple instances where obstruction claims were permitted against parties who withheld documents and relevant information when it prevented someone from pursuing a legal claim or remedy. For example, in Jones, the court permitted an obstruction claim for a police officer's destruction of a dashboard camera videotape recording of an accident that was

17

the subject of a civil damages lawsuit arising out of a claim that the officer negligently stuck the plaintiff with his vehicle while responding to a call. Braswell, __ N.C. App. at __, 805 S.E.2d at 509-10 (citing Jones, 183 N.C. App. at 59, 643 S.E.2d at 633). In affirming the dismissal of Braswell's obstruction claim, the Braswell court stated:

> Here, conversely, Braswell seeks to hold the Officers civilly liable on an obstruction of justice theory *not* for their obstruction of his ability to obtain a legal remedy but rather solely for their actions taken in the course of his criminal prosecution. While torts such as malicious prosecution and false arrest allow law enforcement officers to be held liable for their wrongful acts while conducting a criminal investigation, neither this Court nor our Supreme Court has ever enlarged the scope of the obstruction of justice tort so as to encompass claims based on acts occurring <u>solely in the course of an officer's criminal investigation that are unrelated to a plaintiff's ability to seek and obtain a legal remedy</u>. On these facts, we conclude that the trial court properly dismissed Braswell's obstruction of justice claims.

__ N.C. App. at __, 805 S.E.2d at 510 (emphasis added); <u>see also</u> <u>Blackburn v. Carbone</u>, 208 N.C. App. 519, 703 S.E.2d at 788 (2010) (concluding, "[a]s a result, any action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability <u>to seek and obtain a legal remedy</u> <u>will suffice to support a claim for common law obstruction of</u> <u>justice</u>.") (emphasis added).

Howard argues that Jones and Braswell together indicate that an obstruction of justice claim can be made against a police

officer, even where his actions are part of an ongoing criminal investigation, if the actions are undertaken intentionally for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy.  (Doc. 19 at 21.) Howard further argues that because Soucie and Pennica acted with the intent to prevent him from attaining a remedy (release from prison), a valid obstruction of justice claim has been stated.

The court agrees with Howard.  Here, it is adequately alleged that Soucie and Pennica were aware of the court order directing them to turn over information about Jones, knew that Jones had made inculpatory statements, and suppressed the recording of these statements.  This intentional suppression of evidence, accepted as true at this pleading stage, allegedly prevented Howard from obtaining a legal remedy, as it prevented the disclosure of key evidence that a court had ordered, which lead to Howard's continued imprisonment for more than four years.  This distinguishes this case from Evans, Braswell, Haynes, and Massey, because the police misconduct alleged here occurred after Howard had begun to pursue his statutory remedy of exoneration and occurred in violation of a specific court order directing disclosure.  Cf. Labowitz, 2018 WL 1312259, at *7 (King, R. dissenting) ("The simple rule that a court order is to be obeyed is foundational to our legal system and an independent judiciary."); Williams v. Black, No. 5:07-CT-3170-D, 2010 WL 2465152, at *3 (E.D.N.C. June 16, 2010) ("Moreover,

the court has a compelling interest in discouraging plaintiff and others from disobeying court orders and failing to comply with discovery obligations.").

Therefore, because Howard alleges intentional suppression of evidence in violation of a court order that prevented, obstructed, impeded and hindered his ability to pursue his statutory remedy of exoneration, the motion to dismiss the obstruction of justice cause of action will be denied.

### D.   Common Law Negligence

The fifth cause of action alleges that the Individual Defendants were negligent in various respects in connection with their investigation of Howard.   In light of Howard's voluntary dismissal of this claim against Defendant E.E. Sarvis,[5] only Soucie and Pennica have moved for dismissal of the claim against them in their individual capacity.   Howard alleges they were negligent in failing to disclose exculpatory evidence, failing to comply with the 2011 court order, and providing false information to Howard, his attorney, and the Durham County District Attorney.   (Doc. 1 ¶ 156.)   Soucie and Pennica argue that Howard has not actually alleged negligence on their part and that, even if he has, qualified immunity protects them from liability.   (Doc. 14 at 14–

---

[5]   Sarvis was, at the relevant times, a captain in the DPD who Dowdy reported to throughout the course of the investigation and who served as liaison to the press regarding the DPD's efforts to solve the Washington murders.   (Doc. 1 ¶¶ 20, 27.)

16; Doc. 21 at 8–9).

Under North Carolina common law, police officers are considered "public officers." See Schlossberg v. Goins, 141 N.C. App. 436, 445, 540 S.E.2d 49, 56 (2000). As such, they are generally "immune from personal liability for mere negligence in the performance of [their] duties, but [are] not shielded from liability if [their] alleged actions were corrupt or malicious of if [they] acted outside and beyond the scope of [their] duties." Id. But, if the "cloak of official immunity has been pierced," such as by corrupt or malicious conduct, then "the defendant 'is not entitled to [immunity] protection on account of his office' and is 'then liable for simple negligence' and 'subject to the standard liabilities of a tortfeasor.'" Wilcox v. City of Asheville, 222 N.C. App. 285, 301, 730 S.E.2d 226, 238 (2012) (quoting Epps. v. Duke Univ., Inc., 122 N.C. App. 198, 205–06, 468 S.E.2d 846, 852 (1996)).

Under this doctrine, a "malicious" act is one that is "(1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Id. at 289, 730 S.E.2d at 230. "The concept of willful and wanton negligence encompasses conduct which lies somewhere between ordinary negligence and intentional conduct." Siders v. Gibbs, 39 N.C. App. 183, 186, 249 S.E.2d 858, 860 (1978). A plaintiff may prove malice "based on constructive intent to injure" when "the level of recklessness of the officer's

action was so great as to warrant a finding equivalent in spirit to actual intent." Wilcox, 222 N.C. App. at 292, 730 S.E.2d at 232.

Soucie and Pennica argue that the allegations against them are insufficient to overcome their official immunity. (Doc. 14 at 14–16). They cite to Shaw v. Stroud, which notes that "the North Carolina Supreme Court has never allowed a showing of gross negligence to suffice to pierce an officer's immunity, absent a statute specifically abolishing the common law immunity." (Doc. 14 at 15 (citing Shaw, 13 F.3d 791, 803 (4th Cir. 1994).) They also argue that Howard has alleged only intentional misconduct, which cannot give rise to a negligence claim. (Doc. 21 at 8–9.) Howard responds that the allegations of the intentional violation of a court order and suppression of exculpatory evidence are at least plausibly corrupt or outside the scope of official duties sufficient to pierce their official immunity and give rise to a negligence claim. (Doc. 19 at 24–25.)

Upon review, it is apparent that the fifth cause of action alleges only simple negligence. While there are allegations of willful, wanton, and reckless conduct elsewhere in the complaint (Doc. 1 ¶¶ 113–119), there are no allegations that Soucie and Pennica acted maliciously with the intent to injure Howard. Thus, Howard has not pleaded allegations of negligence sufficient to overcome official immunity. The motion to dismiss the fifth cause

of action against Soucie and Pennica will therefore be granted, but without prejudice.

### E.    Official Capacity Claims

Official capacity lawsuits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 n.55 (1978).  As a result, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985).  It is duplicative to bring the same claim against a defendant in his official capacity and against the government entity that employs that defendant, and in such a case the official capacity claim should be dismissed. Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against [defendant] in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."); Fields v. Tucker, No. 1:10CV844, 2011 WL 4345306, at *2 (M.D.N.C. Sept. 15, 2011), report and recommendation adopted in part, No. 1:10CV844, 2012 WL 174820 (M.D.N.C. Jan. 20, 2012); Alexander v. City of Greensboro, 762 F. Supp. 2d 764, 785-88 (M.D.N.C. 2011).

Individual Defendants argue, without analysis, that the official capacity claims against them in the common law causes of

action are duplicative of the <u>Monell</u> claim brought against the City of Durham and should be dismissed. (Doc. 14 at 10-11.) Howard argues that because causes of action four, five, six, and seven have not been brought against the City of Durham, they are distinct from the <u>Monell</u> claim and should not be dismissed. (Doc. 19 at 25.)

As an initial matter, because an official capacity claim is a claim against the municipality, its dismissal should be sought by the municipality – but the City of Durham has not moved for it in this case. Howard does not argue this as a reason to deny the motion, however. In any event, whether the claims brought against the Individual Defendants in their official capacity duplicate those in the second cause of action against the City of Durham depends on the facts alleged as grounds for each. The problem here is that no party has conducted that analysis.

The <u>Monell</u> claim against the City of Durham purports to incorporate all previous paragraphs of the complaint, suggesting that it seeks to encompass all conduct. However, it does not expressly allege conduct occurring post-conviction to the extent alleged in the fourth through sixth causes of action. (Doc. 1 ¶ 132.) Therefore, the court cannot say at this stage that there is necessarily duplication of every cause of action.

However, with the court's dismissal of the negligence claim against Soucie and Pennica, and because Howard voluntarily

dismissed the claim against Sarvis, the fifth cause of action now only relates to Dowdy and Smith, who were involved only as to pre-conviction conduct. As such, it is duplicative of the second cause of action against the City of Durham, and the negligence claim as to Dowdy and Smith in their official capacity should be dismissed. For this same reason, the sixth cause of action against Dowdy and Smith only involves pre-conviction conduct and, to that extent, duplicates the allegations of the second cause of action against the City of Durham. Moreover, the seventh cause of action for malicious prosecution is plainly directed to pre-conviction conduct and duplicates the allegations of the <u>Monell</u> claim in the second cause of action. Therefore the motion to dismiss these official capacity claims in the fifth, sixth, and seventh causes of action will be granted. Otherwise, the motion is denied without prejudice to the parties providing a more thorough analysis of the argument on any remaining cause of action. To be sure, even if an official capacity claim can proceed as to any Individual Defendant, there is no vicarious municipal liability, and the City of Durham can be liable only if the requisites of <u>Monell</u> – municipal policy or custom - are proven. The court of course expresses no opinion on the viability of any claim against the City of Durham in counts four through seven, as the Individual Defendants only move to dismiss these claims on the grounds that they are duplicative. (Doc. 14 at 10-11; Doc. 21 at 9-10.)

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the Individual Defendants' motion to dismiss (Doc. 13) is GRANTED IN PART and DENIED IN PART, as follows:

1.   The motion to dismiss the fifth cause of action for negligence against Soucie and Pennica in their individual capacity is GRANTED, and those claims are DISMISSED WITHOUT PREJUDICE;

2.   The motion to dismiss the fifth cause of action for negligence against Dowdy and Smith in their official capacity as duplicative of the Monell claim against the City of Durham is GRANTED, and those claims are DISMISSED WITHOUT PREJUDICE;

3.   The motion to dismiss the sixth cause of action for intentional infliction of emotional distress against Dowdy and Smith in their official capacity as duplicative of the Monell claim against the City of Durham is GRANTED, and those claims are DISMISSED WITHOUT PREJUDICE;

4.   The motion to dismiss the seventh cause of action for common law malicious prosecution claim against Dowdy and Smith in their official capacity as duplicative of the Monell claim against the City of Durham is GRANTED, and those claims are DISMISSED WITHOUT PREJUDICE;

5.   The motion to dismiss all other claims is DENIED.

/s/   Thomas D. Schroeder
                                  United States District Judge

March 31, 2018