IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DARRYL HOWARD,                        )
                                      )
            Plaintiff,                )
                                      )
      v.                              )
                                      )
CITY OF DURHAM, DARRELL DOWDY,        )
in his individual capacity;           )
MICHELE SOUCIE, in her                )          1:17cv477
official and individual               )
capacities; SCOTT PENNICA, in         )
his official and individual           )
capacities; MILTON SMITH, in          )
his individual capacity,              )
                                      )
            Defendants.               )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

        This lawsuit arises out of the conviction and incarceration of Plaintiff Darryl Howard for the 1991 murders of Doris and Nishonda Washington and the subsequent burning of their apartment. In 2016, Howard was granted a new trial based on the discovery of exculpatory DNA evidence and released from prison. The State of North Carolina subsequently dismissed all criminal charges against him.

        Howard alleges that Defendants City of Durham, Darrell Dowdy -- an investigator with the Durham Police Department ("DPD") -- and Milton Smith -- a member of the Durham Fire Department -- fabricated and suppressed evidence to obtain his conviction. He also alleges that, following his conviction, two other members of

the DPD -- Michele Soucie and Scott Pennica -- purposefully withheld exculpatory evidence in violation of a state court order, resulting in his unnecessary continued incarceration. Before the court are motions for summary judgment by Defendants Dowdy (Doc. 79), Smith (Doc. 75), Pennica and Soucie (Doc. 77), and City of Durham (Doc. 81). Howard filed a consolidated response (Doc. 87), and Defendants filed reply briefs (Docs. 100, 101, 104, 105). City of Durham also moves for judgment on the pleadings as to Howard's state constitutional claims against it. (Doc. 73.) Howard filed a response (Doc. 90), and the City filed a reply (Doc. 103). Following oral argument on the motions conducted via video-conference, the parties filed supplemental briefing. (Docs. 115, 118.) For the reasons set forth below, Defendants' motions will be granted in part and denied in part.

I. **BACKGROUND**

    A. **Facts**

The facts presented, taken in the light most favorable to Howard as the non-moving party, show the following[1]:

    1. **The Murders and Investigation**

Doris Washington and her 13-year-old daughter, Nishonda, were

---

[1] Howard claims that substantial parts of Dowdy's reports were fabricated. For purposes of context, the court lays out the facts here based on Dowdy's reports and addresses the alleged fabrications later in the opinion. In so doing, the court relies on the record and not on Howard's characterization of it, which was less than fully accurate.

murdered in the early morning of November 27, 1991, in their apartment in the Few Gardens public housing development in Durham, North Carolina. (Doc. 88-5; Doc. 87-8 at 5.)[2] The Durham Fire Department was initially called to the scene because Doris's apartment had been set on fire. The firemen found Doris's and Nishonda's bodies while responding to the fire. (Doc. 87-8 at 5.) Both were naked, lying face down on a bed, and showed signs of strangulation. (Id. at 5, 7.)

Defendant Dowdy, a detective in the DPD, was assigned as the lead investigator in the murders and, as a result, conducted most of the interviews with witnesses, which he recorded in his investigative report. (Doc. 72-1 at 351:16-352:2; Doc. 87-8.)

The morning after the murders, Plaintiff Howard was arrested in Few Gardens for trespassing and driving without a license. (Doc. 87-8 at 7.) According to the DPD report, in the course of his arrest he had a conversation with the officer about the deaths of Doris and Nishonda, as Howard knew Doris personally. (Id. at 7-8.) Howard was brought in to DPD and questioned specifically about the murders. (Id.; Doc. 87-13 at 526:7-25.) The DPD reports indicate that during the booking process, Howard, unprompted by officers, said he could not understand why Doris had killed her

---

[2] All citations to the record are to the ECF docket page except for testimony, which is cited to the actual trial and deposition transcript page.

3

daughter and then herself. (Doc. 87-8 at 8.) Howard denied any involvement and was allowed to leave that day. (Doc. 88-3 at 257:21-25, 265:5-8.) Dowdy spent the rest of that afternoon in the Few Gardens development interviewing residents. (Doc. 87-8 at 9.)

That same morning after the murders, autopsies of Doris and Nishonda Washington were completed. (Doc. 87-17; Doc. 87-18.) The pathologist concluded that Doris had died of blunt force injury to the abdomen (Doc. 87-17 at 2) and Nishonda had died of ligature strangulation (Doc. 87-18 at 2). Doris also had a ligature mark around her neck and showed signs of strangulation. (Doc. 87-17 at 10.) Sperm was found in Nishonda's anus. (Doc. 87-18 at 6.) Doris had a laceration in her vagina (Doc. 87-17 at 3), but the autopsy showed no presence of sperm (id. at 9). Both Doris and Nishonda had been killed before the fire started. (Doc. 87-17 at 10; Doc. 87-18 at 6.)

Three days later, at 1:40 a.m. on November 30, 1991, Dowdy interviewed Roneka Jackson. Jackson had been arrested earlier in the night on unrelated charges and had volunteered information about the Washington murders. (Doc. 87-8 at 11.) In a taped interview, Jackson, who was 17 years old at the time, told Dowdy that at about 10:00 p.m. on the night of the murders she overheard Howard get into an argument with Doris Washington over the fact that Doris was allowing Howard's girlfriend to prostitute herself

4

at Doris's apartment. (Id. at 12-13, 18.) According to Jackson, Howard claimed that his girlfriend was in Doris's apartment and after Doris refused to allow Howard in, Howard said he would come back and kill Doris and her daughter, Nishonda.[3] (Id. at 12, 13, 18.) Jackson said she knew the girlfriend but not her name and never saw her leave Doris's apartment that night. (Id. at 12, 18.) Later that night, Jackson said, she saw Howard and his brother Bruce "come out the house" where Doris Washington lived carrying a television and VCR. (Id. at 13-14.) About ten or fifteen minutes later, Jackson saw smoke coming from the apartment. (Id. at 19-20.)

On December 1, another DPD officer received a tip from an informant suggesting that Doris and Nishonda had been murdered because Doris owed $8,000 to drug dealers from New York or Philadelphia. (Doc. 88-39 at 2.) The tip stated that Doris was using her apartment to stash drugs for these dealers who later found some of the drugs missing when they came to pick them up, hence Doris's $8,000 debt. (Id. at 2-3.) The tipster said that when the drug dealers came to collect their money, "they first raped [Doris] before strangling her." (Id. at 3.) Nishonda, the tipster surmised, may have "unknowingly walked in" on the scene and was killed as a result. (Id.) One of Dowdy's superiors, E.E.

---

[3] Dowdy's report refers to Doris's daughter as "Lashonda." (Doc. 87-8 at 13.)

Sarvis, informed Dowdy on the margins of the tip sheet that there might be "something to this" because he did not believe the sexual assaults were public knowledge at the time. (Id. at 2.) Dowdy, however, did not recall following up on the information contained in this tip, even though it had been flagged by a superior. (Doc. 87-2 at 216:1-217:25.) He instead believed that the tip did not contain relevant information because he did not know the informant who provided the tip and could not "tangibly tie [that] person to the case." (Id. at 220:15-25.)

On December 3, 1991, Dowdy interviewed Kelvin Best.[4] Dowdy reported that Best told him that, on the night of the murders, he had seen Howard and his brother Kenny come around the back of Doris's apartment building carrying a television and VCR. (Doc. 87-8 at 24.) Two days later, Dowdy interviewed Dwight Moody Moss,[5] who was with Best that night. (Id.) Dowdy's report states that Moss provided a signed statement that around 4:00 p.m. on the afternoon of the murders, he observed Howard and Doris arguing. (Id. at 25.) Dowdy reported that Moss heard Howard yell at Doris, "I am going to kill you bitch." (Id.) That night, just prior to midnight, Moss reported seeing Howard, his brother Kenny, and an unidentified woman go to Doris's apartment; the woman knocked on

---

[4] Dowdy's report identifies him as "Kevin Best." (Doc. 87-8.)

[5] Dowdy's report refers to Moss as "Dwight Moody." (Doc. 87-8.) As detailed below, Howard claims that Dowdy fabricated the entirety of Moss's statement.

6

Doris's front door and went in while Howard and his brother went around the back. (Id. at 25-26.) Moss saw the woman leave Doris's apartment 30 to 40 minutes later and then saw Howard and Kenny "come around from the back of Doris' building." (Id. at 26.) Howard appeared to be carrying a television and Kenny a VCR. (Id.) Shortly thereafter, Moss saw smoke coming from the back of Doris's apartment. (Id.)

In early January 1992, Dowdy spoke to Gwendolyn Roper Taylor. According to Dowdy's report, Taylor said that Howard had told her in a club that he had "killed the bitch and her daughter to [sic]," in reference to Doris and Nishonda. (Id. at 27.) Taylor also told Dowdy that she did not want to testify in court about it. (Id. at 27-28.)

In February 1992, three months after the murders, Dowdy requested, and the DPD Chief of Police, Trevor Hampton, approved and wrote, a request to the Governor of North Carolina to offer a $10,000 reward for information regarding the murders. (Id. at 28; Doc. 88-28.) In requesting the reward, the DPD told the Governor there were no leads in the murders, even though Dowdy suspected Howard as the culprit. (Doc. 88-28; Doc. 87-2 at 106:14-21.)[6] The Governor granted the request, and the reward was posted in the Few

---

[6] Dowdy stated in his deposition that he may have told the Chief of Police there were suspects in the case (Doc. 87-2 at 109:4-7, 110:11-14), but the Chief nevertheless told the Governor that DPD had developed no leads (Doc. 88-28).

7

Gardens complex on March 19, 1992. (Doc. 87-8 at 28; Doc. 88-27.)

On June 2, 1992, Dowdy interviewed Eric Lamont Shaw. Dowdy reported that Shaw had witnessed a meeting of a gang known as the New York Boys, in which the gang ordered Howard to kill Doris to settle debts she owed them. (Doc. 87-8 at 28-29.) On June 24, Dowdy interviewed Howard again while he was in the hospital after being wounded by members of the New York Boys. (Id. at 29.) According to Dowdy, Howard told him that on the night of the murders he had been in another apartment unit where he had bought a VCR and boom box in exchange for crack cocaine. (Id.)

On October 10, 1992, DPD arrested Angela Southerland[7] for prostitution. (Doc. 88-30.) When she was arrested, officers reported to Dowdy that she claimed to have been with Howard the night of the murders and had information that only someone who actually saw the murders would know. (Doc. 87-2 at 320:24-321:5.) Believing she matched the description of a woman who witnesses had reported seeing with Howard in Few Gardens on the night of the murders,[8] Dowdy interviewed Southerland and audio-recorded the interview. (Id.; Doc. 87-8 at 30.) The transcript of the interview reflects that Southerland told Dowdy she had seen Doris

---

[7] Southerland went by various names during the course of the investigation and trial: Angela Oliver, Theresa Simpson, and Angela Rogers. (Doc. 72-1 at 283:4-11, 305:23-306:13.)

[8] Howard claims he was with Natasha Mayo, who testified for him as an alibi witness at trial. (Doc. 72-1 at 455-97.)

Case 1:17-cv-00477-TDS-JEP   Document 119   Filed 09/16/20   Page 8 of 135

and Howard arguing about drugs and money the day of the murder, that she herself was inside Doris's apartment when the murders occurred, and that she had seen Howard attack Doris while Howard's brother, Harvey, was present in the apartment. (Doc. 88-32 at 2-3, 6-7, 10.) Southerland also stated that, after the murders, only Harvey (who went by the name "Wiz") left Doris's apartment through the back door –- Howard himself left the apartment through the front. (Doc. 87-8 at 39.)

On October 27, Dowdy spoke with Kelvin Best again. Best provided an updated statement in which he said that he had seen Howard and his brother (whom Best did not identify) leave from the back door of Doris's apartment just before the fire was detected. (Id. at 43-44.)[9]

On November 11, 1992, Dowdy spoke with Roneka Jackson for a second time. (Id. at 44.) Dowdy presented Jackson with a photographic lineup and she identified Angela Southerland as the person with whom she had seen Howard the night of the murders. (Id.) In a different photographic lineup, Jackson identified Harvey Howard as another individual she had seen with Howard that night. (Id.) Following this interview, Dowdy recommended that Jackson receive the $10,000 reward[10] the Governor had authorized

---

[9] Howard contends that Dowdy fabricated this second statement from Best in order to obtain more inculpatory evidence.

[10] It is unclear whether Jackson received the $10,000 reward. She was

because she had provided key information, namely identifying Southerland as being with Howard the night of the murders. (Doc. 87-2 at 284:2-8.)[11]

The next day, November 12, 1992, Dowdy obtained warrants for the arrest of Darryl and Harvey Howard for the murders of Doris and Nishonda Washington. (Doc. 87-8 at 44-45.) Both were arrested and taken into custody.

Shortly thereafter, and after speaking with Dowdy, Defendant Milton Smith, an investigator with the Durham Fire Department who had been assigned to investigate the burning of the Washingtons' apartment, sought warrants for Darryl and Harvey for arson. While booking the two brothers, an exchange occurred between Smith, Darryl, and Harvey that forms the crux of Howard's claims against Smith. In his report documenting the exchange, Smith wrote that Harvey

> stated he was not even at [the Washingtons' apartment] when Doris Washington was killed and her house was set on fire. . . . Darryl Howard stated that [Harvey] was not with him in Few Gardens when this 'thing went down'. Darryl Howard stated that his brother Kenneth was with him. [Smith] then asked Darryl Howard, 'so [Harvey] was not with you, huh? So your brother Kenneth was with you

---

set afire and brutally murdered by members of the New York Boys gang in 1995, a few months after she testified in Howard's trial. See United States v. Celestine, 43 F. App'x 586, 589-90 (4th Cir. 2002) (per curiam).

[11] Howard contends that Dowdy fabricated this evidence, arguing that Jackson originally did not report seeing a woman with Howard that night, and had identified Kenny Howard, not Harvey, as the brother with him.

> when you did the thing'? Darryl Howard stated that 'yes, it was me and Kenneth.'"

(Doc. 88-40 at 5-6.) Smith characterized this statement as a confession by Howard that he had committed the murders and arson.[12]

In February 1993, the DPD obtained samples of Howard's DNA to test against the sperm found in Nishonda Washington's anus. (Doc. 87-8 at 46.) A March 1993 DNA test report indicated the presence of sperm in Nishonda's vaginal and rectal swabs, which had been left within 24 hours of Nishonda's autopsy. (Doc. 72-1 at 79:19-80:25.) The testing excluded Howard as the source of this sperm. (Doc. 87-21.) Dowdy thus understood that if the killer had had sex with Nishonda, Howard was not the killer. (Doc. 87-2 at 183:24-184:4.)

As Howard's trial neared, and after Dowdy had submitted his investigative report to the prosecutors (and thus to Howard's counsel) in preparation for the trial, the lead prosecutor in Howard's case, Michael Nifong, stressed to Dowdy the importance of finding out if Nishonda had a boyfriend -- thus explaining the presence of sperm unattributable to Howard -- and if so, to locate him. (Doc. 88-6 at 74:25-77:5.) Sometime before trial, Dowdy reported back to Nifong that Nishonda -- who was 13 at the time -- had been staying with her boyfriend up until the evening of her

---

[12] Howard argues that Smith purposefully misreported the conversation and that he (Howard) was actually clarifying that Kenneth and not Harvey had been with him in Few Gardens on the night of the murders.

murder, thus explaining away the sperm evidence. (Doc. 87-2 at 170:6-21.) Dowdy never learned the boyfriend's name, never located him, and never found the address where Nishonda and her boyfriend were staying prior to her murder. (Id.)

All of the information that Dowdy believed to be relevant to Nishonda's whereabouts was contained in his report. (Id. at 62:7-63:18.) But his report contains no information regarding his investigation into Nishonda's boyfriend, and indeed contains testimony from a witness that Nishonda had returned to Doris's apartment on Sunday -- two days before the murders and not the evening before. (Doc. 87-8 at 10; Doc. 87-16.)[13]

In 1994, Roneka Jackson became a registered confidential informant for another investigator with the DPD on an unrelated matter. (Doc. 80-13 at 84:6-85:6.)

### 2. Howard's Trial

Howard's trial began on March 27, 1995. (Doc. 72-1.) One of the first witnesses to testify was the pathologist who had performed the autopsies of Doris and Nishonda Washington. He testified that, in his best estimate, the sperm found in Nishonda

---

[13] Howard argues that Dowdy actually performed no additional investigation and instead gave Nifong false, unsupported conclusions about Nishonda's whereabouts. As detailed infra, Dowdy claims that his additional investigation merely turned up no new evidence about Nishonda's boyfriend other than the evidence contained in his report, and so he had no additional information for Nifong on that score, and that his oral interviews of neighbors, consistent with a newspaper report, confirmed Nishonda's return the day of the murders.

Washington's anus had been deposited within 24 hours of the autopsy, which had occurred around 10:00 a.m. the day after the murders.  (Id. at 80:17-25.)

Roneka Jackson testified, first relaying the argument she had witnessed between Howard and Doris Washington the afternoon before the murders in which Howard threatened to kill Doris and her daughter.  (Id. at 173:2-175:3.)  She also testified that later that evening she observed Howard's girlfriend -- whom she could not identify by name -- let Howard in to Doris's apartment.  (Id. at 179:24-180:18.)  She said that later that night she observed Howard and his brother Bruce "coming out . . . the back porch" of Doris's apartment carrying a television.  (Id. at 176:13-177:15.)  The subject of her status as a registered confidential informant with DPD was not raised during her testimony.

Rhonda Davis was the next witness.  She testified that Doris Washington had been a friend of hers for several years and that she knew Howard since childhood.  (Id. at 195.)  She said she was with Doris from about 10:30 a.m. to about 10:30 p.m. just before the murders, getting high on cocaine.  (Id. at 195:16-196:8.)  As Davis was leaving, Doris was directing her daughter, Nishonda, to go to bed, and Doris said she was going "for a run" (to get drugs).  (Id. at 197:4-198:7.)  Davis did not see Doris again that night but did go back to her apartment between 11:30 p.m. and midnight to buy more crack cocaine.  As she knocked on the locked screen

13

door, she testified, about five minutes passed and she saw Howard look out the window and say they "was busy." (Id. at 198:25-200:2.) She heard dishes rattle in the sink. (Id. at 200:3-12.) She went to the front door and knocked, and though nobody came, she "heard somebody going up the steps." (Id.) She then left. On cross-examination, Davis testified she did not hear any threats to Doris earlier that day, which was contrary to the testimony of other prosecution witnesses. (Id. at 202:25-203:16.)

Kelvin Best testified that he had seen Howard and his brother carrying a television and what appeared to be a VCR from the Washingtons' apartment building. (Id. at 228:4-19.) When asked if he could "tell exactly where [Howard and his brother] had come from" when he saw them, Best said they had come "[r]ight behind Doris's -- right out the back door of Doris [Washington's] house." (Id. at 228:20-23.) When asked to clarify if he was saying he had seen them come "[o]ut of the back door of Doris's house," Best responded, "Yes." (Id. at 228:24-25.)

Dwight Moody Moss took the stand next. He testified that he was familiar with Howard and that at about 4:00 p.m. on the afternoon before the murders, he observed Howard outside Doris's apartment arguing that she had "messed up the money" and "messed up the drugs." (Id. at 241:18-242:24.) Howard yelled to Doris, "you will get yours," and "I'll kill you." (Id. at 243:3-18.) Later that evening at about 11:30 p.m., he saw Howard "coming

14

around from the back side of [Doris Washington's] apartment"
complex. (Id. at 244:13-15, 245:16-24.) Moss was then presented
with his signed statement from his interview by Dowdy. Moss
confirmed that the signature at the bottom of the statement was
his, even though the content of the statement was in Dowdy's
handwriting. (Id. at 247:1-14, 247:23-25.) The prosecutor asked
if Moss remembered making this statement to Dowdy, and Moss
responded that he did not remember saying everything in the
statement. (Id. at 248:25-249:8.) However, Moss confirmed that
he had read the statement Dowdy wrote out before signing it. (Id.
at 250:4-11.) On cross-examination, Moss testified that, because
it had been four years since he had given his statement to Dowdy,
he struggled to distinguish between what he had actually told Dowdy
and what rumors he had generally heard about the murders. (Id. at
265:3-25.)

DPD Investigator Robby Davis testified after Moss. Davis
relayed that on the morning after the murders he arrested Howard
for trespassing in Few Gardens. (Id. at 267:1-4, 270:13-272:8.)
While he was in the process of booking Howard, Davis testified,
Howard brought up the deaths of the Washingtons and commented,
among other things, that he knew Doris had been mad at Nishonda
for dating an older man. (Id. at 273:1-24.) He further testified
that during the booking process, Howard, unprompted, repeatedly
commented that "he didn't know why" Doris killed Nishonda and then

15

herself.  (Id. at 273:14-274:7.)

Angela Southerland testified next.  She was an acknowledged cocaine user, both at the time of the murders and at the time of trial.  (Id. at 307.)  Southerland was recalcitrant and argumentative, so much so that she had to be brought to court under arrest as a material witness and the court permitted the prosecution to treat her as a hostile witness.  (Id. at 290:4-10.) After she refused to be responsive to questioning, prosecutors played her taped interview with Dowdy for the jury, with no objection (actually, with encouragement) from Howard's counsel. (Id. at 296:3-297:1.)  On the tape (a transcript of which is provided in the record),[14] Southerland stated that she accompanied Howard to Doris's apartment the day of the murders:

> Me and him went there to pick up his [drug] package or
> his money [from drug sales].  We went there early that
> day, she didn't have it.  He said if you don't have it,
> I'm going to kill your motherfucking ass, if you don't
> have my damn money or my packages when I get back.
> . . . We picked up his brother, Wiz.  We call him Wiz,
> Harvey Howard, and we went back.  She didn't have it.  I
> went in the house with him.  She still didn't have his
> stuff, so he started jumping on her and after a while,
> he grabbed her.  He pushed her against the wall at first.
> He grabbed her, he said let's go.  He was taking her
> upstairs.  He told me to get outside, gone, cause, he
> didn't want me to be around what he [was] fixing to do
> and I asked him not to do it, and the next thing I know,
> there was a lot of noise.  She was hollering and
> screaming.  I stood outside on the porch.  Wiz went in

---

[14] There is no copy of the recording in the record.  Howard requested that Defendants provide a copy, but it was never turned over.  (Doc. 87 at 23 n.9.)  The Durham County Superior Court confirmed that the tape was never entered into evidence at Howard's trial, despite being played aloud for the jury.  (Doc. 89-5.)

there. He was in there with them. The next thing I
know the lights came on upstairs and after while it got
quiet. He turned off the lights. He left and he did
set a fire.

(Doc. 87-8 at 31-32.) When asked how she knew he set a fire, she

stated:

Because me and Wiz was outside when the fire started and
he jumped in the car and we left. He was the only person
in the house.

(Id. at 32.) Later in the interview, Southerland went into more

detail:

First she stood to the door. She was talking. He
started getting rowdy, so he went on in the house. She
didn't have what he wanted. He started pushing her
against the wall, arguing and cussing. He pulled out a
gun at first and he told me to go on back to the car. I
didn't go to the car. I stood at the door, and I know
he made her go upstairs and she said for what, my
daughter or something, my daughter here, my daughter
here. I heard her saying that and he started cursing.
They went upstairs, the lights went on. I heard her
screaming and stuff. The next thing I know that was it.
He called his brother. I went on to the car and then I
seen the fire and he told Wiz, he said he had to burn
them up. He didn't want to leave no evidence.

(Id. at 35-36.) When asked where Howard hit Doris, Southerland

stated:

In the face. He pushed her up against the wall. In her
chest and I said, Darryl please don't. I said, it ain't
worth it, let's go, please, let's go and that's when he
told me to get on out. He said gone out there. He said,
cause I don't want you to be involved in this. I said,
but Darryl I'm ready to go. He said, well if I leave
and he decided what he was going to do, so I just stood
to the door and I heard him making her go upstairs. She
was hollering her daughter, her daughter was there, her
daughter.

17

> . . . and I said Wiz please stop him, stop him.  He said,
> she shouldn't have fucked up his damn shit.  She know[s]
> what time it was.

(Id. at 36, 38.)

Southerland testified that Dowdy had stopped the interview multiple times saying "something ain't right," "turn off the tape," and "come on now." (Doc. 72-1 at 299:19-300:25.) She acknowledged that the interview took almost 46 minutes, but the tape was much shorter.  (Id. at 307-08.)  During the course of her direct examination, she said that the prosecution "can't force me to come and tell something I didn't see." (Id. at 304:10-11.)  When asked by the prosecutor if she had told Dowdy the truth during her interview, Southerland avoided answering the question (id. at 300:15-25), then this exchange occurred:

> Q: Did you hear anything that we just played [from
> Southerland's interview with Dowdy] for the jury that
> was not true?
>
> A: I don't want to talk about that.
>
> Q: Excuse me?
>
> A: I don't know.
>
> Q: Now, I want to tell the jury if some of that is not
> true.
>
> A: It's not.
>
> Q: What part is not true?
>
> A: I don't know.
>
> Q: What part is not true?

18

A: It's true.  I said it.

Q: No ma'am.  I want you to tell this jury -- I want you to look them in the face and tell them what part is not true.

A: I said I am not saying anything.

(Id. at 300:14-301:4.)   At the end of her direct testimony, Southerland testified as follows:

Q: Miss Oliver, did you tell the truth to Darryl Dowdy about what the defendant did that night when you talked to him on this tape?

MR. VANN: Objection.
COURT: Overruled.
BY MR. NIFONG:

Q: Did you?

A: I told you one time.

Q: Tell me again.

A: Yeah.

(Id. at 305:6-15.)   On cross-examination, as to the contents of the tape she testified, "Honestly, I didn't lie about that."  (Id. at 213:6-10.)  She denied that she gave the statement to Dowdy to "get out" or that she "would have said anything" to get back to her cell to sleep.  (Id. at 312:20-25.)

Milton Smith, who by the time of trial was Durham's fire marshal, testified next.  He discussed his work investigating the arson of the Washingtons' apartment the night of the murders and then described the night he arrested Howard and his brother Harvey for arson.  Smith stated that, after he completed booking Darryl

19

Howard and had started booking Harvey, Darryl said that Harvey "was not with him in Few Gardens when this incident took place, that his brother Kenneth was with him." (Id. at 320:1-3.) Smith said he turned around and said to Howard, "So [Harvey] was not with you, huh. So, it was your brother Kenneth with you when you did this thing." (Id. at 320:11-13.) Smith testified that Howard responded "yes, it was me and Kenny." (Id. at 320:17-19.) Smith testified that he did not need to clarify what he meant by "this thing" because it was clear to him that they were discussing the murders and arson. (Id. at 324:15-19.) Smith also testified that, even though Howard had seemingly implicated his brother Kenny in whatever had occurred, Smith continued to book Harvey for arson and never investigated Kenny or issued a warrant for his arrest. (Id. at 327:16-22.)

Gwendolyn Roper Taylor testified next. She said she had known Doris since high school and Howard all her life. (Id. at 332:10-14, 332:22-333:1.) She related how she had heard Howard tell someone at a crowded drink house that he had killed the Washingtons. (Id. at 333:17-24.) She clarified that Dowdy's report had incorrectly stated that Howard had spoken directly to her; instead, she said, she heard Howard make the statement to someone else. (Id. at 333:22-24, 338:12-23.) On cross-examination, Taylor stated that she did not know who Howard was speaking to and did not remember what month or day she had

20

overheard the conversation. (Id. at 336:11-337:7.) She also testified she did not know if Howard was being truthful or had made the statement in jest. (Id. at 337:12-20.) She did say, however, that she was testifying from what she remembered, not from what Dowdy had written in his report. (Id. at 338:4-23.) She also denied that Dowdy had promised her anything for her testimony. (Id. at 339:17-19.)

Eric Campen, Jr., DPD crime scene investigator, testified that after the fire he walked through Doris's apartment and observed a spot near a television where a VCR had been, based on the dust pattern, surmising that someone had recently removed a VCR or similar electronic device. (Id. at 346:5-25.)

Dowdy was the final witness for the State. Because Moss had claimed not to remember making various statements attributed to him in his signed statement, Dowdy was permitted to read Moss's signed statement aloud for the jury. The court gave limiting instructions to the jury about those portions of Moss's statement. (Id. at 372:8-378:2.) In his statement, Moss said that he was at Few Gardens the afternoon of the murders and saw Howard yelling up to Doris's upstairs window over money because she had "messed up" people's "money" and "packages." (Doc. 88-21 at 2.) Howard told her, "I'm going to kill you bitch," to which Doris, who would not let him in, said that he was "not going to do shit." (Id.) Later that evening at about 11:30 p.m. to 11:40 p.m., Moss's statement

21

reflects, Moss saw Howard and his brother Kenny, with another woman (who is described in some detail), leave Sharon Bass's apartment; all three went to the back of Doris's apartment building, but the female then came around and entered the front of the building. (Id. at 3.) At about 12:10 a.m., Moss saw Howard and Kenny "come from around the back of Doris's building," and Howard was carrying a small television and Kenny had what looked like a VCR. (Id. at 4.) Fifteen to twenty minutes later, he saw smoke from Doris's apartment. (Id.)

Dowdy then testified that Gwendolyn Roper Taylor had told him that while at a club "she herself had talked to Darryl Howard" about "why had he killed and did that to Doris and Nishonda Washington." (Doc. 72-1 at 381:16-21.) When asked about the videotaped interview with Angela Southerland, Dowdy testified that he was interrupted by other officers for ten to fifteen minutes. (Id. at 385:24-386:7.) He denied feeding details to Southerland and testified that she actually provided new information that he did not know before interviewing her. (Id. at 386:18-387:8.) Dowdy added, on redirect, that Nishonda Washington had been away from the apartment with her boyfriend for almost a week, returning on the evening of November 26 -- the night prior to her murder. (Id. at 423:8-19.) He then stated that he never found evidence that suggested that Howard had had sexual intercourse with either of the victims, and that he did not investigate the murders as a

22

sexual assault case.  (Id. at 424:21-425:10.)

After the State rested, Howard's girlfriend, Natasha Mayo, testified first for the defense.  She acknowledged that Howard had been looking for her at Doris's apartment and was upset because he knew that Doris encouraged her women friends to do sexual favors for drugs, but Mayo said the event occurred two days before the murders.  (Id. at 462, 485, 493.)  Mayo also said that Howard "sold drugs for a living" and stated that she and Howard were in Few Gardens to buy drugs and fled when they saw smoke coming from Doris's apartment because Howard feared being charged with trespass.  (Id. at 466:24-467:13, 468:1-9.)  Mayo also relayed how Dowdy presented her with "fake warrants" charging her with the arson and murders, laying them on the table as a threat to charge her for the crimes.  (Id. at 477:3-481:22.)  When Dowdy testified as a rebuttal witness, he confirmed that he had typed up warrants but had not fully filled out the applications.  (Id. at 603:25-604:7.)  He stated that, during the interview with Mayo, he never touched the warrants or mentioned them to Mayo but had placed them so they were clearly visible to her.  (Id. at 604:11-21.)

Howard testified in his own defense.  He admitted to having words with Doris about Mayo -- he said two days before her murder -- and acknowledged he was upset but denied threatening her.  (Id. at 511-13.)  He also admitted he talked with Doris in front of her house midday of her murder and that Doris said she "don't do her

23

[Mayo] like that," referring to her use of women to help get drugs. (Id. at 513:1-13.) Howard was present in Few Gardens the night of the murder. (Id. at 516:2-520:14.) According to Howard, he was with Mayo, his brother Kenny, and Sharon Bass; at about 12:30 a.m. or 1:00 a.m., Bass sent him to get some more drugs. (Id. at 517.) He and Mayo went to an apartment near Doris's apartment, got their drugs from "the boys" (without going inside), but left when they saw smoke coming from Doris's window for fear of being arrested for trespass. (Id. at 517-19.) They went back to Bass's and for the rest of the evening "s[a]t around and got high." (Id. at 522:3-7.) Howard denied any involvement in the murders. (Id. at 536:5-17.)

Howard recalled making statements to Officer Davis the next day but denied saying that Doris had killed herself; Howard surmised that Davis "have [sic] a tendency to misunderstand people" and added, "I mean I was kind of high and stuff." (Id. at 525:5-526:3.) Howard denied ever talking to Taylor. (Id. at 531.) When asked about his interactions with Milton Smith, Howard testified that Smith "kept asking [him] about Harvey been [sic] in Few Gardens. Harvey wasn't in Few Gardens that I know of." (Id. at 534:13-16.) Howard told Smith where he had been that night -- with Kenny and not Harvey -- and then Smith "took that and he wrote it the way he wanted to say it." (Id. at 534:18-20.) He further stated that Smith had asked him whether Harvey was in Few Gardens

24

that night, but that he did not write that question down in his report.  (Id. at 535:3-9.)  Howard did acknowledge having told Smith he was a "smart mother fucker."  (Id. at 535:10-13.)  In any event, Howard denied ever confessing to the murders.  (Id. at 554:1-12.)

On cross-examination, Howard testified he sold a $20 rock of crack cocaine for a VCR and "boombox" for Bass the night of the murders.  (Id. at 549:6-15.)  He also denied he was selling drugs from Bass's apartment, contradicting Mayo's testimony that he was, saying "[s]he don't know what be going on."  (Id. at 548:10-21.)

The State waived its opening argument, so Howard's counsel argued first.  He contended that Howard was high the night of the murders and noted that Howard was present at Few Gardens to buy and use drugs.  (Id. at 683-84, 691; see also id. at 503:6-7 (acknowledging Howard had been arrested in Few Gardens "maybe 70 times").)  He pointed out the inconsistencies in the various eyewitnesses' statements as to what they claimed they saw just before the murders, contending that the State's case was built on inherently inconsistent accounts that were influenced by the promise of reward money.  Apparently surprised by Rhonda Davis's testimony that she saw Howard answer the door at Doris's just prior to the murders, counsel commended Dowdy's candor for acknowledging that Davis never mentioned that in her statement to him.  (Id. at 681.)  He even said he had known Dowdy "for a number of years,"

25

and "[h]e's a very nice guy." (Id. at 701:25.)  As to Southerland, however, he flat our called her a "liar" and denied that Dowdy told her what to say.  (Id. at 694:12-695:12.)  Counsel pointed out the obvious lack of any DNA tie between Howard and the victims in what he characterized as a sexual assault.

The State argued that the case was "never about sex" but was about "money and drugs."  (Id. at 738.)  If Howard was telling the truth, the State argued, then every other witness had to be lying, which was unlikely.  Counsel contended that the inconsistencies in eyewitness testimony were understandable since Howard was such a frequent trespasser at Few Gardens, but that they were not material because it was the commonalities of the testimony that mattered. Sutherland was said to be the "most important witness," and the State rebutted any claim that she was intentionally seeking to wrongfully blame Howard by pointing out that she had to be arrested to compel her attendance for trial as a material witness. (Id. at 735:22-737:8.)  To rebut any claim that the New York Boys, not Howard, committed the murders, the State pointed out that Howard had acknowledged in his testimony that he had been shot five times by the New York Boys, even though he denied working for them. (Id. at 734:22-735:21.)

Following almost a day of jury deliberations (Doc. 89-6 at 116:23-117:3), Howard was convicted of two counts of second degree murder and one count of first degree arson, and he was sentenced

26

to 80 years of imprisonment.  (Id. at 765:18-766:10, 777:8-778:23.)
In addressing the court, he continued to profess his innocence.
(Id. at 775:25-776:8.)

### 3. Post-conviction Investigation

In 2009, pursuant to North Carolina law allowing a defendant
to request postconviction DNA testing, see N.C. Gen. Stat. §§ 15A-
269–270.1, Howard filed a motion to retest the rape kits for Doris
and Nishonda.  (Doc. 89-11.)  Dale Morrill, a prosecutor in the
Durham County District Attorney's office, was assigned to Howard's
motion for DNA testing.  (Doc. 89-13 at 140:5-15.)  In February
2010, Morrill informed DPD -- which maintained the physical
evidence from Howard's criminal case -- about Howard's DNA-testing
motion.  (Id. at 146:2-20.)  After Morrill agreed to voluntarily
cooperate with Howard's counsel in inspecting the physical
evidence (Doc. 89-15), a North Carolina Superior Court granted
Howard's motion for DNA testing in September 2010, ordering DPD
and the State Bureau of Investigation ("SBI") to prepare physical
evidence for testing (Doc. 89-16; North Carolina v. Howard, Nos.
92-CRS-28349, 92-CRS-28350, 92-CRS-28352, 2010 WL 10745832 (N.C.
Super. Ct. Sept. 8, 2010)).  The order identified Morrill as the
point of contact for the District Attorney's Office.  (Doc. 89-16
¶¶ 6, 11.)  Among other things, the order required the SBI, DPD,
and District Attorney's Office to inform Howard's counsel of any
biological evidence related to the case, which must be preserved.

27

(Id. ¶ 17.)

The new DNA testing, which occurred in December 2010, again conclusively excluded Howard as the source of the sperm found on Nishonda Washington's vaginal and rectal smears. (Doc. 87-9 at 1.) Testing on Doris Washington's rape kit identified sperm that had previously gone undetected. (Id.) Testing of this DNA indicated that it came from a different man than the sperm found from Nishonda's rape kit and excluded Howard as the source. (Id. at 5.)

The North Carolina Superior Court ordered the SBI to compare the DNA found in Doris's kit with the FBI's convicted offender DNA database ("CODIS") to identify the "actual perpetrator." (Doc. 89-17; North Carolina v. Howard, Nos. 92-CRS-28349, 92-CRS-28350, 92-CRS-28352, 2011 WL 12331548, at *1 (N.C. Super. Ct. Mar. 1, 2011).) The database search identified Jermeck Jones, a convicted felon, as a DNA match to the sperm found in Doris's rape kit. (Doc. 89-18.) SBI informed Scott Pennica, a sergeant at DPD, about the match, and told him that Morrill was working on the case. (Doc. 89-12.) When SBI sent Pennica the lab report identifying Jones as the DNA match, the report included a statement that the DNA analysis was not considered complete until a DNA sample from Jones was obtained and submitted to confirm the match. (Doc. 89-18.) This statement also advised that the District Attorney's Office had told SBI it would not be pursuing the CODIS hit as a

criminal case.  (Id.)

According to Pennica, Howard's case was the first instance in which DPD had originally obtained a conviction and then received post-conviction DNA evidence through CODIS showing that someone else may have committed the crime.  (Doc. 89-19 at 55:13-22; 60:20-61:13.)  Because of the novelty of the case, Pennica took time to read information about it, including the trial transcript.  (Id. at 54:21-25.)  Pennica recognized that while the burden of proving innocence rested with a defendant, it would reflect poorly on DPD not to act so he notified his supervisors and ensured that his investigators obtained the DNA from the potential suspect.  (Id. at 123:2-124:15.)  Thus, he took seriously the need to find Jones and obtain a DNA sample from him.  (Id. at 53:5-15.)  To help him, Pennica tasked Michele Soucie, a DPD investigator, with finding Jones and obtaining a DNA sample, in part because Soucie was good at documenting her work.  (Id. at 59:4-60:3; Doc. 89-12 at 3.)  Pennica updated Soucie about what he had learned about Howard's case, and Soucie spoke with SBI regarding the recent testing of the DNA samples.  (Doc. 89-26 at 44:5-25.)

Howard never received notice regarding the results of the new DNA testing, so he filed a motion for disclosure in September 2011, which the court granted (the "September 2011 Order").  (Doc. 89-23.)  Among other things, the order required the Durham District Attorney's Office to immediately share the name of the CODIS match

with Howard and his counsel and required both the District Attorney's Office and DPD to share "any information it possesse[d]" about the individuals identified via DNA-testing. (Id. ¶ 14.) At his deposition in this case, Morrill testified that his regular practice was to inform relevant state agencies about legal obligations they may have vis-à-vis a court order. (Doc. 89-13 at 172:1-173:9, 176:4-23.) But Howard's post-conviction counsel never served the September 2011 Order on DPD. (Doc. 71 (stipulation).) And Morrill has no recollection of reading the order (Doc. 89-13 at 249:14-250:3), nor did he remember specifically telling Pennica or anyone at DPD about their legal obligations under it (id. at 172:6-24). However, he did remember making certain efforts for his office to comply with it, such as ensuring that the DNA match to Jermeck Jones was turned over to Howard's counsel. (Id. at 249:6-250:22.)

Morrill recalled speaking with Pennica, his DPD contact on Howard's case, once or twice around the time of the order (id. at 256:13-24); Pennica likewise remembered having conversations with Morrill around the same time (Doc. 89-19 at 62:4-24). However, both Soucie and Pennica maintain that they never received or knew about the September 2011 Order during this time period. (Doc. 78-3 at 138:14-25, 140:16-141:8; Doc. 78-4 at 97:15-98:3, 99:2-5.)

In the meantime, Soucie had begun preparing a search warrant to obtain a DNA sample from Jones. (Doc. 89-21.) On December 14,

2011, Jones was arrested on a separate outstanding warrant and was taken into DPD custody.  Upon learning of Jones's arrest, Soucie applied to a magistrate for a search warrant to obtain a DNA sample from Jones.  (Doc. 89-26 at 33:5-17, 41:13-20.)  Soucie and Pennica hoped to interview Jones to see if they could uncover the truth about the Washington murders.  (Doc. 89-19 at 60:5-10, 79:2-6.)  Both officers participated in Jones's interview, or attempted interview, which was videotaped.  (Id. at 81:5-24; Doc. 89-26 at 50:4-51:8.)  At that time, officers obtained a buccal DNA sample from Jones.  (Doc. 89-26 at 79:9-11.)  Although a technician obtained the sample from Jones, Soucie ensured that the sample was sent to the SBI for testing.  (Doc. 78-4 at 83:1-20.)

When told that his DNA sample was for a murder, Jones stated that he had never murdered anyone.  (Doc. 89-29 at 6:5-6.)  Jones refused to waive his Miranda[15] rights and, as Pennica put it, "lawyered up."  (Doc. 78-3 at 68:24-69:5.)  Jones did claim that he did not know Doris Washington but that Nishonda had been his girlfriend.  (Doc. 89-29 at 8:12-17.)  He told the officers that he had had sex with Nishonda and had no idea why his DNA was found in Doris, with whom he denied ever having sex.  (Id. at 16:21-17:7.)  When he was left alone in the interview room, Jones made

---

[15] Miranda v. Arizona, 384 U.S. 436 (1966).

phone calls to unidentified individuals. Unbeknownst to him, a recording device in the room's thermostat captured his conversations.[16] In one call, Jones said that he was being interviewed about "the other Shonda and her mama," and that he had nothing to do with the murders, and he wondered aloud, "How the fuck my name come up?" (Id. at 10:13-25.) However, the only statements Soucie wrote down from Jones's interview was that Jones had said he "had nothing to do with" the murders, and that "Nishonda was his girlfriend but he never slept with her mom." (Doc. 89-20 at 5.) Because Jones had invoked his right against self-incrimination, Soucie and Pennica did not discuss the case with him further. (Id.)

According to Pennica, the interview with Jones was the last thing he did regarding Howard's postconviction investigation. (Doc. 89-19 at 111:19-112:6.) Soucie testified that she wrote up her report and submitted all relevant documents, including a copy of Jones's interview, to the DPD records department, "like I was told to do." (Doc. 89-26 at 80:7-11; Doc. 78-4 at 79:5-17.) She stated that nobody, including Pennica, told her to take any action beyond turning her reports over to the records department. (Doc. 78-4 at 84:11-85:3.) Her understanding from the information she received from the CODIS notification was that the District

---

[16] According to Soucie, there were "signs everywhere" indicating that interviews would be recorded. (Doc. 89-26 at 50:13-24.)

Attorney's Office "wasn't pursuing anything with it," so all she had to do was submit her report to the records department. (Id. at 85:3-5, 86:22-87:4; Doc. 89-18.)

The Durham District Attorney's Office depended on DPD –- here, Soucie and Pennica –- for any relevant updates and actions DPD had taken in regard to Howard's case. (Doc. 89-13 at 267:11-24; 274:4-275:12.) However, neither Soucie nor Pennica told Morrill or anyone else at the District Attorney's Office about the interview with Jones or the buccal swab they had taken from him, nor did DPD further investigate Jones following the interview. (Doc. 89-19 at 111:19-113:1.) Because he had never worked on a case like this, Pennica said he believed SBI, who handled the DNA analysis, would contact the District Attorney's Office with the results. (Id. at 111:21-112:6.) He further said that he expected to receive direction from the District Attorney's Office regarding the next steps DPD should take on Howard's case, but he received none. (Id. at 112:7-15.) Soucie and Pennica claimed to never have received notice of the September 2011 Order, so they claim they did not know they had an obligation to turn over evidence relating to Howard's case.

SBI reported in June 2012 that Jones's DNA from the buccal swab matched the DNA recovered from Doris Washington's rape kit. (Doc. 87-14.) This report was sent to DPD. (Id. at 3.) The record is unclear as to when Howard and his counsel learned of

this evidence, but it appears that Howard learned of it shortly thereafter. However, because Howard's post-conviction counsel's contact regarding the DNA testing was with the District Attorney's Office, and because DPD never informed the District Attorney's Office about the interview with Jones, Howard would not learn about the interview until July 2016. (Doc. 87-3 ¶¶ 129-34.)

Howard filed a motion for a new trial in March 2014 based on the new DNA evidence. A North Carolina Superior Court judge granted the motion in May. State v. Howard, Nos. 92 CRS 28349, 25350, 28352, 2014 WL 10715439 (N.C. Super. Ct. May 27, 2014). Following the State's appeal, the North Carolina Court of Appeals vacated the trial court's order in April 2016 and remanded the case for an evidentiary hearing. State v. Howard, 783 S.E.2d 786 (N.C. Ct. App. 2016). At this time, the recording of Jones's interview in 2011 was handed over to the Durham District Attorney's Office and to Howard. The superior court evidentiary hearing was held in August 2016. Jermeck Jones was called to testify, but he invoked his Fifth Amendment right against self-incrimination when asked what he knew about the murders and if he had sexually assaulted Doris Washington. (Doc. 87-3 ¶ 65.) In a lengthy December 2016 order, the superior court found that the DNA evidence showed two different men had assaulted Doris and Nishonda –- Jones had sexually assaulted Doris and an unidentified man, not Howard, had sexually assaulted Nishonda. (Id. ¶¶ 183-86.) The court

34

further determined that, pursuant to the September 2011 Order, DPD "was required immediately to provide" Howard's counsel with any information it found regarding Jermeck Jones and that Jones's interview fell under the purview of the September 2011 Order. (Id. ¶¶ 129-34.) Furthermore, the court found that the DNA evidence conclusively excluded Howard as one of the men who committed the murders.[17] (Id. ¶ 185.) The court vacated Howard's conviction, ordered him released from custody, and ordered a new trial. (Id. at 26.) The State elected not to retry Howard for the murders.

### 4. Deposition Testimony

As part of the present lawsuit, Howard deposed (some 25 years later) several of the witnesses Dowdy interviewed while investigating the murders. Howard reports he was unable to locate Southerland, and Jackson was murdered not long after the trial. Some of those who were deposed testified generally that Dowdy falsified or misrepresented the statements they gave him to further implicate Howard in the murders.

Gwendolyn Roper Taylor testified that Dowdy's report inaccurately stated that Howard directly told her that he had

---

[17] Howard emphasizes the superior court's finding that Howard is innocent of the murders. (Doc. 87-3 ¶¶ 115, 199.) Such a finding is not necessary to, and indeed may be inconsistent with, the court's award of a new trial. In any event, there is a dedicated statutory process by which a convicted defendant may establish his factual (as opposed to legal) innocence by applying to the North Carolina Innocence Inquiry Commission. See N.C. Gen. Stat. §§ 15A-1460 et seq. As of the present, there is no indication Howard has done so.

35

killed the Washingtons. (Doc. 88-13 at 72:16-24.) She testified that all she could remember was that she had heard a man say he had "killed the bitch," but she now said it could have been any man in the club who made that statement. (Id. at 57:20-25.) She claimed she intended to say that at Howard's trial, but cited her nervousness and youth for her failure to do so. (Id. at 119:12-22.)

At his deposition, Kelvin Best testified that he never told Dowdy he had seen Howard leave the back door of Doris Washington's apartment because it was physically impossible for him to have seen the back door from where he was standing that night. (Doc. 88-9 at 184:8-185:23.) However, he acknowledged that he may have assumed that Howard came out of the back door of her apartment when he saw him coming out the side of her apartment building. (Doc. 80-12 at 233:9-14.)

Eric Lamont Shaw testified that he never had any personal knowledge of Howard being involved with the murders and never would have represented otherwise to Dowdy. (Doc. 87-6 at 12:1-13:4.) He claimed he never told Dowdy about being present during a New York Boys gang meeting in which Howard was ordered to kill Doris Washington. (Id. 11:12-25.) He further said that he only told Dowdy about the rumors he had heard -- and made clear they were

36

only rumors.[18]  (Id. at 11:8-11, 83:7-22.)

Dwight Moody Moss was deposed twice.  He testified that when Dowdy approached him to discuss what he had seen the night of the murders, Moss simply signed the statement Dowdy presented without reading it.  (Doc. 88-24 at 37:17-38:10.)  Moss said he did so to get Dowdy to leave him alone, that he knew nothing about the murders, and that he told Dowdy that he knew nothing.  (Id. at 38:12-13, 38:21-39:25.)  Howard argues that the statement Moss signed was written ahead of time by Dowdy and contained false testimony that Moss had seen Howard tell Doris Washington he was going to kill her and that he had seen Howard around the Washingtons' apartment minutes before the fire was detected.

Both of Moss's depositions ended prematurely when he became so agitated and threatening that Howard's counsel felt compelled to terminate them.[19]  (Doc. 80-15 at 66:7-18; Doc. 80-16 at 51:19-20.)  After the first deposition, a magistrate judge ordered Moss to participate in a continued deposition "in an orderly manner."

_____

[18] Shaw, who was in jail when Dowdy interviewed him, also stated during his deposition that Dowdy had offered to get him out of jail in exchange for a statement implicating Howard.  (Doc. 87-6 at 10:22-11:7.)  Dowdy testified in his deposition that when such offers are made, they are to be recorded in police reports (Doc. 87-2 at 27:1-21), but his police report from Shaw's interview contained no such record of an offer, nor did it mention that Dowdy had interviewed Shaw in jail (Doc. 87-8 at 28-29).

[19] A magistrate judge recently denied Howard's motion to continue Moss's deposition under the supervision of an armed deputy because of insufficient efforts to do so before the discovery period closed.  (Doc. 110.)

(Doc. 54 at 2.) Even then, Moss's second deposition ended prematurely after Moss became antagonistic. (Doc. 80-16 at 51:19-20.) As a result, Dowdy's counsel was unable to examine Moss. Moss, according to his deposition testimony, suffers from bipolar disorder and schizophrenia, but he has been unable to treat those conditions for at least half a year, if not more. (Doc. 80-15 at 8:1-22; Doc. 80-16 at 19:4-12.)

Sections of Moss's depositions reflect erratic, inconsistent, and sometimes false testimony. For example, Moss stated that he never testified at Howard's trial (Doc. 80-15 at 43:17-20, 45:21-46:3; Doc. 80-16 at 41:2-8), even though he unquestionably did (Doc. 72-1 at 238-66). During one deposition, Moss told Howard's counsel to hurry through her questions so he could "get it over with because [he didn't] know" the answers, saying that he would simply answer "no" to all of her questions. (Doc. 80-15 at 65:15-17.) In his second deposition, he stated that he could not remember what he said in his prior deposition just two months earlier (Doc. 80-16 at 33:4-16) and that he could not remember what occurred in his interaction with Dowdy in 1991 (id. at 33:18-29). When asked whether he earned money by providing information to the police during the 1990s, Moss became extremely agitated, accusing Howard's counsel of calling him a rat. (Id. at 48:10-49:1.) The argument that ensued resulted in the premature termination of Moss's second deposition.

### B.  Procedural History

On May 24, 2017, Howard initiated this action.  (Doc. 1.)
The individual Defendants jointly moved to dismiss certain causes
of action for failure to state a claim.[20]  (Doc. 13.)  The motion
was granted in part and denied in part.  (Doc. 22.)  See Howard v.
City of Durham, 1:17cv477, 2018 WL 1621823 (M.D.N.C. Mar. 31,
2018).  The court dismissed negligence claims brought against
Soucie and Pennica in their individual capacities and dismissed
all official capacity claims brought against the individual
Defendants as duplicative of the Monell[21] claim Howard alleged
against the City of Durham.  Id. at *9.

The current motions for summary judgment followed (Docs. 75,
77, 79, 81), as well as the City of Durham's motion for judgment
on the pleadings as to Howard's state constitutional claims (Doc.
73).  Following briefing and the video-conference hearing held on
July 7, 2020, the motions are ready for decision.

## II.  ANALYSIS

### A.  Legal Standard

Summary judgment is appropriate where the pleadings,
affidavits, and other proper discovery materials demonstrate that

---

[20] E.E. Sarvis was originally named in the complaint but has since been
dismissed by Howard.  (Doc. 20.)

[21] Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of initially demonstrating the absence of a genuine dispute as to any material fact. Celotex, 477 U.S. at 323. "Once the moving party meets its initial burden, the non-moving party may not rely upon mere allegations or denials contained in its pleadings, but must come forward with some form of evidentiary material allowed by Rule 56 demonstrating the existence of a genuine issue of material fact requiring a trial." Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 301 (4th Cir. 1998) (per curiam) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Celotex, 477 U.S. at 324).

When considering the motion, the court must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). It "cannot weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568 (4th Cir. 2015). There is no issue for trial unless sufficient evidence favoring the non-moving party exists for a reasonable factfinder to return a verdict in its favor. Anderson, 477 U.S. at 249-50, 257. Thus, the issue to be determined on a summary judgment motion is "not whether . . . the evidence unmistakably favors one side or the other, but whether

40

a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. Indeed, the nonmoving party may not create a genuine issue of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)).

With this standard in mind, the motions will be addressed as they relate to each Defendant.

**B.   Dowdy**

Most of Howard's claims are brought against Dowdy, DPD's lead investigator in the Washington murders. Dowdy argues that Howard's claims fail to withstand scrutiny and should be dismissed. Howard contends that Dowdy violated his constitutional rights in violation of 42 U.S.C. § 1983 under a variety of theories: fabricating witness statements; committing multiple violations of Brady v. Maryland, 373 U.S. 83 (1963); malicious prosecution; and failing to perform an adequate investigation. He also alleges state tort claims for malicious prosecution, negligence, and intentional infliction of emotional distress.

**1.   Federal Constitutional Violations**

Howard alleges that much of Dowdy's misconduct occurred in relation to the witnesses he interviewed for Howard's trial. This

41

necessitates that the court analyze the federal constitutional claims, where relevant, in regard to Dowdy's alleged actions with each witness.

### a.    Fabrication of Evidence

Howard alleges that Dowdy fabricated false statements from Kelvin Best, Dwight Moody Moss, Gwen Roper Taylor, Eric Lamont Shaw, Roneka Jackson, and Angela Southerland.[22]  He also alleges that, in order to negate the relevance of the DNA evidence excluding Howard as the source of sperm found from Nishonda Washington's rape kit, Dowdy fabricated evidence that Nishonda had been with her boyfriend up until the night of the murders and that she had been sexually active with that boyfriend.

"The Fourteenth Amendment protects against deprivations of liberty accomplished without due process of law." Massey v. Ojaniit, 759 F.3d 343, 354 (4th Cir. 2014) (internal quotation marks omitted).  The Fourth Circuit has recognized a due process right not to be deprived of liberty as a result of an investigating officer's fabrication of evidence. See Washington v. Wilmore, 407 F.3d 274, 282-83 (4th Cir. 2005).  Such a claim requires a showing of "proof that [the investigator] fabricated evidence and that the

---

[22] Howard concedes that he cannot proceed on his fabrication claim against Dowdy as to statements he recorded from Rhonda Davis because she is deceased and thus could not be deposed for this lawsuit.  (Doc. 87 at 55 n.20.)  Howard has also clarified that he is not pursuing a fabrication claim against Dowdy in relation to the recorded statements of Terry Suggs (who reported that Doris used and sold crack cocaine).  (Id.; Doc. 87-8 at 7.)

42

fabrication resulted in the deprivation of [the plaintiff's] liberty." Id. at 282. The false evidence must have been fabricated "deliberately or with reckless disregard for the truth." Massey, 759 F.3d at 357 (quoting Miller v. Prince George's Cty., 475 F.3d 621, 627 (4th Cir. 2007)). This may be demonstrated by showing that the investigator "entertained serious doubts as to the truth of [the] statements or had obvious reasons to doubt the accuracy of the information he reported." Id. (quoting Miller, 475 F.3d at 627); see, e.g., Washington, 407 F.3d at 285 n.2 (Shedd, J., concurring) (noting that "the issue . . . is not simply whether the justice system failed [the plaintiff], but instead whether any such failure is the result of deliberate or reckless misconduct by law enforcement").

To satisfy the causation element of a fabrication claim, Howard must show that his conviction and subsequent imprisonment "resulted from [the officer's] fabrication of evidence." Washington, 407 F.3d at 283. Causation in constitutional tort cases requires a showing of "both but-for and proximate causation." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012). Thus, Howard must show that Dowdy's fabrications of witness statements actually caused his conviction, as well as demonstrate that his "conviction was a reasonably foreseeable result of [the officer's] initial act of fabrication." Washington, 407 F.3d at 282.

Case 1:17-cv-00477-TDS-JEP   Document 119   Filed 09/16/20   Page 43 of 135

A complicating factor in the analysis, as is borne out in the shifting testimony of several witnesses, is that the scene of the murders, Few Gardens, was known for heavy drug use and, as Howard himself argues, "residents were known to make bogus reports to the police." (Doc. 87 at 9.) Many of the witnesses, including Howard, Southerland, Best, and Roper, were either addicted to, or actively using, drugs such as crack cocaine. (Id. at 12 n.4.) At least four witnesses -- Jackson, Shaw, Moss, and Southerland -- were under arrest, in jail, or facing criminal charges. (Id.) Jackson was a minor, age 17, when she first spoke with Dowdy, and others were homeless or "strapped for cash," according to Howard. (Id.) Howard argues that because of these vulnerabilities, "any reasonable investigator would understand it was imperative to carefully vet each of these witnesses." (Id.) To the extent this argues a negligence standard, the test here is one of deliberate or reckless falsification.

Howard also argues that witnesses who claimed they observed him commit the murders or heard him confess to them afterwards must have been influenced by Dowdy because, Howard claims, he has now been proven factually innocent. Of course, that is not precisely the case, as Howard was granted a new trial, not

exonerated.[23]   It is entirely possible that several witnesses affirmatively chose to lie and to implicate Howard in the murders for their own gain or for the drug-trafficking New York Boys gang. To the extent these witnesses were deposed, their testimony came under the shadow of the court order granting Howard a new trial following the revelation that the DNA found in Doris Washington was traced to Jermeck Jones.  Another entirely possible scenario is that the witnesses were in fact telling the truth to Dowdy and at trial and now seek to distance themselves from the case by recanting their prior sworn testimony.

### i.   Kelvin Best

When Dowdy first spoke to Kelvin Best in December 1991, he reported that Best told him that on the night of the murders he saw Howard "come from the side" of Doris Washington's apartment building with his brother Kenny fifteen minutes before emergency services arrived to respond to the fire.  (Doc. 87-8 at 24.)  A year later, in October 1992, Dowdy spoke with Best again.  Dowdy wrote that Best told him he saw Howard and Howard's brother "come out the back door of Doris Washington's [apartment]" a few minutes before fire trucks arrived.  (Id. at 43-44.)  Howard argues that

---

[23] Howard's repeated references to his exoneration relies on a finding in the North Carolina state court's 25-page order granting his motion for appropriate relief that he was "factually innocent of the murders." (Doc. 87-3 ¶ 199.)  Such a finding was not necessary to the court's order (apparently drafted and presented by Howard's post-conviction counsel), which is reflected by the fact that Howard was granted a new trial, not exonerated.

this change in Best's testimony -- that he had seen Howard exit Doris's back door instead of coming from the side of her building -- was fabricated by Dowdy.

At Howard's trial, Best testified that he had seen Howard and his brother come "[r]ight behind Doris's -- right out the back door of Doris [Washington's] house." (Doc. 72-1 at 228:22-25.) He was apparently not cross-examined as to what he claimed he saw, but only as to his physical location at the time he saw Howard that night. (Id. at 231:19-233:1.) In his deposition, however, Best tried to walk away from his trial testimony, claiming he never would have told Dowdy that he had seen Howard come out the back door of Doris's apartment because it was not physically possible for him to have seen her back door from his vantage point. (Doc. 88-9 at 184:21-185:15.) While Best said that the information contained in his second statement was false (id. at 214:4-7), he attributed it to his assumption based on where he had seen Howard come from (Doc. 80-12 at 183:14-184:14, 337:17-25). Best acknowledged in his deposition that Dowdy did not pressure him to provide inculpatory information or offer any money or benefit for providing information; rather, Best claims he did his best to tell Dowdy and the jurors the truth. (Id. at 333:5-340:8.) Thus, there is no evidence that Dowdy's allegedly fabricated statement caused Best to testify at trial that he saw Howard come out the back door of Doris Washington's apartment.

Even in the light most favorable to Howard, this evidence fails to support a claim that Dowdy deliberately or recklessly falsified or fabricated evidence that caused Howard's conviction. Best testified at trial, without evidence of influence or coercion, to what he claimed to have observed. See Massey, 759 F.3d at 355-56 (witness's positive identification of defendant at trial without improper influence negated claim that officer's fabricated pretrial identification caused plaintiff's conviction). Perhaps a more probing inquiry might have questioned the accuracy of Best's statements given his precise physical location. But even then, it was Best, not Dowdy, who made an assumption about where Howard had come from that night when he was seen. Because Best concedes his error, there is no credibility question here.

Howard argues (as he does with other witnesses) that the court must credit the witness's deposition testimony at this stage whenever it conflicts with prior testimony and that it therefore prevents summary judgment. (Doc. 87 at 59 n.21; Doc. 115.) It is true the court must view the evidence in the light most favorable to Howard, but that does not mean the court must ignore the witness's testimony under oath at trial where there is no indication of coercion or involuntariness in that testimony. To hold otherwise would undermine the sanctity of the oath and the trial process, thus permitting any witness who chooses subsequently to testify contrary to his or her sworn trial

47

testimony to support a fabrication claim. But witnesses may change their testimony for reasons independent of any improper influence. Howard cites several cases to support his novel argument, but these cases merely apply the accepted proposition that a court cannot weigh conflicting testimony; they do not extend as far as he contends. Cf. Jacobs, 780 F.3d at 570 (reversing summary judgment because the court accepted some witness testimony over that of others); Ilunga v. Holder, 777 F.3d 199, 207 (4th Cir. 2015) (noting simply that adverse credibility determinations can be drawn from inconsistencies and omissions); Shaw v. Stroud, 13 F.3d 791, 804 (4th Cir. 1994) (finding that the trial court did not abuse its discretion in refusing to strike a deposition that allegedly contradicted a statement the witness previously gave as well as affidavits of other witnesses); United States v. Crawford, 121 F.3d 700, 1997 WL 532495, at *3 (4th Cir. 1997) (per curiam) (unpublished opinion) (noting that contradictory testimony among trial witnesses raised credibility issue for the jury to decide). Rather, to attack sworn trial testimony at this stage there must be some evidence or basis from which a jury could reasonably conclude that the law enforcement officer improperly influenced the witness or had serious doubts about the truthfulness of his or

48

her testimony.  See Gilliam v. Sealey, 932 F.3d 216, 240 (4th Cir. 2019); Massey, 759 F.3d at 357.[24]  None is shown as to this witness.

Thus, Best's testimony will not be considered as the basis for any alleged fabrication.

### ii.  Gwendolyn Roper Taylor

Dowdy initially contacted Gwendolyn Roper Taylor by phone and then met with her in person for an interview.  (Doc. 72-1 at 380:3-9.)  She did not provide a written statement, and thus Dowdy's report is the only tangible evidence of the meeting.  (Doc. 87-8 at 27-28.)  Dowdy's report reflects that she said that while at a club Howard told her he had killed Doris Washington.  (Id. at 27; Doc. 87-2 at 369:20-23.)  At Howard's trial, however, she testified that while at a crowded club (technically a liquor house, which is a private home where alcohol is sold and consumed) sometime after the murders but before the end of that year, she overheard someone ask Howard about Doris Washington being killed, and she heard Howard say, "Yeah, I killed the bitch."  (Doc. 72-1 at 333:17-334:22.)  She testified that Howard also said that "the next one to get in his way he'll mess them up too."  (Id. at 335:4-7.)  On

---

[24] It is for this reason that Howard's reliance on Sales v. Grant, 158 F.3d 768 (4th Cir. 1998), is misplaced.  There, the Fourth Circuit found that the district court had erroneously credited a witness's trial testimony that directly conflicted with that same witness's testimony at a separate trial.  Id. at 778-79.  However, the issue here is not merely whether a witness who testified at Howard's trial has made a conflicting statement at a more recent deposition.  Rather, it is whether the witness's later testimony demonstrates that Dowdy caused Howard's conviction by fabricating statements.

cross-examination, Taylor said she did not know who Howard was speaking to and did not remember the month or day of the conversation. (Id. at 336:11-337:7.) She also could not say whether Howard was being truthful or had made the statement in jest. (Id. at 337:6-20.) But she added, "whatever he said you know I heard it and I told them that and that was it." (Id. at 336:16-17.) Taylor acknowledged that Dowdy's report had incorrectly stated that Howard had spoken directly to her, but she denied any insinuation that she was testifying from his report but rather insisted that she was testifying "by what I remember." (Id. at 338:4-23.)[25]

At her deposition in 2019, Taylor gave a different version from her trial testimony. She said she told Dowdy that she had heard an unidentified man tell someone else that he had killed Doris Washington. She maintains that she told Dowdy "it could have been anybody" who made the statement in the club (Doc. 88-13 at 79:1-7) and that she had intended to testify to that effect at Howard's trial but failed to do so because she was young and nervous (id. at 119:12-22). However, she denied that Dowdy had offered her anything in exchange for her statement, and likewise denied that he threatened her if she failed to provide a statement or to testify. (Doc. 80-11 at 112:7-17.) She confirmed that when

---

[25] When Dowdy testified at trial, he maintained that his recollection recorded in his report was correct. (Doc. 72-1 at 402:12-20.)

she testified at Howard's trial, she did her best to tell the truth.  (Id. at 116:23-117:7.)

Dowdy argues that there is no evidence that he pressured Taylor to provide inculpatory information or ever offered money for her testimony.  He contends the record shows that Taylor told the truth to the best of her ability when she spoke to him and when she testified at Howard's trial.

Whether or not she testified truthfully at trial, Taylor testified unequivocally that she heard Howard admit to the murders. See Massey, 759 F.3d at 355-56.  Her attempt to backslide, after Howard was granted a new trial, undermines her oath at trial.  As with Kelvin Best's testimony, there is no evidence that Dowdy's allegedly fabricated statement (that Howard confessed directly to Taylor) caused Taylor to testify at Howard's trial in the manner she did.  She testified clearly that she heard Howard himself confess to killing Doris.  The discrepancy between whether Howard made the statement to her or to someone else does not negate her trial testimony that she heard Howard say he had killed Doris Washington.

At oral argument, Howard contended that Taylor's deposition testimony requires permitting the claim to proceed to trial, citing Gilliam v. Sealey, 932 F.3d 216 (4th Cir. 2019).  But Howard misconstrues that case.  There, the Fourth Circuit denied the law enforcement officers' motion for summary judgment because of

51

evidence that the officers had met with the plaintiffs' 16-year-old friend multiple times and made him take a polygraph test in which he declared that he did not know anything about the crime. Id. at 228. The officers subsequently "marked [the friend] as a suspect in the case" and ordered an analysis of his fingerprints. Id. Only then did the friend change his story and testify at plaintiffs' trial that one of the plaintiffs had confessed to committing the crime. Id. The Fourth Circuit found that this, in addition to other evidence of the officers' bad faith,[26] was sufficient to create a fact issue as to whether the friend's confession was fabricated or coerced. Id. at 240. Other cases cited by Howard stand for a similar proposition. See, e.g., White v. Smith, 696 F.3d 740, 757 (8th Cir. 2012) (allowing a § 1983 fabrication claim to proceed when evidence demonstrated "that Defendants coached and manipulated" witnesses "into adopting Defendants' theory of the case"). Here, there is no evidence of coercion or manipulation, only an allegation of fabrication. The question is not merely whether the witness lied or the justice system failed. There must be evidence that Dowdy intentionally or

---

[26] A witness testified at deposition that she had told officers she had observed a different suspect attack the murder victim on the night of the murder, but the officer's interview notes for this witness did not reflect this testimony. The officers had also requested that this alternative suspect's fingerprints be tested against prints on a beer can found at the crime scene, but then withdrew this request three days before the defendant's trial. Gilliam, 932 F.3d at 228.

recklessly falsified Taylor's statements to which she testified at trial.  See Halsey v. Pfeiffer, 750 F.3d 273, 295 (3d Cir. 2014) (noting that "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong").[27]  Taylor's statements contained in Dowdy's investigative report therefore cannot form the basis of a claim of fabrication.

### iii. Dwight Moody Moss

Dwight Moody Moss is a schizophrenic who suffers from bipolar disorder.  He testified at trial that around 4:00 p.m. on the afternoon of the murders he saw Howard arguing with Doris over money and heard Howard say that she "messed up the money, you messed up the drugs."  (Doc. 72-1 at 242:22-23.)  He also heard

---

[27] To the extent Howard argues that a fabricated witness statement could have caused his conviction because the false statement coerced a witness to testify in conformance with the statement itself, the cases he relies upon are distinguishable.  Jackson v. City of Cleveland, 925 F.3d 793, 817 (6th Cir. 2019); see also Bermudez v. City of New York, 790 F.3d 368, 375-76 (2d Cir. 2015).  In Jackson, law enforcement officers asked a 12-year-old witness to identify in a lineup suspects who had committed a shooting.  Jackson, 925 F.3d at 804.  Because the 12-year-old did not identify the two suspects that the officers believed had committed the crime, they brought the child into a room, accused him of lying, called him racial slurs, and then forced him to sign a statement that he had failed to identify the suspects because he feared retaliation.  Id. Another officer coached the child before trial.  Id. at 805.  The Sixth Circuit found that the plaintiffs' fabrication claim survived in part because the witness "would have faced a real threat of prosecution for perjury had his [trial] testimony conflicted with his earlier [fabricated] signed statement."  Id. at 817.  Here, there is no indication that Dowdy pressured or coerced Taylor to provide false statements in the first place, and no evidence that he later coached or coerced her to testify in conformance with an allegedly fabricated statement.

Case 1:17-cv-00477-TDS-JEP   Document 119   Filed 09/16/20   Page 53 of 135

Howard tell Doris, who was in her upstairs window, "you will get yours" and "I'll kill you." (Id. at 243:5-15.) He further testified he saw Howard and another male come from around the backside of Doris's apartment that evening with what appeared to be a television and VCR. (Id. at 255:9-13.) Shortly thereafter, he said, he saw smoke coming from Doris's apartment window. (Id. at 256:2-4.) When his memory faltered during his testimony, Moss was presented with the statement Dowdy recorded from his interview and which Moss signed. Moss told the jury that he told Dowdy the truth, was "quite sure" Dowdy gave him the opportunity to read the statement, looked over the statement before signing it, and then signed it. (Id. at 248:25-250:19.) On cross-examination Moss testified, "I know what I know and know what I heard," but conceded he could not at that time separate the two. (Id. at 265:23-25.) In his deposition, however, Moss claimed he told Dowdy he knew nothing about the murders, did not read his statement before signing it, and signed it only to "get out of there." (Doc. 88-24 at 38:2-13.) He also claimed no memory of ever testifying at Howard's trial. (Doc. 80-15 at 43:3-20; 45:6-:9.) Dowdy contends the court should disregard Moss's deposition testimony in its entirety on the grounds Moss is incompetent to testify.

Every witness is deemed competent but may be deemed incompetent to testify if he "does not have personal knowledge of the matters about which he is to testify, that he does not have

54

the capacity to recall, or that he does not understand the duty to testify truthfully." United States v. Lightly, 677 F.2d 1027, 1028 (4th Cir. 1982). "Whether the witness has such competency is a matter for determination by the trial judge after such examination as he deems appropriate." United States v. Odom, 736 F.2d 104, 112 (4th Cir. 1984). See United States v. Cassidy, 48 F. App'x 428, 445 (4th Cir. 2002) (per curiam) (upholding district court's decision that a witness was competent to testify even though he exhibited "erratic" and "bizarre" behavior during his testimony). The trial court is accorded "great latitude" in determining the competency of a witness to testify. Odom, 736 F.2d at 111.

Dowdy argues that Moss's inconsistent (and sometimes flatly incorrect) responses, as well as his irascible demeanor during questioning, sufficiently demonstrate his incompetency. Dowdy argues that the court should disregard his entire deposition testimony, including the material portions in which he denied telling Dowdy what he had seen the night of the murders.

The record consists only of excerpts from Moss's deposition testimony. No doubt Moss's testimony may be in jeopardy, but absent the opportunity to examine the witness, it is premature for the court to decide at this time whether Moss is incompetent to testify. While a hearing is not required in every case in order to make this decision, Odom, 736 F.2d at 111, it is necessary here.

55

Cf. United States v. Whittington, 26 F.3d 456, 466 n.9 (4th Cir. 1994) (noting that a district court's decision whether a witness is competent comes after an "examination of a prospective witness").  The court cannot tell on this record whether Moss is incompetent, combative, unwilling, or some combination of the three.

Dowdy's only challenge to the merits of Moss's deposition testimony is contained in a single sentence that concludes it "amounts to mere conjecture or speculation of a sort that cannot defeat a summary judgment motion."  (Doc. 80 at 37.)  Dowdy provides absolutely no analysis, so the court will not attempt to discern what he means.  Consequently, Dowdy's argument will be rejected at this time as it relates to Dwight Moody Moss's deposition testimony.  Whether Moss is incompetent, and if not, to what extent he would be permitted to testify or his incomplete deposition testimony could be admissible must await another day.

### iv.  Eric Lamont Shaw

According to Howard, Dowdy falsely reported that Eric Lamont Shaw told him that he was present at a meeting of New York Boys gang members in which the gang directed Howard to kill Doris Washington to clear all debts that Howard owed the gang.  Dowdy recorded this statement in his investigation report, which indicates that Dowdy documented Shaw's statement on June 2, 1992.  (Doc. 87-8 at 28-29.)  Shaw testified at his deposition that he

56

never made such statements to Dowdy because he never witnessed such a meeting. (Doc. 87-6 11:12-12:6.) Rather, he only told Dowdy about the rumors he had heard about what had happened. (Id. at 14:10-15:9.)

Shaw never testified at trial, nor was his statement introduced. Dowdy argues that this precludes a finding of causation, since the jury could never convict Howard based on evidence that was never presented to it. Howard argues that causation can still be shown if fabricated evidence not presented to a jury was "used to obtain evidence later shown to the jury" or "used as [the] basis for a criminal charge." Jackson v. City of Cleveland, 925 F.3d 793, 816 (6th Cir. 2019) (alteration in original); Halsey, 750 F.3d at 294 n.19.

Howard has not offered any indication of how Shaw's testimony was used to obtain evidence that was then presented to the jury, nor has he demonstrated (as counsel conceded at the hearing) how Shaw's testimony was used to charge Howard for the murders. (Doc. 117 at 46:2-4.) Dowdy spoke with Shaw in June 1992, but his report contains no additional action until Dowdy interviewed Angela Southerland in October 1992. (Doc. 87-8.) Southerland was not arrested pursuant to any information Shaw provided. (Id. at 30.) Furthermore, after Dowdy interviewed Southerland, he followed up with other witnesses to seek confirmation of Southerland's account, but not with Shaw. Thus, even assuming Dowdy fabricated

57

the contents of Shaw's interview, Howard has not shown that it was used to obtain more evidence or to charge Howard with the murders. Therefore, Shaw's statements cannot be considered in assessing whether Dowdy's fabrications may have caused Howard's conviction.

### v. Angela Southerland

Howard contends that Dowdy fabricated statements from Angela Southerland by stopping the taping of her interview and improperly feeding her inculpatory information so that she would give false answers that implicated Howard in the murders. Southerland's taped interview is approximately 10 minutes long, but Dowdy's notes reflect that the interview took 46 minutes. The recording is important because Southerland is the only witness the prosecution offered as having been present in Doris's apartment at the time of the murders, and it was played in its entirety to the jury when Southerland claimed to know nothing about the murders. Howard points to the missing recorded portions of the interview and Dowdy's shifting explanation for it as evidence of fabrication.

At trial, Dowdy testified that he could not fully explain the timing discrepancy.[28] He surmised that he must have written down the wrong time or been interrupted by other officers when he stopped the recording. (Doc. 72-1 at 385:16-386:8, 401:15-

---

[28] Howard's contention that he was hampered by Dowdy's failure to disclose the fact he stopped the tape is unpersuasive, as his trial counsel clearly cross-examined Dowdy at trial on this very point.

402:11.)  Dowdy acknowledged that stopping the tape was against his normal practice.  (Doc. 87-2 at 338:14-20.)  And Paul Martin, then-head of DPD's Organized Crime Division, testified that DPD trained officers to record the entire interview but that whenever a recording needed to be stopped, to explain the reason for doing so.  (Doc. 87-7 at 36:10-37:5.)  When asked about the discrepancy, Dowdy testified that when he "first initially went in to interview" Southerland he was interrupted for 10 to 15 minutes by personnel from the vice unit.  (Id.)  It is unclear whether he had started the taping at that point.  Regardless, a 10- to 15-minute delay does not explain the 30 to 35 minutes missing from the tape.

In his deposition, Dowdy testified that he may have stopped the interview to "go[] back over what [Southerland] was saying" or "to clarify some information she may have been telling [him]." (Doc. 87-2 at 337:13-14, 338:1-2.)  He argues that at his deposition some 24 years after the fact he was merely speculating why it took 46 minutes to complete Southerland's interview and that such speculation is too thin a reed to support a fabrication claim.

Howard's pursuit of this claim is hampered by the fact that the recording of the interview is not in the record, nor was it made a part of the trial record.  So, one cannot discern when, if anytime, the tape was stopped during the interview.  Moreover, Southerland has not been found, nor was she deposed, so she cannot

59

add context to the interview. Unlike other witnesses, however, she did testify at trial at one point that she was not present during, and knew nothing about, the murders. On the other hand, at one point she did adopt her recorded statement as true. (Doc. 72-1 at 305:6-15.)

Howard's claim therefore rests on the 36-minute discrepancy between the length of the interview and the length of the recording, Dowdy's concession that he may have stopped the tape to probe Southerland's inconsistent answers, his inconsistent explanations for stopping the tape in violation of his own practice and DPD training, Dowdy's concession that he "probably" told her she could be charged with murder or being an accessory to murder (Doc. 87-2 at 400:19-24), and Southerland's testimony that, at times, adopted and contradicted the statement. Dowdy also acknowledged that Southerland's statement contained details that only someone who was either present or had reviewed the autopsy reports would know, such that if she was not present then Dowdy would have been the likely source of that information. (Doc. 87-2 at 340:11-25.) Viewed in the light most favorable to Howard as the nonmoving party, this evidence creates a genuine issue of material fact whether Dowdy fabricated any portion of Southerland's statement or recklessly offered her testimony knowing or having serious doubts it was likely false in light of all the other available evidence at the time. Massey, 759 F.3d at

60

357 (liability may be demonstrated by showing that the investigator "entertained serious doubts as to the truth of [the] statements or had obvious reasons to doubt the accuracy of the information he reported").

Therefore, Dowdy's motion for summary judgment as to Southerland's testimony as the basis of a claim of fabrication will be denied at this time.[29]

### vi. Roneka Jackson

Howard argues that Dowdy fabricated a statement from Roneka Jackson after he had completed his interview with Angela Southerland. Dowdy recorded two statements from Jackson regarding the murders: one in the days immediately following the murders in 1991 and another roughly a year after the murders in 1992. At the time of the murders, Jackson was 17 years old.

In the first interview, which was conducted on November 30, 1991, and taped, Jackson said she observed Howard and Doris in an argument at about 10:00 p.m. the night of the murders, which was precipitated by a shooting by some "white boys" and that Howard said he was coming back and that "[w]e going to kill her and her daughter." (Doc. 87-16 at 12.) After that, about midnight, she

---

[29] It is not at all clear how, in the absence of Southerland's testimony or a copy of the audio recording, Howard will demonstrate in what manner Southerland's recorded statement was allegedly altered, as Howard has not addressed how a jury would determine when the recording was stopped and how that may have affected Southerland's subsequent statements. This issue will need to be addressed further by the parties.

saw Howard exit Doris's apartment with a television and a VCR, followed by his brother, Bruce, whom she knew as a drug dealer, and put the items in a car.  (Id. at 13-17.)  It was about 15 minutes later that she saw smoke coming from Doris's apartment.  (Id. at 22.)  When asked for more detail, she explained that Howard was upset that his girlfriend, who was in Doris's apartment, had been trading sexual favors for drugs and Doris would not let her out or Howard come in.  (Id. at 18.)  She said that she was providing this information of her own free will, without any promise or expectation and, when pressed, said the information was based on what she saw, not what she heard.  (Id. at 21-24.)

Dowdy spoke with Jackson a second time nearly a year later, on November 11, 1992, at the DPD after Dowdy had interviewed Angela Southerland.  (Id. at 44.)  His report states that Jackson identified Southerland from a six-person photo array as "the person she had seen on the night of 11/27/91 along with Darryl Howard" (id.) even though she did not report in her taped interview that she saw Southerland that night.  She also identified out of a six-person photo array Howard's brother Harvey (not Bruce, as she reported in her taped interview) as the person she had seen with Howard that night.  (Id.)

At Howard's trial, Jackson testified that she lived a street over from Few Gardens and had known Doris and her daughter for about 2 to 3 years.  She also knew Howard to be a friend of Doris's

62

and that Doris sold cocaine, which both Howard and Doris used. (Doc. 72-1 at 169:2-171:15.)  Jackson testified that sometime in the afternoon of the murders, she observed (from about 12 feet away) Howard looking for his girlfriend, who was at Doris's apartment, but Doris would not let him in.  (Id. at 172:14-173:4, 174:3-4.)  Upset, Howard yelled to Doris's upstairs window and said he was going to kill her and her daughter, and then left. (Id. at 173:15-175:23.)  About 10:00 p.m. that evening, she saw Howard and his brother, Bruce ("I think that's his name") leave Doris's apartment with a television and go to a car.  (Id. at 176:13-177:23.)  She then saw Howard use a nearby payphone, followed by smoke from Doris's apartment.  (Id. at 177:24-178:25.) Fire trucks came about 15 minutes later.  (Id. at 179:7-9.)  She said she saw a female she recognized as Howard's girlfriend at Doris's apartment that evening, but she could not remember whether she left with him.  (Id. at 180:7-18.)  On cross examination, she acknowledged multiple prior convictions, a poor memory, and that Howard seemed to be acting casually, and not in any hurry, when he left Doris's apartment.  (Id. at 183:10-187:10, 188:6-190:8.)  She also said she had not talked to Dowdy or anyone else in preparation for her testimony.  (Id. at 191:15-22.)

Howard argues that discrepancies in Jackson's various retellings of the night of the murders are sufficient for a reasonable jury to conclude that Dowdy fabricated Jackson's second

63

statement because it is highly unlikely that Jackson would, unprompted, change her story to adhere so closely to Southerland's version without Dowdy's intervention. Furthermore, Howard argues, Jackson's trial testimony appeared to revert back to her original 1991 statement -- she identified Bruce, not Harvey, as the brother she saw with Howard that night, and she could not identify Howard's girlfriend. Dowdy argues that such discrepancies are not sufficient to support a fabrication claim and also contends that in the absence of any post-trial testimony by Jackson, it invites only speculation as to whether Dowdy did anything to improperly influence or fabricate Jackson's testimony.

Because Jackson was murdered after the trial, Howard was unable to depose her for this lawsuit. A careful review of Jackson's recorded statement, second interview notes, and trial testimony, however, reveal an insufficient basis for a finding of fabrication. Jackson's trial testimony materially followed her November 30, 1991, recorded statement, which was given before Dowdy took Southerland's statement on October 10, 1992. Howard does not argue that Dowdy fabricated this first statement. Moreover, while Howard claims that Jackson did not implicate Howard's girlfriend in this first interview (but rather in the subsequent interview when she identified Southerland in a photo array as the woman she saw Howard with that night), her first interview in fact reflected that she knew that Howard's girlfriend was at Doris's apartment

64

that night.  Howard's argument to the contrary (Doc. 87 at 63) puts too literal a reading on Dowdy's deposition testimony, as Dowdy clearly acknowledged that Jackson did not say she saw anyone "with" Howard or his brother but that Jackson had stated a female had been in the apartment with Doris (Doc. 87-2 at 297:2-24). While Jackson was not expressly asked in her first interview if she had seen the girlfriend, it can reasonably be inferred that she may have in order to have stated that the girlfriend was in Doris's apartment.  This is consistent with Jackson's trial testimony that she saw the girlfriend, whose name she did not know, at Doris's apartment that evening.  In any event, nothing from Jackson's second statement led to any trial testimony; specifically, Jackson never identified Southerland at trial.  This is important because, while Howard points to Dowdy's concession that he "needed" Jackson's identification of Southerland (Doc. 87 at 25), the issue on this claim is Howard's conviction, not his arrest.  Gilliam, 932 F.3d at 234, 240-41 (analyzing separately whether fabrication of evidence was sufficient to support a Fourth Amendment malicious prosecution claim and a Fourteenth Amendment due process fabrication claim); see also Halsey, 750 F.3d at 291 ("The boundary between Fourth Amendment and Fourteenth Amendment claims is, at its core, temporal.  . . . . [T]he Fourth Amendment forbids a detention without probable cause.  But this protection

against unlawful seizures extends only until trial." (internal citations omitted).)

Furthermore, the fact Jackson identified Howard's brother Harvey, not Bruce, in the second interview is insufficient for a fabrication claim, because she testified at trial that she saw Bruce. The discrepancy was fodder for cross-examination to attack Jackson's credibility, but it was not exploited. Moreover, there is no indication that any of Jackson's statements or testimony was anything but voluntary; she acknowledged as much in her first statement (which Howard does not challenge), and she was not cross-examined on that point at trial. On this record, especially where Jackson is now unavailable, it would be merely speculative for a jury to conclude that Dowdy improperly influenced Jackson's statements or testimony. See Halsey, 750 F.3d at 295 ("A witness's misidentification should not be regarded as a fabrication in the absence of persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the identification was incorrect, and thus, in effect, offered the evidence in bad faith.").

For these reasons, Dowdy's interviews of Jackson cannot serve as the basis for a claim of fabrication.

### vii. Nishonda Washington's Boyfriend and her Sexual Activity

Howard also argues that once the DNA evidence came back

66

clearing Howard of any sexual assault of Nishonda Washington, Dowdy falsely advised the prosecutor that he had evidence that Nishonda had been staying with her boyfriend up until the evening before her murder, ruling out sexual assault as part of the crimes and thus accounting for the presence of exculpatory DNA evidence from her rape kit tests.

Dowdy points to three examples in his report that show he did not fabricate such evidence.  He reported that Ella Moore told him Nishonda had been away for four days and returned on Sunday -- two days before the murders (Doc. 87-8 at 9-10); that Alice Gordon told him that she had not seen Nishonda for a week prior to the murders (id. at 10); and that Howard himself had told DPD officers that Doris was angry Nishonda had been seeing an older man (id. at 8).  Dowdy further testified at his deposition that he had asked neighbors about Nishonda's whereabouts and was told that she had been gone for four or five days with her boyfriend and then returned home the day of the murders.  (Doc. 80-5 at 171:16-21.) He also points to a contemporaneous newspaper article reporting on the murders that stated "[n]eighbors said Nishanda [sic] . . . had run away from home recently, but returned Tuesday," as evidence that Dowdy's interviews with neighbors were corroborated.  (Doc. 80-7 at 1.)  At trial, Dowdy testified (without objection)[30] that

---

[30] The admissibility of this testimony at trial, a contested fact issue, is unclear.

67

Nishonda had been away for a week with her boyfriend and had returned on November 26, the evening before the murders.  (Doc. 72-1 at 423:8-19.)  Dowdy further points out that, after he submitted his investigatory report but continued to investigate the whereabouts of Nishonda's boyfriend at the prosecutor's request, he did not submit his handwritten notes on the matter because his investigation turned up no new evidence to report to the prosecutor.

Dowdy argues that he was not required to record every interview or discussion he had with neighbors.  While true, Dowdy's deposition indicates that he took a broad, inclusive approach as to what he ought to put into his investigative report in this case. (Doc. 87-2 at 88:16-90:11.)  He suggests that he may have recorded conversations with neighbors, conducted at the prosecutor's request shortly before trial, in contemporaneous handwritten notes (id. at 186:22-189:17), but those notes are missing.  He also incorrectly claimed that his report contained witness testimony that Nishonda had returned the day of the murder.  (Id. at 171:7-11.)  He stated that if information was not contained in his report, it meant he did not believe it was sufficiently relevant to the investigation.  (Id. at 188:7-23.)

Although there is evidence that Dowdy received information that Nishonda had an older boyfriend and had been away with him for a few days, Dowdy's report contains no indication how he

68

learned that Nishonda had returned the afternoon before her murder. The timing of Nishonda's return is important because the jury was told that the sperm found in Nishonda's rape kit had been deposited within approximately 24 hours of the autopsy, which took place at 10:00 a.m. the day after the murders. (Doc. 72-1 at 80:17-25.) Furthermore, Dowdy knew that Nishonda had reportedly said she was taking a bath the night of the murders, which may have reduced the presence of any sperm previously left by a boyfriend, and Dowdy knew this 24-hour window was of critical importance to his theory of the case (Doc. 87-2 at 184:17-185:13); if Nishonda in fact returned to the apartment on Sunday, two days prior to the murders, whether she had spent a few days with her boyfriend would be irrelevant, and the recent sexual activity of a 13 year-old under these circumstances would be hard to explain. Dowdy's report, while showing that Nishonda had been away for some time and had been seeing an older man, only states that Nishonda returned on Sunday -- outside the 24-hour window. Nowhere does the report state that she returned Tuesday evening, hours before the murders; yet that is precisely what Dowdy told the prosecutor, who relied on that at trial. (Doc. 72-1 at 423:8-19.) If Dowdy had found witnesses to support his statement that Nishonda had returned only the day of the murders, that would be different from what his report stated and thus would be new evidence warranting an amendment to his report, according to Dowdy's own standard.

Dowdy properly notes that he cannot be held liable for his testimony at Howard's trial. Washington, 407 F.3d at 283. But it is his alleged false assurances to the prosecutor that he had fully investigated the boyfriend issue and had evidence Nishonda returned home the day of the murders that is the basis of the fabrication claim. Id. (citing Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988)) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial -- none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."). Because the only evidence in Dowdy's report about when Nishonda returned home from her boyfriend would tend to prove the opposite of what Dowdy told the prosecutor, a genuine issue of material fact exists as to whether Dowdy properly reported or fabricated this evidence.

*   *   *

With these potential bases for fabrication in mind, the question is whether Howard can satisfy the causation element of a fabrication claim by showing that his loss of liberty -- i.e., his conviction and subsequent imprisonment -- "resulted from [the officer's] fabrication of evidence." Washington, 407 F.3d at 283. This requires a showing of "both but-for and proximate causation." Evans, 703 F.3d at 647. Howard must demonstrate that his

70

conviction was a reasonably foreseeable result of Dowdy's alleged acts of fabrication.  <u>Washington</u>, 407 F.3d at 283.

The court finds that, viewing the evidence in the light most favorable to Howard, a reasonable jury could conclude that Dowdy's alleged fabrications, if believed, both actually and proximately caused his conviction.  Angela Southerland's testimony provided a critical link: it placed Howard at the scene of the crimes and detailed how he actually committed them.  Howard was a frequent visitor to Few Gardens, but she was the only witness who claimed to have been present in Doris's apartment during the murders and observe Howard's attack of Doris (including causing her chest injury that was the actual cause of death).  (Doc. 87-8 at 36.) The prosecutor acknowledged in his closing argument (and later in his deposition) that she was the "most important" -- indeed the "key" -- witness whose testimony was necessary for a conviction in an otherwise heavily circumstantial case.  (Doc. 72-1 at 735:22-24; Doc. 88-6 at 189:13-191:2.)  And Dowdy's alleged false assurances to the prosecutor that he had evidence that Nishonda had been with her boyfriend up until the evening of the murders, in light of his written report to the contrary, provided a key to linking Howard to the murders while explaining away any sexual assault and lack of Howard's DNA found in the minor victim. Without Dowdy's assurances on this issue, the prosecution's main theory of the case was significantly impaired.  While a close

71

question given the other evidence against Howard, it was reasonably foreseeable that the jury would have found reasonable doubt had the alleged fabrications not occurred.  Therefore, Dowdy's motion for summary judgment as to the fabrication claim will be denied.

### b.  <u>Brady</u>-Based § 1983 Claims

Howard brings a § 1983 claim against Dowdy, arguing that on at least three occasions he suppressed exculpatory evidence disclosable under <u>Brady</u>:  (1) evidence that Roneka Jackson was a confidential informant for the DPD while also deeply embedded with the New York Boys gang; (2) exculpatory statements that witnesses gave him; and (3) his alleged knowledge that he lacked evidence that Nishonda Washington had returned from her boyfriend's Tuesday night but nevertheless investigated the murders as a sexual assault case.

In <u>Brady v. Maryland</u>, the Supreme Court held that when the prosecution suppresses evidence that is "favorable to [the] accused" and is "material either to guilt or to punishment," the accused's due process rights are violated.  373 U.S. 83, 87 (1963). The Fourth Circuit has held that a § 1983 claim based on <u>Brady</u> violations may be brought against police officers who fail to disclose exculpatory evidence to the prosecution.  <u>Barbee v. Warden, Md. Penitentiary</u>, 331 F.2d 842, 846-47 (4th Cir. 1964). Such claims apply equally to impeachment evidence as well.  <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  To make out a <u>Brady</u>

72

claim against Dowdy under § 1983, Howard must present evidence that "(1) the evidence at issue was favorable to him; (2) the [o]fficer[] suppressed the evidence in bad faith; and (3) prejudice ensued." Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 396-97 (4th Cir. 2014) (footnote omitted). Prejudice exists "if there is a reasonable probability that the jury would have reached a different result had the evidence been properly disclosed." Id. at 397 (internal quotations omitted). However, the issue is not merely "whether the defendant would more likely than not have received a different verdict" if the evidence had been disclosed but "whether, in the absence of disclosure, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. (internal quotations omitted).

### i. Roneka Jackson's Confidential Informant Status and New York Boys Gang Connection

Howard argues that Dowdy purposefully withheld information from the prosecutor (and thus from Howard) that Roneka Jackson was a confidential informant for the DPD and was connected to the New York Boys gang. According to Howard, Jackson was embedded with the New York Boys gang because she sold drugs for them and had a child with one of their members. He also notes that, at the same time, she served as a paid confidential informant for the DPD and had provided the department information and tips related to various crimes. Thus, he contends, she "had significant motives to point

73

the police away from the true perpetrators and towards Howard," satisfying both the DPD and the New York Boys. (Doc. 87 at 70.) Howard argues that had the jury learned of her informant status, a reasonable probability existed that it would have given Jackson's testimony far less credence. Dowdy does not dispute Jackson's connections with DPD and the New York Boys gang and acknowledges that they were never disclosed to Howard, but he maintains that he never knew about these connections at the time of Howard's trial. (Doc. 80-5 at 268:5-269:3.) He further argues that, in any event, Jackson's credibility was already sufficiently attacked based on her extensive criminal record and the fact that she was entitled to a monetary reward for her information leading to Howard's arrest. (Doc. 80 at 33.)

At oral argument on the present motions, Dowdy's counsel acknowledged that Jackson's status as a paid informant was Brady material. (Doc. 117 at 33:17-22.) See Banks v. Dretke, 540 U.S. 668, 698 (2004); see also Robinson v. Mills, 592 F.3d 730, 737-38 (6th Cir. 2010). Her connection to the New York Boys gang is similarly favorable to Howard, as it provides a reason why she would lie. See Amado v. Gonzalez, 758 F.3d 1119, 1133 (9th Cir. 2014) (finding that a witness's affiliation with a rival gang was "clearly" material under Brady); United States v. Sanchez, No. 07 CR 0149, 2009 WL 5166230, at *9-10 (N.D. Ill. Dec. 22, 2009) (finding that the government was obliged to disclose that a key

74

witness had been a member of street gang and had an extensive arrest record). Thus, the issue is whether Dowdy knew of Jackson's status in these respects.

Jackson had two "handlers" at DPD who knew of her status: Betty Boswell and Robby Davis. Boswell did not work on the Washington murder investigation; Davis did but died thereafter, so he was never deposed. (Doc. 87 at 24 n.12.) According to Boswell, Jackson became a confidential informant in 1994 (Doc. 80-13 at 84:11, 84:23-85:6), roughly two years after she gave her second statement to Dowdy on November 11, 1992 (Doc. 87-8 at 44) but prior to Howard's criminal trial, which began on March 27, 1995 (Doc. 72-1 at 1).[31] Jackson was paid for information she provided. (Doc. 87-7 at 71:7-12, 75:20-22.)

Dowdy testified at his deposition that he never knew of Jackson's confidential informant status or involvement with the New York Boys gang until after Jackson was brutally murdered by members of that gang a few months after the trial. (Doc. 80-5 at

---

[31] Howard claims that he has presented evidence that Jackson was an informant prior to 1994. Boswell indicated that Jackson had informally provided information to her about various crimes in the area for a few years such that she may have been colloquially considered an "informant" (Doc. 88-16 at 185:9-25, 262:11-16), but she did not officially register as a confidential informant with the DPD until 1994 (Doc. 80-13 at 84:8, 84:23-85:6). This is consistent with the deposition testimony of Paul Martin, head of DPD's Organized Crime Division, that Jackson was an informant when she was 17 years old and was an informant for four years (from age 17-21). (Doc. 88-6 at 74:21-75:22.) However, the key question is whether Dowdy knew of her informant status at the time Jackson testified at trial, at which time there is no dispute she was an informant.

75

269:6-21.)  He also denied knowing that Jackson had provided a statement regarding a different murder case two weeks before Howard's trial.  (Id. at 279:18-281:24.)

Boswell testified that she never would have told Dowdy that Jackson was a confidential informant, even if Jackson were testifying in one of Dowdy's cases, as any interaction with other DPD departments was the responsibility of the head of the Organized Crime Division.  (Doc. 80-13 at 167:13-22, 193:12-14, 194:8-24.) The only employees of DPD she would have informed about Jackson's status would have been Jackson's co-handler -- Robby Davis -- and Paul Martin, who at the time was the head of DPD's Organized Crime Division, which handled confidential informants.  (Id. at 193:12-14.)  She directed her confidential informants not to tell others about their status in order to maintain their safety.  (Id. at 144:13-145:20, 151:7-21.)  According to Boswell, a confidential informant's status was not widely known throughout DPD, even if that informant was involved in other DPD cases.  Boswell disclaimed any knowledge of how, if at all, Martin handled informant identification.  (Doc. 88-16 at 212:7-20.)

Paul Martin, as head of DPD's Organized Crime Division, was privy to the DPD's registry of confidential informants.  (Doc. 88-16 at 167:14-25; Doc. 80-14 at 51:3-17.)  He was not one of Dowdy's direct supervisors and did not oversee or review Dowdy's work or actions, as the two worked in different departments.  (Doc. 80-14

76

at 18:21-23.)  He explained that confidential informants typically did not testify at trials because their informant status would have to be disclosed, thus risking both the informants' personal safety and their use to the DPD as an informant.  (Id. at 50:5-22.)  But, as he further testified, the different departments within DPD, including his own, would cooperate by sharing information when cases or crimes overlapped.  (Id. at 51:20-52:3.)  To that effect, Martin explained, his division detectives were trained to cooperate with other divisions, including homicide, where Dowdy worked, to share pertinent information safely and securely.  (Id. at 52:4-53:13.)  Specifically, Martin agreed that his division's detectives "were expected to share any information they had relating to their confidential informants who may have any information about a homicide."  (Id. at 53:9-13.)  This included Martin's understanding that if one of his detectives learned that his informant was going to testify in a homicide case, he was expected to disclose the informant's status to the homicide detective in charge of that witness.  (Id. at 54:22-55:13.)  When presented with evidence of Boswell's direction to Jackson to speak to an investigator in the homicide division of DPD about providing information in a different murder case, Martin described it as "typical" of how DPD worked together with shared witnesses.  (Doc. 87-7 at 77:2-24.)  Thus, Martin understood that either Boswell or Robby Davis would have told Dowdy that Jackson was a confidential

77

informant for DPD had they learned she was to testify at Howard's trial. (Doc. 87-7 at 86:24-87:11.) In fact, Martin testified that Davis would have been obliged to tell Dowdy about Jackson's status under these circumstances, which is why, he said, DPD had certain "policies and procedures" about "tracking" in place. (Doc. 80-14 at 50:14-51:2.) And Martin "fully expect[ed] Davis would have done that." (Doc. 87-7 at 87:9-11.) Of course, Davis was directly involved with the Washington homicide investigation, having been the officer who originally arrested Howard for trespassing the morning after the murders and who reported that Howard repeatedly said Doris had killed Nishonda and then herself. (Doc. 87-8 at 7-8.) And, importantly, he testified at Howard's trial on the same day that Jackson resumed and completed her testimony that she had begun the day prior. (Doc. 72-1 at 267:1-282:20.) According to Martin, Dowdy also worked on other cases involving the New York Boys in which Jackson was involved, so Martin believed that Dowdy would have been aware of Jackson's status as to those cases as well. (Doc. 87-7 at 87:12-24.)

Dowdy argues that this claim "disregards [his] testimony that he was unaware of Jackson's status" at the time. (Doc. 105 at 13-14.) He contends that Martin's testimony should be disregarded because (1) Martin had no personal knowledge about Dowdy's knowledge of Jackson's confidential informant status and merely speculated about what Dowdy should or should not have known, and

(2) Martin's testimony does not qualify as evidence of a usual practice of DPD as to confidential informants under Rule 406 of the Federal Rules of Evidence. Dowdy has also submitted an affidavit from DPD Captain Joseph Kelly, who worked at DPD during Howard's trial and is the current head of the Organized Crime Division. Kelly states that during the Washington murder investigation, it was DPD policy to limit a confidential informant's status to the head of the Organized Crime Division and the officer who registered the informant. (Doc. 80-4 ¶¶ 10-14, 18-21.) None of these is sufficient to warrant granting summary judgment.

Kelly's affidavit conflicts with Martin's testimony of how (or if) an informant's identity would be disclosed to other officers within DPD. At this stage, the evidence must be viewed in the light most favorable to Howard. As such, the court cannot accept Dowdy's invitation to find his and Kelly's testimony as more credible, and there is sufficient evidence from which a jury could conclude that Dowdy would have been informed of Jackson's status as a paid DPD informant and her connection to the New York Boys gang. Were a jury to believe that DPD's Organized Crime Division required handlers to inform case detectives of an informant's status, as Martin testified, it could conclude that at least Robby Davis must have known about it, especially since he testified as a witness in Howard's trial, and likely would have

informed Dowdy.[32]  The same is true as to Jackson's involvement
with the New York Boys gang.  Boswell testified that she knew that
Jackson had a child with a member of the New York Boys and that
the information Jackson provided was tied specifically to the New
York Boys' drug operation.  (Doc. 88-16 at 184:3-20.)  She also
understood that "Roneka was pretty imbedded with the New York
Boys," which was precisely why Boswell wanted information from
her.  (Id. at 226:16-17.)  Boswell knew this when she signed
Jackson as an informant, including the fact she was dating a member
of the gang.  (Id. at 227:16-21.)  Furthermore, Dowdy worked on a
different murder case, contemporaneous with his work on the
Washington murders, in which he worked with detectives from the
Organized Crime Division.  Martin testified that Dowdy would have
cooperated with the Organized Crime Division detectives such that
he would have been made aware of any DPD informants who had
pertinent information regarding the case and other cases with
Jackson involving the New York Boys gang.  (Doc. 87-7 at 63:1-
68:24.)  Dowdy also supervised a separate murder case in which

---

[32] Dowdy's contention that Martin's testimony fails under Federal Rule
of Evidence 406 is misplaced.  Dowdy relies on a line of cases that
requires evidence of a routine practice of an organization to contend
that Howard has failed to demonstrate that DPD regularly disclosed an
informant's identity to a homicide detective.  See, e.g., Wilson v.
Volkswagen of Am., Inc., 561 F.2d 494, 511-12 (4th Cir. 1977).  Those
cases apply the rule where the existence of the practice is demonstrated
only through experience, and not by any rule.  Here, the factual dispute
is over the existence of an internal rule or policy within the Organized
Crime Division or DPD, not a routine or regular practice.  Thus, the
issue is distinguishable from Rule 406 cases.

Jackson provided two statements to DPD in 1994, prior to Howard's trial.  Martin testified that as a supervisor on this homicide investigation, Dowdy would have been told by Organized Crime Division detectives about the identities of confidential informants who provided information in that case -- including Jackson.  (Id. at 78:22-83:18.)

Thus, although the evidence is conflicting, there is sufficient evidence which, if believed, would permit a jury to reasonably conclude that Dowdy knew of, but did not disclose, Jackson's status as a paid DPD informant and New York Boys gang affiliate at the time of her testimony.  Dowdy's motion for summary judgment on this claim will therefore be denied.  The suppression of such evidence, if true, would have substantially undermined the fairness of the trial.

### ii.  Exculpatory Witnesses Statements

Howard contends that Dowdy suppressed exculpatory statements from witnesses.  Alternatively, even if witnesses did not give exculpatory statements, Howard contends that Dowdy's suppression of their answers (by fabricating false statements instead) could have been used to impeach Dowdy at trial.  Howard cites two instances.  First, he points to Eric Lamont Shaw's deposition testimony that he told Dowdy that he only knew rumors about the Washington murders, yet Dowdy reported that Shaw had been present at a New York Boys gang meeting in which the gang ordered Howard

81

to kill Doris Washington.  Even though Shaw did not testify at trial, Howard argues that Dowdy's misconduct in falsifying Shaw's testimony and failing to truthfully record his statements could have been used to impeach Dowdy and his reliability at trial. Second, based on Dwight Moody Moss's deposition testimony, Howard claims that Dowdy suppressed Moss's statement that he did not know what happened on the night of the murders, never read the written statement Dowdy presented to him, and claimed to know that Kelvin Best was paid a reward.  Dowdy contends that this is insufficient to support a <u>Brady</u> claim.

Dowdy is correct.  Shaw never testified.  It is too far afield to suggest that Dowdy's alleged knowledge that he falsified Shaw's statements constitutes exculpatory <u>Brady</u> material on the grounds it could be used to attack <u>Dowdy's</u> credibility.  Howard cites no case to support his argument that misconduct committed by Dowdy as it related to Shaw -- who did not testify and whose statements were not otherwise used in the investigation -- supports a § 1983 <u>Brady</u> (or <u>Giglio</u>) claim.  In <u>Gauger v. Hendle</u>, 349 F.3d 354, 360 (7th Cir. 2003), <u>overruled on other grounds by</u> <u>Wallace v. City of Chicago</u>, 440 F.3d 421 (7th Cir. 2006), the Seventh Circuit rejected such a claim in an even less attenuated posture.  There, the plaintiff brought a § 1983 claim against detectives who allegedly lied about what he had said during an interrogation.  He styled his claim under <u>Brady</u>, but the Seventh Circuit disagreed: "Gauger

82

argues that Brady . . . required the detectives to give truthful versions of Gauger's statements at the interrogation to the prosecutors to be forwarded to his counsel at his criminal trial. We find the proposed extension of Brady difficult even to understand. . . . The problem was not that evidence useful to [Gauger] was being concealed; the problem was that the detectives were giving false evidence. Gauger wants to make every false statement by a prosecution witness the basis for a civil rights suit, on the theory that by failing to correct the statement the prosecution deprived the defendant of Brady material, that is, the correction itself." Id. at 360. Cf. Armstrong v. Daily, 786 F.3d 529, 553 (7th Cir. 2015) ("[A]n accused has no claim against an officer who fabricates evidence and puts the evidence in a drawer, never to be used.").

As to Moss, his deposition testimony directly conflicts with his sworn trial testimony. In the absence of evidence that Dowdy improperly influenced or coerced Moss, and there is none, Howard cannot create a claim of suppression when Moss testified under oath at trial to facts that eliminate this new claim. Howard also misstates the record as to what Moss allegedly knew about Best's supposed reward. Howard's brief states that Moss testified that "his good friend [Kelvin] Best showed him the paperwork for the reward money he had received in exchange for his testimony" (Doc. 87 at 17); but Moss's deposition indicates only that Best showed

him an "envelope" that had "the Department of such and such, or whatever" written on it. (Doc. 88-24 at 34:11-16.) Best himself testified at his deposition that he never asked for and never received money for his testimony in Howard's case. (Doc. 80-12 at 136:19-137:8, 137:18-138:5.) Moss's testimony that Best received reward money, on this record, lacks foundation. This ground therefore fails.

### iii. Suppressed Investigation as a Sexual Assault Case and Failure to Investigate Nishonda's Boyfriend

Howard argues that Dowdy suppressed the fact that he initially "suspected the crimes were sexual assaults" and then withheld the fact that he did not perform an additional investigation into the whereabouts of Nishonda Washington's boyfriend or where Nishonda had been prior to the murders. (Doc. 87 at 78.) The only evidence Howard cites in support of this argument is Dowdy's deposition in which, after being assigned to the case, Dowdy wanted to know whether Doris and Nishonda had been sexually assaulted. (Doc. 87-2 at 208:18-209:25.) Dowdy agreed that the autopsies and the fact that the Washingtons' bodies were found naked in bed suggested that they had been sexually assaulted. (Id.)

But there is no indication in the record that Dowdy misled the prosecutor, Michael Nifong, about the nature of the crime by not telling him he originally suspected the crimes were sexual assaults. Nifong testified that he understood the fact that Doris

84

and Nishonda were sexually assaulted was a "mechanism to accomplish the purpose of the crime in the first place, which was to either get information or to punish somebody." (Doc. 80-9 at 34:6-15.) Yet the evidence available to him did not show "sexual motivation" as an impetus for the murders. (Doc. 88-6 at 119:1-4.) Nifong did say that one of the bases for his understanding was Dowdy's assurances that he had investigated and concluded that Nishonda had stayed with a boyfriend. (Id. at 119:13-21.) Howard urges that Dowdy suppressed the fact that "he had not actually done any investigation into Nishonda's alleged boyfriend and had no evidence supporting his assertion that she had been away until the night of the crime." (Doc. 87 at 78.) But this lack of evidence was known to Howard at the time of his trial. As the court has discussed at length above, Dowdy's investigative report contained no reference or witness statement that Nishonda had returned home on the evening of her murder. The only evidence that she had returned was Dowdy's testimony at trial. However, Howard's counsel did not cross-examine Dowdy on this issue, despite the fact that nothing else in the record supported Dowdy's testimony. In other words, the lack of evidence that Howard claims Dowdy suppressed was evident at the time of Howard's trial. Furthermore, the crux of Howard's claim here is Dowdy's fabrication that he did in fact investigate and find evidence of Nishonda's whereabouts with her boyfriend. The court has already found that Howard's fabrication

85

claim on this point survives summary judgment.  But Dowdy's <u>failure</u>
to disclose the alleged <u>absence</u> of information about that
relationship and its timing is not exculpatory or impeachment
evidence within the meaning of <u>Brady</u> and <u>Giglio</u>.  Otherwise, every
alleged failure to act or fabrication could be deemed a <u>Brady</u>
violation.  <u>See</u> <u>Gauger</u>, 349 F.3d at 360.  This basis for the claim
therefore fails.

### c.  Malicious Prosecution

Howard brings a federal malicious prosecution claim against
Dowdy.  Neither party devotes much analysis to this claim in his
briefing.  In fact, Dowdy's motion for summary judgment did not
directly address Howard's federal malicious prosecution claim but
sought summary judgment as to the parallel claim under North
Carolina law.  (Doc. 80 at 41-43.)  In his reply brief, Dowdy
generally argues that Howard's malicious prosecution claims --
both federal and state -- fail as a matter of law.  (Doc. 105 at
17-18.)

A § 1983 malicious prosecution claim is "properly understood
as a Fourth Amendment claim for unreasonable seizure which
incorporates certain elements of the common law tort."  <u>Evans v.</u>
<u>Chalmers</u>, 703 F.3d 636, 647 (4th Cir. 2012) (quoting <u>Lambert v.</u>

86

<u>Williams</u>, 223 F.3d 257, 261 (4th Cir. 2000)).[33] Howard must show that Dowdy (1) caused (2) a seizure of Howard pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in Howard's favor. <u>Hupp v. Cook</u>, 931 F.3d 307, 324 (4th Cir. 2019) (quoting <u>Evans</u>, 703 F.3d at 647).

Dowdy contests only the second element, arguing that because he did not fabricate witness statements, probable cause existed for Howard's November 12, 1992 arrest. (Doc. 105 at 17–18.) "Probable cause is determined by a 'totality-of-the circumstances' approach." <u>Smith v. Munday</u>, 848 F.3d 248, 253 (4th Cir. 2017) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 230 (1983)). It requires "more than bare suspicion" but "requires less than that evidence necessary to convict." <u>United States v. Gray</u>, 137 F.3d 765, 769 (4th Cir. 1998) (en banc) (internal quotations omitted). Furthermore, probable cause is "an objective standard of probability that reasonable and prudent persons apply in everyday life." <u>Id.</u> A court must consider "the facts within the knowledge of the arresting officers to determine whether they provide a

---

[33] "Because the Fourth Amendment is the only constitutional provision implicated by a § 1983 malicious prosecution claim . . . even malfeasance that would normally implicate a common law malicious prosecution claim, such as the continuation of a prosecution without reasonable cause but after an initial appearance, is not actionable under § 1983." <u>Gray v. Maryland</u>, 228 F. Supp. 2d 628, 637 (D. Md. 2002) (internal citations omitted) (citing <u>Brooks v. City of Winston-Salem</u>, 85 F.3d 178, 183-84 (4th Cir. 1996)).

probability on which reasonable and prudent persons would act."[34] Id. Fabricated or coerced evidence cannot establish probable cause. See Gilliam, 932 F.3d at 234.

Because Howard argues that Dowdy fabricated certain pre-arrest evidence implicating him, the court must examine the remaining evidence to determine whether it provided Dowdy probable cause to arrest Howard for the murders. See Munday, 848 F.3d at 253. Unlike the court's previous fabrication analysis, which considered the trial testimony of the witnesses, the focal point on this claim is Howard's arrest. The court must consider whether the unchallenged evidence available to Dowdy at the time of Howard's arrest was sufficient to establish probable cause.

Under this standard, the court will not consider, for example, Angela Southerland's taped statement or Roneka Jackson's second statement that corroborated Southerland's account. Nor will it consider the entirety of Dwight Moody Moss's statement, as Howard has challenged it and the court has not determined that Moss is incompetent to testify (even though its admissibility and Moss's

---

[34] Howard points to Dowdy's deposition testimony that subjectively he believed he lacked probable cause to arrest Howard in February 1992. (Doc. 87-2 at 113:4-8.) Later, Dowdy said that he did have probable cause by February 1993. (Id. at 123:13-15.) The deposition is not wholly clear on this point, because the context of the questioning was whether Dowdy had probable cause when the DPD requested reward money from the Governor (which was February 1992) but the questioner asked Dowdy if he had probable cause in February 1993. (Id.) Ultimately Howard was arrested in November 1992, so that was when Dowdy needed probable cause. Regardless, because the standard is objective, Dowdy's subjective belief is not relevant. Gray, 137 F.3d at 769.

88

competency have yet to be determined). Smith's statement of Howard's alleged confession cannot be considered as it came after Dowdy's arrest of Howard. But while Dowdy allegedly fabricated parts of other witnesses' statements, unchallenged portions can be considered. Thus, Kelvin Best's second statement (that he witnessed Howard exiting the back door of Doris Washington's apartment) will not be considered, but there is no dispute that Best told Dowdy he saw Howard come from the back side of Washington's apartment complex generally. Nor does Howard dispute Best's first statement in which he says he saw Howard around Doris's apartment shortly before emergency responders arrived to put out the fire. Howard also does not challenge Roneka Jackson's first statement, in which she said she heard Howard threaten to kill Doris earlier in the day and saw Howard come out of Doris's apartment roughly fifteen minutes before firefighters responded to the fire.

Dowdy has not provided a detailed analysis of what evidence supported the finding of probable cause, and the court need not do the work for him. However, in addition to the above, the following information appears to have been known to Dowdy at the time of Howard's arrest, since Dowdy recorded it in his investigative report:

- A statement from Rhonda Davis, a friend of Doris Washington's, that around midnight on the night of the

89

murders she went to Doris Washington's apartment, knocked on the door, and could tell someone was looking through the kitchen curtains but the lights were out. She heard a male voice inside say that the occupants were busy. (Doc. 87-8 at 11.)

- A DPD officer reported that when Howard was arrested by DPD for trespassing the day after the murders, Howard, without being asked about the murders, told the officer that he had been at Doris's apartment that night and that he could not understand why she had killed her daughter and then herself. (<u>Id.</u> at 8.) This version appeared at the time to be counterfactual.

- When Dowdy spoke with Howard in the hospital in June 1992, Howard said he had actually been in a different apartment in Few Gardens that night and that he had altered his story because Dowdy "was attempting to place the murder[s] . . . on [Howard] and that this was [Howard's] way of assisting . . . in the investigation." (<u>Id.</u> at 29.) However, Howard did not tell Dowdy anything further, stating that it was DPD's job to figure out who killed the Washingtons and that he was not a snitch. (<u>Id.</u> at 30.)

DPD's case was admittedly circumstantial, as the prosecutor told the jury at trial. (Doc. 88-6 at 28:22-29:3, 189:13-190:8.) But even viewing the evidence in the light most favorable to Howard

90

and without considering any of the evidence the court has found to be the proper subject of a claim of fabrication, probable cause nevertheless existed to support Dowdy's arrest of Howard for the murders of Doris and Nishonda Washington. Dowdy knew from Jackson's first interview that Howard and Doris Washington had argued the evening of the murders over what was described as Howard's anger over Doris allowing Howard's girlfriend to prostitute herself at Doris's apartment, and Howard had ended the argument by threatening to kill Doris and Nishonda.[35] Dowdy knew as well that two witnesses -- Jackson and Best -- saw Howard and his brother coming from around the back of Doris's building carrying a television and VCR right before the fire was detected (according to Jackson, from 5 to 15 minutes). Dowdy also had the statement from Gwen Roper Taylor, who was present and heard Howard boast (even assuming it was to another, as she later testified) that he had committed the murders. Dowdy thus had evidence of a motive, opportunity, and a confession suggesting that Howard had murdered the Washingtons. While perhaps less than sufficient evidence to convict, this was sufficient evidence to reasonably conclude that Howard probably committed the crimes. See, e.g., Gray, 137 F.3d at 770 (finding probable cause existed to arrest

---

[35] Although Jackson later testified on cross-examination at Howard's trial that Doris Washington did not seem upset, bothered, or worried by Howard's threats (Doc. 72-1 at 187:14-188:1), there is no indication that Jackson told Dowdy this during her first interview. Thus, Dowdy had no reason to second-guess Doris's reaction to Howard's threats.

murder suspect after (1) wiretap information identified suspect's street name as being involved with the murder, (2) forensic evidence demonstrated that a firearm that the defendant possessed had been fired at the crime scene, and (3) a witness from the scene identified the defendant as resembling one of the assailants); Gomez v. Atkins, 296 F.3d 253, 262-66 (4th Cir. 2002) (in § 1983 claim, finding probable cause for murder even though defendant was acquitted where motive, opportunity, and physical evidence (although "not overly compelling") linked defendant despite an alibi); Mallory v. Holdorf, Civil Action No. 3:11-03295-MBS, 2012 WL 4479070, at *2-3, *11 (D.S.C. Sept. 28, 2012) (in § 1983 claim, finding probable cause to arrest a husband for the murder of his wife despite his later acquittal when witnesses reported hearing what they believed to be a married couple arguing, saw a man run to a vehicle resembling plaintiff's van and driving away after the argument/murder, plaintiff failed a polygraph test regarding the murder, and his alibi did not conclusively exclude him from committing the murder), aff'd, 575 F. App'x 108 (4th Cir. 2014) (per curiam); Schlamp v. Prince George's Cty., Civil Action No. DKC 2006-1644, 2008 WL 7482628, at *6 (D. Md. Sept. 11, 2008) (in a § 1983 claim, finding that probable cause existed to arrest plaintiff for murder (by stabbing) when the undisputed facts showed that, immediately before a large fight, plaintiff had shouted he was going to kill the victim, plaintiff instigated the fight, and

92

witnesses reported seeing plaintiff punching the victim), aff'd, 322 F. App'x 312 (4th Cir. 2009) (per curiam); Kipps v. Ewell, 538 F.2d 564, 566-67 (4th Cir. 1976) (finding probable cause for murder based on statement from fellow inmate that defendant admitted the murder and showed him the weapon, defendant had been seen with the victim within days of her estimated death, and several others reported that defendant told them shortly after the victim's body was found that he could provide information about the victim but would not do so voluntarily); Mead v. Shaw, Civil Action No. 3:12-CV-00132-GCM, 2016 WL 316870, at *6 (W.D.N.C. Jan. 25, 2016) (in a § 1983 case, finding that probable cause existed to arrest boyfriend for the murder of girlfriend, despite his acquittal at trial, based on, among other things, his demeanor at the crime scene and during interviews with law enforcement, his past violent or difficult relationships with women, his apparent attempts to manipulate a polygraph exam, and the presence of his DNA in the victim's rape kit), aff'd, 716 F. App'x 175 (4th Cir. 2018) (per curiam); Harkness v. City of Anderson, No. C.A. 8:05-1019-HMH, 2005 WL 2777574, at *1-4 (D.S.C. Oct. 25, 2005) (in a § 1983 case, finding that probable cause existed to arrest plaintiff for murder after a 12-year-old witness (who law enforcement later determined actually committed the murders) identified plaintiff as the shooter, correctly identified plaintiff's vehicle, identified plaintiff out of a photographic line-up as the shooter, and

93

generally provided inculpatory information that law enforcement was able to verify).

Thus, even disregarding the allegedly fabricated evidence, a reasonable officer would have believed there was a probability that Howard was responsible for the murders. Because probable cause existed to arrest Howard for the murders and arson, his § 1983 malicious prosecution claim fails.[36]

### d. Failure to Investigate

Howard alleges that Dowdy violated his due process rights by failing to properly investigate his case; namely, Dowdy fabricated evidence to implicate Howard, withheld exculpatory evidence, and intentionally failed to perform further investigations into the source of sperm found in Nishonda. Furthermore, Howard argues that Dowdy failed to adequately investigate the New York Boys as suspects, even though Dowdy received a tip strongly suggesting that the gang was responsible for the murders.

Law enforcement has no constitutional duty to "investigate independently every claim of innocence" or "perform an error-free investigation." Baker v. McCollan, 443 U.S. 137, 146 (1979). The Fourth Circuit has also made clear that "there is no independent constitutional right to investigation of a third party." Gilliam,

_____

[36] Howard's argument that Dowdy conceded otherwise is wrong, as he clearly stated he believed he had probable cause for an arrest. (Doc. 72-1 at 382:5-13.)

94

932 F.3d at 240.  However, it has recognized a due process claim for failure to perform an adequate investigation if an officer takes bad faith actions to shield his wrongful acts, including fabricating testimony and failing to disclose exculpatory evidence.  Id. at 240-41.  Dowdy argues that because Howard's fabrication and Brady claims fail, his failure to investigate claim necessarily fails because there was no illegal conduct from which Dowdy would shield himself.  He contends, alternatively, that in the absence of any evidence of bad faith he is entitled to qualified immunity because any duty to follow alternative leads was not clearly established in 1991-94.

To the extent the court has found that Howard has presented evidence from which a jury could conclude that Dowdy fabricated and suppressed evidence, Dowdy's motion for summary judgment as it relates to Howard's claim of inadequate investigation will be denied.  It will be up to a jury to determine whether Dowdy fabricated and suppressed evidence to cover up his failure to adequately investigate the New York Boys' participation in the murders[37] and Nishonda's sexual history and return date to Doris's apartment (particularly after DNA evidence excluded Howard as a source of the sperm found in Nishonda before trial) and, if so, if

---

[37] To be clear, Howard has not provided evidence that the New York Boys in fact had any role in the murders of the Washingtons.

he acted in bad faith to shield his allegedly wrongful acts.[38] Consequently, the court need not reach Dowdy's immunity argument.

## 2. State Law Claims

Howard brings three state law claims against Dowdy: malicious prosecution; negligence; and intentional infliction of emotional distress. Dowdy first argues that public official immunity shields him from liability against all three claims.

"Public official immunity, which applies to public officials sued in their individual capacity, is analogous to qualified immunity in the federal context." White v. City of Greensboro, 408 F. Supp. 3d 677, 705 (M.D.N.C. 2019). A public official is entitled to immunity from suit unless he "engaged in discretionary actions which were allegedly: (1) corrupt; (2) malicious; (3) outside of and beyond the scope of his duties; (4) in bad faith; or (5) willful and deliberate." Smith v. Jackson Cty. Bd. of Educ., 608 S.E.2d 399, 411 (N.C. Ct. App. 2005) (quoting Reid v. Roberts, 435 S.E.2d 116, 119 (N.C. Ct. App. 1993)). More specifically, "public official immunity applies to public officials in their individual capacity for negligence in performance of their duties," not to actions taken with malice. White, 408 F. Supp. 3d at 704 n.20. Thus, if Howard has

---

[38] The Fourth Circuit concluded in Gilliam that as of 1983 a defendant's "constitutional rights not to be imprisoned and convicted based on coerced, falsified, and fabricated evidence or confessions, or to have material exculpatory evidence suppressed, were clearly established." Gilliam, 932 F.3d at 241.

sufficiently forecast evidence showing Dowdy acted with malice, public official immunity will not shield him from liability.

Malice in the public official immunity context refers to "wantonly do[ing] that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 321 S.E.2d 888, 890 (N.C. 1984). Dowdy argues that Howard has failed to show that he acted with malice in investigating the Washington murders. However, the actions described in analyzing Howard's federal claims, taken in the light most favorable to Howard, create an issue of material fact as to whether Dowdy acted with malice since Howard's state law claims arise out of the same facts as his federal claims. Thus, Howard has forecast sufficient evidence, if believed, to deprive Dowdy of public official immunity. See Wells v. N.C. Dep't of Corr., 567 S.E.2d 803, 813 (N.C. Ct. App. 2002) ("[I]f the plaintiff alleges an intentional tort claim, a determination [whether public official immunity applies] is unnecessary since . . . a public official . . . is [not] immunized from suit."); cf. Maney v. Fealy, 69 F. Supp. 3d 553, 564-65 (M.D.N.C. 2014) (synthesizing North Carolina cases and concluding that public official immunity does not apply to intentional torts in which malice encompasses intent). Therefore, Howard's claims for malicious prosecution and intentional infliction of emotional distress against Dowdy are not barred by public official immunity.

Furthermore, "once the cloak of official immunity has been pierced . . . the defendant is not entitled to [immunity] protection on account of his office and he is then liable for simple negligence." Wilcox v. City of Asheville, 730 S.E.2d 226, 238 (N.C. Ct. App. 2012) (alteration in original) (internal quotations omitted). Because Howard has satisfied his "burden of showing that [Dowdy] acted maliciously," public official immunity will not shield Howard's negligence claim. Id.

Having concluded that Dowdy is not entitled to public official immunity as to Howard's state law claims, the court will turn to the merits of each claim.

### a. Malicious Prosecution

To bring a state law claim for malicious prosecution in North Carolina, Howard must demonstrate that Dowdy "(1) instituted, procured or participated in the criminal proceeding against [him]; (2) without probable cause; (3) with malice; and (4) the prior proceeding terminated" in Howard's favor. Moore v. Evans, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996) (quoting Williams v. Kuppenheimer Mfg. Co., Inc., 412 S.E.2d 897, 899 (N.C. Ct. App. 1992)).

Dowdy argues that Howard's malicious prosecution claim fails because (1) the prosecutor independently made the decision to bring Howard's case to trial, and (2) probable cause existed to prosecute Howard for the murders. As to his first argument, Dowdy argues

98

that the North Carolina Supreme Court's decision in <u>N.C. Farm Bureau Mutual Insurance Co. v. Cully's Motorcross Park, Inc.</u>, 742 S.E.2d 781 (N.C. 2013), altered the first element of a malicious prosecution claim such that when a third party "independently exercise[s] discretion to make the prosecution his own," after a defendant provides the third party with information, that decision insulates the defendant from liability. <u>Id.</u> at 787-88. Howard contends that <u>Cully's</u> has no application to law enforcement officials. However, it is not necessary to decide this issue because, as the court has already determined, probable cause existed to arrest Howard for the murders.[39]

Just as the court cannot consider the alleged fabricated evidence in deciding whether probable cause existed in relation to Howard's § 1983 malicious prosecution claim, it cannot consider the same evidence in relation to Howard's common law malicious

---

[39] Although the finding is unnecessary, Dowdy is likely incorrect that <u>Cully's</u> would be applicable here. The North Carolina Supreme Court expressly limited the holding of <u>Cully's</u> to instances where a private party provides information to a public official. <u>Cully's</u>, 742 S.E.2d at 787-88. Furthermore, <u>Cully's</u> rule only applies where an individual provides information that he "believes to be true." <u>Id.</u> at 787. But Dowdy was not acting as a private party and the court has found there is a jury question whether Dowdy knowingly provided the prosecutor with false information. As <u>Cully's</u> noted, "where it is unlikely there would have been a criminal prosecution of [the] plaintiff except for the efforts of [the] defendant," a genuine issue of material fact exists regarding the first element of a malicious prosecution claim. <u>Becker v. Pierce</u>, 608 S.E.2d 825, 829 (N.C. Ct. App. 2005) (internal quotations omitted).

Case 1:17-cv-00477-TDS-JEP   Document 119   Filed 09/16/20   Page 99 of 135

prosecution claim.  See Braswell v. Medina, 805 S.E.2d 498, 507 (N.C. Ct. App. 2017).  Even so, as the court found with the federal claim, Dowdy did not lack probable cause when he arrested Howard for the murders of the Washingtons.  Thus, for the same reasons that the court granted Dowdy's motion as it relates to Howard's federal malicious prosecution claim, Dowdy's motion as to Howard's state malicious prosecution claim will be granted.[40]

### b. Negligence

Dowdy's only argument regarding Howard's negligence claim relies upon public official immunity.  However, the court has found that Howard has presented evidence sufficient to pierce the cloak of public official immunity such that Dowdy is not shielded from liability against Howard's negligence claims.  Because Dowdy offers no other argument on this issue, his motion for summary judgment as it relates to Howard's negligence claim will be denied.

### c. Intentional Infliction of Emotional Distress

To bring a claim for intentional infliction of emotional distress, Howard must show "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional

--------

[40] Unlike a § 1983 malicious prosecution claim, a common law malicious prosecution claim is not bound by the strictures of the Fourth Amendment. The North Carolina Supreme Court has recently declined to clarify whether North Carolina law recognizes a malicious prosecution claim when, after a magistrate or grand jury finds probable cause, "that probable cause later evaporates but the prosecution nevertheless continues in bad faith." Turner v. Thomas, 794 S.E.2d 439, 445-46 (N.C. 2016). As Howard has not raised this particular argument, the court does not consider it.

distress to another." Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981). The tort may also be established if Dowdy's actions demonstrate "a reckless indifference to the likelihood" that he would cause Howard severe emotional distress. Turner v. Thomas, 794 S.E.2d 439, 446 (N.C. 2016) (quoting Dickens, 276 S.E.2d at 335). Dowdy argues that Howard has offered no evidence that he engaged in extreme and outrageous conduct sufficient to satisfy the first element of the tort.

The North Carolina Supreme Court has defined extreme and outrageous conduct as actions that "exceed[] all bounds of decency tolerated by society." West v. King's Dep't Store, Inc., 365 S.E.2d 621, 625 (N.C. 1988). Extreme and outrageous conduct is a high threshold. Turner, 794 S.E.2d at 446. The North Carolina Supreme Court has found that when "law enforcement officials deliberately abus[e] their authority as public officials to manipulate evidence and distort a case for the purpose of reaching a foreordained conclusion of guilt," their actions constitute extreme and outrageous conduct. Id.

As already noted, Howard has established a genuine issue of material fact whether Dowdy fabricated important evidence while prosecuting the murders. If a jury were to find that Dowdy committed this misconduct, it could likewise determine that his actions were extreme and outrageous. Thus, the court will deny his motion for summary judgment as to Howard's intentional

infliction of emotional distress claim.

**C. Milton Smith**

Milton Smith seeks summary judgment on the two claims Howard brings for allegedly fabricating a confession from Howard while he and his brother Harvey were being booked in jail.[41] (Docs. 75, 76.) Howard brings a federal § 1983 fabrication claim and a state law claim for intentional infliction of emotional distress against Smith. (Doc. 87 at 86-89.)

After Howard had been arrested by DPD for the Washington murders, Smith obtained warrants to arrest Howard and his brother Harvey for the arson of the Washingtons' apartment. In the course of booking the two, Smith recorded the following exchange in his report:

> Darryl Howard appeared to my left, still in the jail holding area. Darryl Howard stated that "Wiz" was not with him in Few Gardens when this "thing went down." Darryl Howard stated that his brother Kenneth was with him.
>
> This investigator then asked Darryl Howard, "so 'Wiz' was not with you, huh? *So your brother Kenneth was with you when you did the thing"? Darryl Howard stated that "yes, it was me and Kenneth."*

(Doc. 88-40 at 5-6 (emphasis added).) As Smith continued to complete the arrest/detention report, he recorded that Howard, "who had walked from my left, behind me and now stood to my right

---

[41] Howard has abandoned his state law malicious prosecution claim against Smith. (Doc. 87 at 88 n.33.) Smith's motion for summary judgment will therefore be granted as to that claim.

stated 'you're a smart mother fucker aren't you?'" (Id. at 6.)
At trial, Smith characterized Howard's statement as a confession
that he had committed the murders and arson, a position he
maintained in his later deposition. (Doc. 72-1 at 324:15-325:19;
Doc. 88-12 at 65:18-23 ("All I know is he confessed to it. And he
was a grown-assed man when he confessed to it.").)

When cross-examined at trial about whether he told Smith that
he and Kenny "did that thing," Howard testified, "I didn't tell
him that," and said that the statement was Smith's "own
interpretation to help himself to say something like that." (Doc.
72-1 at 546:8-14.) According to Howard, Smith had asked where
Howard and his brother Harvey had been the night of the murders
(id. at 545:20-546:1), and he responded specifically to that
question (id. at 534:16-19). Howard testified that Smith heard
him say that Kenny was with him that night and "wrote it the way
he wanted to say it." (Id. at 534:8-20.) In his deposition,
Howard testified that he had no recollection of telling Smith that
Harvey was not with him in Few Gardens "when this thing went down"
and that Kenny was with him. (Doc. 88-3 at 361:8-25.) Later in
his deposition, Howard insisted that he had never confessed to the
murders and arson and never told Smith that he had "[done] this
thing." (Id. at 419:23-420:9.)

    1.   **Section 1983 Fabrication Claim**

Smith argues that Howard has failed to present evidence that he knowingly fabricated or misrepresented any statement by Howard and, in any event, has failed to demonstrate that his report was the but-for cause of Howard's conviction.  According to Smith, the only evidence that he fabricated a confession is found in Howard's deposition where, when asked whether he said he "did this thing," testified, "I don't remember telling him that."  (Doc. 88-3 at 361:8-25.)  Smith contends that Howard's attempt to clarify his response later in the deposition fails to create an issue of material fact by offering conflicting versions of his own testimony.  Howard points to his trial testimony denying Smith's version of the exchange and his deposition testimony that he never confessed to the murders or said he "did this thing."

In the light most favorable to Howard, there is a genuine issue of material fact whether Smith accurately recounted Howard's alleged statement in his report.  Smith's contention that Howard's deposition testimony is the only evidence that he fabricated a confession ignores Howard's trial testimony that Smith purposefully mischaracterized their conversation into a confession and that Howard never confessed to the killings.  Moreover, Howard's deposition testimony is not fatally conflicting; his lack of any recollection of having said he "did this thing" is not

inconsistent with his denial of ever confessing to the murders.[42] Thus, a jury must decide which of the two characterizations of this conversation is correct. See, e.g., Swick v. Wilde, No. 1:10-cv-303, 2012 WL 3780350, at *21 (M.D.N.C. Aug. 31, 2012).

Smith also argues that Howard cannot show causation because his arrest, indictment, conviction, and incarceration would have occurred even had Smith's alleged fabrication not been presented to the jury. (Doc. 76 at 15.) To the extent Smith argues that the alleged statement was not material to the finding of probable cause (because Howard had already been arrested for murder) or the prosecutor's decision to indict, Smith relies on the wrong standard. (Id. at 16 (relying on cases addressing § 1983 malicious prosecution claims regarding plaintiff's pretrial detention).)[43] As Howard notes and the court has stated earlier, the liberty interest here is Howard's conviction and incarceration. Massey v. Ojaniit, 759 F.3d 343, 354 (4th Cir. 2014); see also Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988).

---

[42] Smith's reliance on "sham affidavit" cases barring the presentation of an affidavit to conflict with prior deposition testimony, e.g., Cordero v. City of Columbia, C/A No. 3:11-cv-2502-JFA, 2013 WL 1282061, at *3 (D.S.C. Mar. 27, 2013), aff'd, 543 F. App'x 334 (4th Cir. 2013) (per curiam), is therefore misplaced. See Sanders v. Mitre Corp., No. CIVA 104CV1116 JCC, 2005 WL 5436644, at *3 (E.D. Va. July 20, 2005), aff'd, 198 F. App'x 304 (4th Cir. 2006) (per curiam) (declining to strike affidavit that failed to directly contradict prior sworn testimony).

[43] E.g., Durham v. Horner, 690 F.3d 183, 188-89 (4th Cir. 2012) (addressing a § 1983 malicious prosecution claim); Miller v. Prince George's Cty., 475 F.3d 621, 627-28 (4th Cir. 2007) (Fourth Amendment unreasonable seizure claim).

Case 1:17-cv-00477-TDS-JEP   Document 119   Filed 09/16/20   Page 105 of 135

To be sure, Smith's trial testimony is not actionable. Briscoe v. LaHue, 460 U.S. 325, 345-46 (1983). But this does not immunize Smith from liability for conduct "outside the courtroom" that "violated an accused's rights." Snyder v City of Alexandria, 870 F. Supp. 672, 688 (E.D. Va. 1994). "Courts considering the applicability of Briscoe in police misconduct cases have held that a witness cannot immunize pretrial conduct by testifying about it." Washington v. Wilmore, No. Civ. A. 3:02CV00106, 2006 WL 2471611, at *7 (W.D. Va. Aug. 23, 2006) (citing Snyder, 870 F. Supp. at 688). "[I]n fabrication of evidence cases, it is clear that the fabricator may be liable for his pretrial actions even where he himself has offered the evidence in an immunized judicial proceeding." Id. at *8 (citing Zahrey v. Coffee, 221 F.3d 342 (2d Cir. 2000)). See Spurlock v. Satterfield, 167 F.3d 995, 1001-04 (6th Cir. 1999) (finding that an officer was immune from liability as to his trial testimony, but not for officer's misconduct that formed the grounds for his trial testimony); Buckley v. Fitzsimmons, 20 F.3d 789, 796 (7th Cir. 1994) ("Immunity for prosecutorial deeds does not whitewash wrongs completed during the investigation."); Burgess v. Balt. Police Dep't, Civil Action No. RDB-15-0834, 2016 WL 795975, at *7 n.10 (D. Md. Mar. 1, 2016) (rejecting crime lab analyst's argument that, because he testified at plaintiff's criminal trial, he was immune from plaintiff's claims that he fabricated lab results implicating plaintiff in the

106

crime and subsequently testified about the results at trial);
Washington v. Buraker, No. CIVA302CV00106, 2006 WL 759675, at *7
(W.D. Va. Mar. 23, 2006) (noting that "although it does not appear
that the [fabricated] police report [authored by the defendant]
influenced the decision to bring charges, it is unquestionable
that" false information in the report "influenced the way in which"
the case was prosecuted (internal citations omitted)).

The issue is whether Howard's conviction was a "reasonably
foreseeable result of [Smith]'s initial act of fabrication" –– his
report of the confession. Washington v. Wilmore, 407 F.3d 274,
282-83 (4th Cir. 2005). That will be for a jury to decide. Smith's
argument that the allegedly fabricated confession cannot be
construed to have caused Howard's conviction is unavailing. This
case was admittedly circumstantial. As the prosecutor argued to
the jury, "the real crux of this case comes down to one thing and
that is whether or not you believe the defendant." (Doc. 72-1 at
719:21-24.) A confession reported by a law enforcement officer
carries great potential weight. In the absence of the reported
confession or the other allegedly fabricated evidence, a
reasonable jury could conclude that reasonable doubt existed to
avoid a finding of guilt. See, e.g., Tarlton for McCollum v.
Sealey, No. 5:15-CV-451-BO, 2018 WL 1129976, at *12 (E.D.N.C. Mar.
1, 2018), aff'd sub nom. Gilliam v. Sealey, 932 F.3d 216 (4th Cir.
2019); Washington v. Buraker, 322 F. Supp. 2d 702, 712 (W.D. Va.

2004) (finding causation where fabricated evidence "could have affected the judgment of the jury"), aff'd sub nom. <u>Washington v. Wilmore</u>, 407 F.3d 274 (4th Cir. 2005).

Thus, Smith's motion for summary judgment on Howard's fabrication claim must be denied.

### 2. Intentional Infliction of Emotional Distress

Smith finally seeks summary judgment on Howard's claim for intentional infliction of emotional distress. Smith challenges only the causation element. (Doc. 76 at 17-18.) Specifically, he contends that even if Howard was wrongfully convicted, he cannot show that any emotional distress was caused by the firefighter's report. Smith urges that "Howard was going to be indicted and tried for the Washington murders . . . regardless of whether Smith recorded the statements" in his report. (<u>Id.</u> at 18.) However, as the court detailed in considering the causation prong of Howard's fabrication claim against Smith, the issue is not whether Smith's actions caused Howard to be tried, but rather whether the allegedly fabricated report caused Howard's conviction and subsequent incarceration. Notably, the Supreme Court of North Carolina recently found that the causation element of an intentional infliction of emotional distress claim was satisfied when law enforcement officers "altered and manipulated evidence" to obtain a murder conviction "despite evidence to the contrary." <u>Turner v. Thomas</u>, 794 S.E.2d 439, 446-47 (N.C. 2016). Here, a jury could

108

reasonably conclude that Smith fabricated or deliberately misconstrued statements made by Howard into a confession. Consequently, a jury must resolve whether Smith misrepresented or fabricated a confession of the murders in his report and, if so, whether that caused Howard severe emotional distress.

### D. Soucie and Pennica

Defendants Michele Soucie and Scott Pennica jointly move for summary judgment as to the three claims against them: a § 1983 suppression claim, a state law claim for obstruction of justice, and a state law claim for intentional infliction of emotional distress. (Docs. 77, 78.) They argue that Howard has failed to forecast sufficient evidence from which a reasonable jury can conclude that they acted intentionally because there is no evidence they knew of the state court's September 2011 Order requiring DPD to alert him to any exculpatory evidence found in connection with the additional DNA tests. Further, they contend, even if there was a constitutional violation they are entitled to qualified immunity.

#### 1. Section 1983 Suppression Claim

Howard alleges that Soucie and Pennica violated his liberty interest in proving his innocence under North Carolina's post-conviction relief statutes by intentionally suppressing exculpatory post-conviction information; namely, notes and a video recording of their December 2011 interview of Jermeck Jones when

109

they obtained his buccal DNA sample for the SBI.  Howard contends their failure caused him to spend an additional four and one-half years in prison.  Soucie and Pennica do not dispute that DPD's audio recording of Jones's interview and their related notes contain exculpatory information whose disclosure was required by the state court's September 2011 Order.  Rather, they maintain that no one ever shared the court order or its requirements with them, and because they had no independent duty to provide the materials, there is no basis from which a jury could reasonably conclude that they acted intentionally.

As noted in this court's prior order denying Soucie and Pennica's motion to dismiss, while the Brady duty to disclose exculpatory evidence does not continue post-conviction, convicted individuals have a liberty interest in demonstrating their innocence with new evidence under state law.  (Doc. 22 at 13 (citing Dist. Att'y's Off. for Third Jud. Dist. v. Osborne, 557 U.S. 52, 68 (2009); Burgess v. Balt. Police Dep't, Civil Action No. RDB-15-0834, 2016 WL 795975, at *7-8 (D. Md. Mar. 1, 2016)).)  Howard agrees, as this court also noted in that same order (Doc. 22 at 14-15) that to be actionable a violation of this interest must be intentional.  (Doc. 87 at 90.)

Howard's claim relies on circumstantial evidence to suggest that DPD was informed of its obligation under the September 2011 Order to disclose the materials that were not provided.  Both

110

Soucie and Pennica maintain that they never had knowledge of that order or the obligations set forth within it. (Doc. 78-3 at 64:9-24; Doc. 78-4 at 29:4-32:17.) Howard points to statements by Durham Assistant District Attorney Dale Morrill who, while having no specific recollection of ever receiving the order or what he may have done in response, acknowledged that, as was his practice, "If I receive an order, I'm going to comply with it to the best of my ability." (Doc. 89-13 at 250:13-14.) Based on Morrill's "general practices" and the evidence of what he did, Howard contends a jury can infer that he disclosed the order's contents to Pennica and Soucie. (Doc. 87 at 91.) For example, District Attorney Tracey Cline requested, and Morrill turned over, DPD's complete file to Howard's post-conviction counsel, as required by the order. (Doc. 89-13 at 131:21-132:7, 151:14-152:8.) Morrill also met with Howard's counsel to review the evidence and sent a letter to DPD requesting it to send the evidence to the SBI. (Id. at 149:20-150:3, 153:5-17.) Additionally, Morrill coordinated with the SBI for the testing of DNA. (Id. at 162:5-15.) Morrill also recalls having spoken with Pennica between August 26 and September 15, 2011. (Id. at 256:13-16.)

Howard also cites the actions of Pennica, a DPD sergeant, and Soucie, a DPD investigator. Pennica had one or two "brief" conversations with Morrill, "reiterating what [Morrill's] boss [District Attorney Cline] was telling him." (Doc. 89-19 at 62:22-

111

24.)  Pennica retrieved a copy of Howard's trial transcript, which he reviewed to familiarize himself with the case.  (Id. at 54:21-25.)  He recommended to his supervisors that they try to find Jones and interview him so that "hopefully the truth . . . would come out one way or the other."  (Id. at 60:6-10, 79:2-6.)  Pennica assigned Soucie the responsibility of locating the subject whose DNA had been returned on the CODIS report.  (Doc. 89-26 at 32:18-22.)  He also joined her for the session with Jones to extract his DNA sample and attempt to question him following his arrest.  (Doc. 89-19 at 68:15-18.)

Soucie learned that Jones had an outstanding warrant relating to a driving offense, emailed his probation officer, had him brought in, and read him his rights.  (Doc. 89-26 at 41:4-20, 48:5-7; Doc. 89-29 at 3:17-4:18.)  She obtained the buccal DNA sample, sent it to the SBI crime lab, burned a copy of the CD from the recording of the encounter with Jones, and testified that, as Pennica instructed her, turned it all into the "records" file.  (Doc. 89-26 at 84:1-85:23.)  Focusing on Soucie's acknowledgment that it was her practice to send all materials to the district attorney in an open homicide case (id. at 22:3-9), Howard contends this is a concession of intentional misconduct.  He focuses heavily on the potential impeachment value of statements Jones made during the interview, even though he invoked his right to counsel, and zeroes in particularly on phone calls Jones made after Pennica and

Soucie left the interview room that were recorded on the hidden camera.[44] He concludes that Soucie and Pennica suppressed their notes and the recording because they recognized that they would have reflected poorly on DPD's prior handling of Howard's case.

A failure to disclose exculpatory information is a necessary, but not sufficient, condition for police liability under § 1983. Jean v. Collins, 221 F.3d 656, 663 (4th Cir. 2000) (en banc) (Wilkinson, C.J., concurring in the judgment). Indeed, a plaintiff must show that an officer acted in bad faith in failing to disclose evidence; this showing must "negate any negligent or innocent explanation for the actions on the part of the police." Id. Here, the record fails to meet this standard.

A necessary predicate for Howard's claim is knowledge by Pennica and Soucie of their obligation to forward their notes and video recording of Jones's DNA extraction to the DA or to Howard's counsel. Morrill does recall speaking to Pennica -- his point of contact at DPD about Howard's postconviction case -- after the

---

[44] These include: a statement that Nishonda had been his girlfriend but that he did not kill her; once he was informed that his DNA would be taken, his contradictory statement that he did not know Doris (despite the fact that his DNA was subsequently found on her); a statement that he had consensual sex with Nishonda (despite the fact that she was 13 years old and his DNA was not found on her); the fact that when he was in the interview room alone, he made a series of calls from his cell phone in which he implicated himself in the crimes and indicated that he had just lied to Soucie and Pennica, including statements that he did not want to "rat on anybody," that "I ain't said nothing," that "ain't nothing they going to learn without my attorney", and that he had visited the Washington apartment. (Doc. 89-29 at 13:6-7, 24:21, 26:22-24, 28:3.)

113

August 26, 2011, SBI CODIS report and just prior to the filing of the September 2011 Order. (Doc. 78-2 at 256:13-24.) Morrill told Pennica that he wanted to go "above and beyond" to ensure the District Attorney's Office complied with the post-conviction procedures. (Doc. 89-13 at 152:10-154:20.)

However, the parties have acknowledged that Howard's post-conviction counsel never served the September 2011 Order on DPD. (Doc. 71 ¶ 3.) There is also no evidence that anyone informed DPD of the order's directives as to DPD, which were set out in the last of several numbered paragraphs which otherwise addressed other parties. Morrill testified that he did not specifically recall receiving the order himself or informing DPD of the its contents. (Doc. 78-2 at 253:3-16, 254:9-255:5.) He had no memory of ever sending the order to DPD. (Id. at 255:15-256:11.) He did agree that as an officer of the court his general practice was to follow the law and ensure that state agencies knew of their legal responsibilities. (Id. at 253:24-254:8, 254:15-25, 255:5-8.) All the evidence indicates that he did so as to his responsibilities -- turning over the case file, making the physical evidence available, and directing DPD to collect Jones's DNA. And while Morrill may have expected DPD to turn over to him any other evidence that was created, in this post-conviction posture it cannot be assumed that DPD had the same understanding absent knowledge of the order.

There is also no dispute that the district attorney, Tracey Cline, had announced that she would not pursue any claims against Jones related to the Washington murders. (Doc. 89-18 at 1; Doc. 89-13 at 201:12-15.) The record reflects that Morrill passed this declination decision on to Jason Kreag, Howard's post-conviction counsel, and to Pennica, who informed Soucie. (Doc. 89-13 at 201:12-22; Doc. 89-26 at 87:10-12.)

Soucie became involved in the case on December 5, 2011, almost 3 months after the September 2011 Order, and Pennica directed her to collect Jones's DNA as per the August 26, 2011, SBI CODIS report. (Doc. 89-26 at 26:13-22, 32:18-22.) The CODIS report, which was directed to Pennica, included this statement from the SBI: "Per a conversation with DA Tracey Cline on 8/26/2011, the CODIS hit will not be pursued by the Durham County District Attorney's Office." (Doc. 89-18 at 1.) It is also important that by the time Pennica and Soucie got involved, DPD had classified Howard's case as "closed." (Doc. 89-26 at 25:6-13.) So, the normal rules about open file discovery and disclosing all information to the district attorney, upon which Howard relies, were not applicable.[45] This was also the first post-conviction case on which either investigator had worked. (Doc. 89-26 at 26:8-12; Doc. 89-19 at 53:12-13.)

---

[45] This is one reason why Brady does not apply at this post-conviction stage. See Osborne, 557 U.S. at 68-70.

Soucie collected Jones's buccal DNA and forwarded it to the SBI for further processing. (Doc. 89-26 at 84:1-10.) Although Soucie and Pennica tried to interview Jones about the Washington murders, he invoked his right to counsel; it was only after Soucie and Pennica left Jones alone in the room that the recording equipment hidden in the thermostat continued to run and captured Jones's comments about the murders. But there is no evidence that anyone at DPD ever viewed the video. (Doc. 89-30 at 329:4-17.) In light of the DA's directive that DPD would not pursue the case, Soucie wrote her report and put it and the recording in the file, as Pennica directed. (Doc. 89-26 at 85:2-15.)

Viewing the complete record, the evidence is insufficient to negate any innocent or even negligent explanation for the failure of DPD to provide the notes and recording to Howard's post-conviction counsel. It is not contested that ordinarily, in an active investigation, the practice and expectation was for DPD to disclose its file to the DA's office, which in turn would disclose it to the defendant's counsel; no one suggests that DPD would be expected to disclose materials directly to defense counsel. (Doc. 89-13 at 106:4-18.) But there was no active DPD investigation here. Soucie and Pennica were told by Morrill, and the SBI's CODIS report confirmed, that the district attorney, Cline, had declared that she was not going to prosecute any case against Jones. Thus, the only basis for requiring disclosure was the September 2011

116

Order.  But on this record, a jury could only speculate that its terms as to DPD's responsibilities were ever disclosed to Soucie and Pennica.  Moreover, it defies reason to suggest that two DPD investigators, knowing their very actions were subject to ongoing court oversight, would carry out the mandate of the SBI CODIS report and mail the DNA to the SBI, yet intentionally flout a court order to produce their interview notes and a video routinely recorded in order to protect the result of a case on which they had never worked and which was resolved by jury verdict nearly two decades earlier.  Rather, the record strongly indicates that neither Pennica nor Soucie was aware of any obligation to provide their notes and the recording in a closed case to the DA or to post-conviction counsel with whom they had no interaction.

Soucie and Pennica's motion for summary judgment on this claim will therefore be granted.  Because Howard has failed to demonstrate sufficient evidence from which a jury could reasonably conclude that Soucie and Pennica acted intentionally, the court need not address their alternative argument that they are entitled to qualified immunity.

### 2.  Obstruction of Justice

Soucie and Pennica also seek summary judgment on Howard's state law claim for obstruction of justice against them. Obstruction of justice, a common law claim in North Carolina, is broadly defined as "any action intentionally undertaken . . . for

117

the purposes of obstructing, impeding, or hindering [a] plaintiff's ability to seek and obtain a legal remedy." Braswell v. Medina, 805 S.E.2d 498, 509 (N.C. Ct. App. 2017) (quoting Blackburn v. Carbone, 703 S.E.2d 788, 795 (N.C. Ct. App. 2010)); see also Jones v. City of Durham, 643 S.E.2d 631, 633 (N.C. Ct. App. 2007) (quoting Broughton v. McClatchy Newspapers, Inc., 588 S.E.2d 20, 30 (N.C. Ct. App. 2003)).

Howard argues that the same conduct that supports his suppression claim supports his obstruction of justice claim. Soucie and Pennica respond similarly that Howard has failed to demonstrate sufficient evidence from which a jury could reasonably conclude that they intentionally withheld evidence. For the same reasons Howard's suppression fails –- that, construing the facts in the light most favorable to Howard, the record does not demonstrate a genuine dispute whether Soucie and Pennica intentionally disregarded the September 2011 Order -- his obstruction claim fails as well. Thus, Soucie and Pennica's motion for summary judgment on Howard's obstruction of justice claim will be granted.

### 3. Intentional Infliction of Emotional Distress

Howard's claim for intentional infliction of emotional distress also rests on his contention that Soucie and Pennica acted intentionally in not disclosing their notes and the video recording of their session with Jones. This claim, too, rises or falls on

118

proof of an intentional violation of the September 2011 Order.
Therefore, for the reasons noted above, it fails. Soucie and
Pennica's motion for summary judgment as to Howard's claim for
intentional infliction of emotional distress will be granted as
well.

### E. City of Durham

The City of Durham moves for summary judgment on all of
Howard's federal constitutional claims against it on the grounds
that Howard has failed to forecast evidence of an unconstitutional
policy, custom, or practice. (Docs. 81, 85.) The City further
argues that Howard's state law claims of obstruction of justice,
intentional infliction of emotional distress, and malicious
prosecution fail to withstand summary judgment because of both the
derivative nature of the claims and governmental immunity.

#### 1. __Monell__ Claims

To prevail on a § 1983 claim against a municipality, a
plaintiff must demonstrate a constitutional violation as a result
of an official policy, practice, or custom of the municipality.
Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). However,
a municipality may not be held liable for a § 1983 claim based on
the acts of its employees under a *respondeat superior* theory of
liability. Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S.
397, 403 (1997); see also Pembaur v. City of Cincinnati, 475 U.S.
469, 479 (1986) ("The 'official policy' requirement was intended

Case 1:17-cv-00477-TDS-JEP   Document 119   Filed 09/16/20   Page 119 of 135

to distinguish acts of the municipality from acts of employees of the municipality."). A policy, practice, or custom for which a municipality may be held liable can arise in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in original) (internal quotations omitted). A "final policymaker" under Monell is "someone who has the responsibility and authority to implement final municipal policy with respect to a particular course of action." Id. at 472 (internal quotations omitted). This sort of policymaking refers to the "authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987). This is an issue determined by state law. City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988) (plurality opinion); Riddick v. Sch. Bd. of City of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000). In considering North Carolina law, the court must consider "whether policymaking authority in fact rests where state law has placed it." Lytle,

326 F.3d at 472.  In so doing, the court "must look to the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law."  Hunter v. Town of Mocksville, 897 F.3d 538, 555 (4th Cir. 2018) (quoting Riddick, 238 F.2d at 523).

Howard expressly limits his Monell claim to conduct occurring up to his conviction in 1995, and more specifically, to alleged misconduct committed by Dowdy and Smith.[46]  The City of Durham argues generally that Howard has failed to forecast evidence sufficient to establish a Monell violation.  In his response brief, Howard urges two theories of liability involving only the conduct of Dowdy.  Each will be addressed in turn.

First, Howard argues that the City ratified Dowdy's misconduct "through its maintenance of blatantly insufficient systems of supervision and discipline despite notice of Dowdy's ongoing violations."  (Doc. 87 at 99.)  Howard argues that Dowdy's supervisors, Sergeant M.T. Bowers and Captain E.E. Sarvis, knew of Dowdy's unconstitutional actions, were directly involved in the Washington murder investigations, and did nothing to stop him.  Additionally, Howard argues that the DPD Police Chief became directly involved in the unconstitutional actions because Dowdy coordinated with him to obtain an offer of a large money reward

_____

[46] Howard had included DPD Officer E.E. Sarvis in the complaint but has since dismissed all claims against him.  (Doc. 20.)

from the Governor of North Carolina. Howard urges that, given "[t]he sheer amount of flagrant misconduct in this case alone suggests" that these supervisors were aware of Dowdy's constitutional violations. (Id. at 100.) Furthermore, he contends, because the "high-level supervisors" were aware of the problems in the Washington murders investigation and failed to intervene, they effectively ratified and approved Dowdy's misconduct sufficient for Monell liability. (Id. at 103.) Howard contends, moreover, that while the actions of Soucie and Pennica do not subject the City to liability, they are evidence of a pattern of misconduct within DPD to indicate City liability for the alleged constitutional violations at issue here. (Id. at 104.)

Under this standard, Howard's ratification claims fail. Howard does not contend that any of Dowdy's direct supervisors can be considered a final policymaker. That is because police captains and lieutenants, absent some showing of delegation of power, are not final policymakers for a municipality. See Lytle, 326 F.3d at 472-73 ("The police department has multiple captains and multiple lieutenants, and it is far-fetched to assert that each of these individuals has the power to be a final policymaker for the city."). Moreover, Howard has not directed the court to any law or evidence that a final policymaker delegated final decision-making authority to Dowdy's direct supervisors such that they too could be considered policymakers sufficient to establish liability

122

for the City.  Id.  Thus, the only basis for Howard's argument of Monell liability via ratification to prevail is if the DPD Police Chief held final policymaking authority and ratified Dowdy's actions.

Here, too, Howard's claim falters.  As a preliminary matter, Howard fails to cite any municipal code, ordinance, or case law demonstrating that the DPD Police Chief has relevant final policymaking authority, either from positive law or from a delegation of powers from the City of Durham.  But even if the chief had such authority, as the City appeared to contemplate at oral argument (Doc. 117 at 87:11-14), there is no evidence that he ratified Dowdy's allegedly unconstitutional actions.

Howard rests his ratification argument on two points. Initially, he points to the chief's coordination with Dowdy some three months after the murders to submit a letter to the Governor seeking authorization for a $10,000 reward for information regarding the Washington murders.  Howard argues that the letter contained a material misrepresentation -- that there were no leads in the case -- even though Dowdy suspected Howard as the culprit. Even if untrue, that representation was not unlawful.  The statute authorizes the Governor to offer a reward "[w]hen it shall appear to [him], upon satisfactory information furnished to him, that a felony . . . has been committed [in North Carolina], whether the name or names of the person or persons suspected of committing

123

the . . . crime be known or unknown." N.C. Gen. Stat. § 15-53.1.

Nor does the misrepresentation suggest that the chief knew about and approved of Dowdy's other alleged misconduct. See Praprotnik, 485 U.S. at 127. Actually, the opposite. It tends to indicate an ongoing effort to gather more leads.

Howard's other contention is that "[t]he sheer amount of flagrant misconduct in this case" raised "glaring red flags" and "suggests" that Dowdy's direct supervisors must have known and, because they reported to the chief, the chief necessarily ratified them by failing to act. (Doc. 87 at 100.) This is insufficient. Howard has presented no evidence that Dowdy's supervisors, and more importantly, the chief, knew of the alleged misconduct. Because the record lacks evidence that the DPD Police Chief knew of Dowdy's allegedly wrongful actions and subsequently ratified them, and because Dowdy's supervisors are not final policymakers, Howard's ratification theory of liability fails. See Love-Lane v. Martin, 355 F.3d 766, 782-83 (4th Cir. 2004) (holding that plaintiff must show the municipality or final policymaker "was aware of the constitutional violation and either participated in, or otherwise condoned it"); cf. Spell, 824 F.2d at 1392-95 (recounting the numerous witnesses who testified at trial to establish municipal liability).

Howard's alternative basis for establishing Monell liability focuses on the failure to disclose that Jackson was a DPD paid

124

informant.  As an alternative to his claim that Dowdy suppressed Jackson's informant status, Howard argues that DPD had a custom, policy, and practice of segregating information about informants that, combined with insufficient training, caused the <u>Brady</u> violations with respect to Roneka Jackson.  Howard points to the testimony of Betty Boswell that she not only never asked informants if they were serving as witnesses but directed them not to disclose that fact to anyone, including DPD officers.  (Doc. 88-16 at 156:24-164:9, 166:25-167:13.)  As a result, she prevented herself from knowing whether the informant was also a DPD witness.  (<u>Id.</u> at 163:25-164:7, 211:5-212:20.)  Howard also cites the affidavit of DPD Captain Kelly, who testified that DPD disclosed an informant's identity only to the officer registering the informant (and possibly her partner) as well as the Commander of the Organized Crime Division and not to other officers because it would be "dangerous and impractical."  (Doc. 84 ¶¶ 10, 19.)  Kelly also stated that it would be "impractical and extraordinarily burdensome" to cross-check a witness list with the Organized Crime Division's confidential informant registry due to the volume of cases and lack of personnel.  (<u>Id.</u> ¶ 21.)  Finally, Howard relies on the deposition testimony of Dowdy, wherein he claims he never knew of Jackson's informant status or relationship with the New York Boys.  (Doc. 87-2 at 267:25-269:25, 312:19-314:18.)

    This alternative claim also fails.  Even if the DPD's

Organized Crime Division's handling of informants constituted a policy, Howard has not shown that a final policymaker knew of or ratified it.  Love-Lane, 355 F.3d at 782-83.  Nor has he shown that a final policymaker had delegated policymaking authority to subordinate officers (such as Martin or Kelly) who knew of or ratified the conduct.

This leaves two ways by which Howard may establish Monell liability as to his claim about failing to disclose informants: by demonstrating an omission, such as a failure to properly train officers, thus manifesting deliberate indifference to the rights of citizens; or by showing the existence of a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.  See Lytle, 326 F.3d at 471.

A municipality may be held liable for a failure to adequately train its employees.  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  To impose liability under § 1983 on a municipality for a failure to train, that failure must reflect the municipality's deliberate indifference to the rights of its citizens.  Id. Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Connick v. Thompson, 563 U.S. 51, 61 (2011) (quoting Bryan Cty., 520 U.S. at 410).  The Supreme Court has found that, to demonstrate deliberate indifference for purposes of failure to train, a plaintiff would ordinarily present

evidence of a "pattern of similar constitutional violations by untrained employees." Id. at 62. Without evidence of a pattern of constitutional violations, a plaintiff will struggle to establish municipal liability, as a "decisionmaker[] can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights" if the decisionmaker lacks notice that the training is deficient. Id. A "rare" exception exists in which a plaintiff may establish "single-incident liability" based on the failure to adequately train officers. Id. at 63-64; see also Jones v. City of Martinsburg, 961 F.3d 661, 672 (4th Cir. 2020) ("[A] single incident is almost never enough to warrant municipal liability.").

Here, there is no evidence of a pattern of failure to disclose a testifying witness's DPD informant status. Perhaps that reflects the practical problems of allowing an informant to testify in criminal cases. Nevertheless, Howard's failure to train claim fails for a more fundamental reason; he has not shown that the municipality knew or should have known about a deficiency in the officers' training. See Jones, 961 F.3d at 672 (noting in failure to train case that "[a]t its core, the strict Monell test asks for some level of notice"). Howard has not shown that a policymaker or the municipality itself knew that its training regarding the disclosure of the status of confidential informants was inadequate. Without this showing, he cannot also prove that the

127

deficiency "reflect[ed] a deliberate or conscious choice by the municipality." Id. (alteration in original) (quoting Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000)). Thus, Howard has failed to establish a Monell claim for failure to adequately train.

For these same reasons, Howard has failed to demonstrate his last basis for liability. There is no record evidence that DPD had a persistent and widespread practice of failing to disclose the status of confidential informants to other departments within the DPD when the witnesses were offered to testify. This theory of liability requires a demonstration that "a pattern of comparable practices has become actually or constructively known to responsible policymakers." Spell, 824 F.2d at 1391. Thus, in order for the City to be held liable, (1) it must have actual or constructive knowledge "of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers, 'as a matter of specific intent or deliberate indifference,' to correct or terminate the improper custom or usage." Randall v. Prince George's Cty., 302 F.3d 188, 210 (4th Cir. 2002) (quoting Spell, 824 F.2d at 1391).

Actual knowledge may be shown "by recorded reports to or discussions by a municipal governing body." Spell, 824 F.2d at 1387. Constructive knowledge may be shown "by the fact that the practices have been so widespread or so flagrant that in the proper exercise of its official responsibilities, the [municipality]

128

should have known of them." Id. Proof of a single violation will not support the inference that the violation occurred because of a municipality's "condoned custom of comparable practices." Id.; see also Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 403 (4th Cir. 2014) ("Sporadic or isolated violations of rights will not give rise to Monell liability.").

Howard has failed to satisfy this "stringent" burden. Although he argues that he has shown that Roneka Jackson's status as a confidential informant was not recorded in cases in which she provided witness statements, this is insufficient. See Spell, 824 F.2d at 1391-95 (describing the testimony of many witnesses showing "in great factual detail" the inner workings of a police department's custom or practice of encouraging excessive force). Furthermore, even if the cases involving Jackson were sufficient to show that a custom existed, Howard has presented no evidence that a policymaker was either actually or constructively aware of it. Id. at 1394 (describing evidence showing police chief participated and condoned police misconduct). Thus, Howard has failed to show that DPD had a persistent practice of failing to disclose the status of confidential informants who were offered as witnesses such that municipal liability may attach.

Therefore, Howard has failed to adduce evidence sufficient to establish municipal liability for the alleged deprivation of his

129

rights, and the City's motion for summary judgment on this basis
will be granted.

## 2. State Law Claims

The City of Durham seeks summary judgment as to Howard's state
law claims. As a result of the parties' stipulation of dismissal
of certain claims and parties (Doc. 20) and this court's March 31,
2018, memorandum opinion and order dismissing certain claims (Doc.
22), the only remaining state law claims against the City are those
related to Soucie and Pennica for obstruction of justice and
intentional infliction of emotional distress.[47]

The City argues that it is entitled to summary judgment on
those claims to the extent they are dismissed against Soucie and
Pennica. Alternatively, it contends it is entitled to governmental
immunity for any claim arising out of actions taken prior to
January 20, 2004. Howard's response is based on the viability of
the claims against Soucie and Pennica. As the court will grant
Soucie and Pennica summary judgment as to those claims, and because
the City's liability is derivative, the City's motion for summary
judgment as it relates to these remaining state law claims will be
granted.[48]

---

[47] The City mistakenly claims that Howard's state malicious prosecution
claim was brought against Soucie and Pennica. (Doc. 85 at 44; Doc. 85-
1 at 2.)

[48] The City is named in Count 5, alleging negligence, but it is based on
the actions of Soucie and Pennica. The court's previous dismissal of

130

### 3. State Constitutional Claims

Howard alleges a direct claim against the City of Durham under Article I §§ 1, 18, 19, and 21 of the North Carolina Constitution. (Doc. 1 ¶ 172.) He seeks damages for physical, emotional, and pecuniary injuries he claims are a result of Defendants' alleged misconduct. (Id. ¶¶ 174-75.) The City moves for judgment on the pleadings as to this constitutional claim. (Docs. 73, 74.)

A motion for judgment on the pleadings is reviewed by the same standard as that applicable to a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014). In other words, the court considers whether the factual allegations in the complaint, which are accepted as true, "plausibly suggest an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009). The only difference is that a under a Rule 12(c) motion, the court may consider the complaint, the answer, and documents incorporated by reference into these pleadings. Mendenhall v. Hanesbrands, Inc., 856 F. Supp. 2d 717, 724 (M.D.N.C. 2012). "Specifically, exhibits integral to and explicitly relied on in the complaint may be reviewed, provided their authenticity is not in question." Colin v. Marconi Com. Sys. Emps.' Ret. Plan, 335 F.

---

the negligence claim against Soucie and Pennica (Doc. 22 at 24-25) effectively eliminates this basis for liability against the City, although it does not appear that the City has moved for summary judgment as to that claim.

Case 1:17-cv-00477-TDS-JEP   Document 119   Filed 09/16/20   Page 131 of 135

Supp. 2d. 590, 596 (M.D.N.C. 2004) (internal quotation marks omitted).

The City of Durham argues that under North Carolina law a plaintiff may bring a direct claim under the North Carolina Constitution only when no other adequate state remedy is available. Howard contends that, to the extent that this court grants summary judgment on his other state claims, Howard would lack an adequate state remedy and the state constitutional claims against the City should survive.

The state constitutional remedy is a narrow one. "[A] direct cause of action under the State Constitution is permitted only 'in the absence of an adequate state remedy.'" Davis v. Town of S. Pines, 449 S.E.2d 240, 247 (N.C. Ct. App. 1994) (quoting Corum v. Univ. of N.C. ex rel. Bd. of Governors, 413 S.E.2d 276, 289 (N.C. 1992)). "Thus, the availability of a direct cause of action under the North Carolina Constitution depends on the injury [Howard] seeks to remedy, and whether a state law claim is available to him." White v. City of Greensboro, 408 F. Supp. 3d 677, 699 (M.D.N.C. 2019). "[A]n adequate state remedy refers to the possibility of relief, and it is not necessary that a plaintiff prevail on his other state law claims." Id. (internal quotation marks omitted); see, e.g., Wilcox v. City of Asheville, 730 S.E.2d 226, 237 (N.C. Ct. App. 2012) ("[A]dequacy [of a remedy] is found not in success, but in chance."), disc. rev. denied, 738 S.E.2d

132

401 (N.C. 2013).

Howard's argument that his direct constitutional claims survive if his other state claims are dismissed is incorrect. The fact that Howard has developed his claims thus far demonstrates the existence of adequate state remedies for his injuries. See Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ., 678 S.E.2d 351, 355 (N.C. 2009) (noting that an adequate state remedy must allow a plaintiff to "have at least the opportunity to enter the courthouse doors and present his claim"). His direct constitutional claims do not address injuries that are distinct from his other injuries arising out of his state law claims against the Individual Defendants or the City of Durham. That he ultimately fails as a factual matter does not give rise to a claim under the North Carolina Constitution. See Copper ex rel. Copper v. Denlinger, 688 S.E.2d 426, 429 (N.C. 2010). Therefore, the City of Durham's motion for judgment on the pleadings as to Howard's Eighth Cause of Action for a direct claim under the North Carolina Constitution (Doc. 73) will be granted.

III. **CONCLUSION**

For the reasons stated,

IT IS THEREFORE ORDERED as follows:

Defendant City of Durham's motion for judgment on the pleadings (Doc. 73) is GRANTED, and Howard's direct constitutional claims (Eighth Cause of Action) are DISMISSED;

133

Defendant Milton Smith's motion for summary judgment (Doc. 75) is GRANTED as to Howard's common law malicious prosecution claim (Seventh Cause of Action), which is DISMISSED, but is otherwise DENIED as to Howard's § 1983 fabrication claim (First Cause of Action) and intentional infliction of emotional distress claim (Sixth Cause of Action);

Defendants Michele Soucie and Scott Pennica's motion for summary judgment (Doc. 77) is GRANTED, and the claims Howard brings against them in his § 1983 claim (Third Cause of Action), common law obstruction of justice claim (Fourth Cause of Action), and intentional infliction of emotional distress claim (Sixth Cause of Action) are DISMISSED WITH PREJUDICE;

Defendant Darrell Dowdy's motion for summary judgment (Doc. 79) is GRANTED IN PART as to Howard's § 1983 malicious prosecution claim (First Cause of Action) to the extent noted herein, as well as to his common law malicious prosecution claim (Seventh Cause of Action), which is DISMISSED; but is otherwise DENIED; and

Defendant City of Durham's motion for summary judgment (Doc. 81) is GRANTED, and Howard's § 1983 Monell claims (Second Cause of Action) as well as the derivative state law claims for common law obstruction of justice (Fourth Cause of Action) and intentional infliction of emotional distress (Sixth Cause of Action) are DISMISSED.

134

```
                                        /s/   Thomas D. Schroeder
                                    United States District Judge

September 16, 2020
```