IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DARRYL HOWARD                )
                             )
            Plaintiff,       )
                             )
       v.                    )      1:17cv477
                             )
CITY OF DURHAM, et. al,      )
                             )
            Defendants.      )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This case arises out of the conviction and incarceration of Plaintiff Darryl Howard for the 1991 murders of Doris and Nishonda Washington, which conviction was subsequently overturned in 2016 based on the discovery of exculpatory DNA evidence and the State of North Carolina's election to dismiss all criminal charges against Howard. Howard alleges that Defendants Darrell Dowdy and Milton Smith ("Defendants") fabricated and suppressed evidence to obtain his conviction.[1] Before the court are multiple motions in limine filed by the parties in anticipation of trial. For the reasons set forth below, the motions will be granted in part and denied in part.

## I.  BACKGROUND

The background of this case is extensively set out in this

_____

[1] Additional Defendants and claims were dismissed on dispositive motions (Docs. 22, 119) and a stipulation of dismissal (Doc. 126).

court's prior summary judgment order.  <u>Howard v. City of Durham</u>,
487 F. Supp. 3d 377 (M.D.N.C. 2020).  Relevant facts will be
discussed as pertinent to each pending motion.  In short, in the
early hours of November 27, 1991, Doris Washington and her 13-
year-old daughter, Nishonda, were found dead in their Durham, North
Carolina apartment after the local fire department responded to
reports of a fire.  Doris died of blunt force injuries; Nishonda
was strangulated.  Medical evidence suggested both had some form
of prior sexual activity.  Defendant Dowdy conducted the
investigation by the Durham Police Department ("DPD"), and
eventually Howard was charged with the murders and arson.  In 1994,
DNA evidence ruled Howard out as a contributor to any sexual
activity involving the victims, and he was released from custody
pending trial.  Howard was tried for the crimes in March 1995, and
following testimony by multiple witnesses including Howard
himself, he was convicted and sentenced to 80 years of
imprisonment.  But in 2009, Howard took advantage of a new state
law and sought and obtained retesting of the semen/sperm taken
from the victims, which linked the DNA contributed to Doris
Washington to a Jermeck Jones and eventually led to a December
2016 state court ruling granting Howard a new trial.  The State
thereafter dismissed all charges, and this lawsuit followed.  On
April 30, 2021, the governor issued Howard a "Pardon of Innocence."

The case is set for trial in November 2021, and the parties initially filed 29 motions in limine, including multiple cross motions and totaling over 3,800 pages of materials. The court directed the parties to meet and confer to resolve or narrow their evidentiary disputes because they had not previously attempted to do so. (Doc. 242.) The parties responded, noting resolution of some motions. (Doc. 246.) A hearing was held on July 23, 2021, on the remaining motions, and the court ruled orally on several motions and took others under advisement. The court further directed the parties to file supplemental material, which has now been filed.[2] (Docs. 250-257.) This order memorializes the court's decisions at the July 23 hearing and provides further rulings on the remaining motions.

## II. ANALYSIS

### A. Factual Innocence and Pardon of Innocence

The parties have filed multiple motions that relate to evidence of Howard's innocence. Specifically, Defendants move to exclude any reference to Howard's "factual innocence," including those contained in the December 2016 Order of North Carolina Superior Court Judge Orlando Hudson granting Howard a new trial after a hearing on the DNA (Doc. 161), and the April 2021 Pardon

---

[2] After the July 23 hearing, Defendants withdrew their motion (Doc. 175) to exclude evidence of any alleged violation of DPD policies or standard procedures. (Doc. 252.) To the extent Defendants may seek a limiting instruction regarding this evidence (id.), the court will entertain that request once made.

3

of Innocence issued to Howard by North Carolina Governor Roy Cooper (Doc. 210). Howard seeks to admit a summary of Judge Hudson's Order and the full Pardon of Innocence. (Doc. 186.)

### 1. December 2016 Order

While DNA test results at the time of Howard's 1995 trial excluded him as having contributed any bodily fluids suggesting any sexual activity with Nishonda Washington,[3] it was not until 2014 when DNA identified a particular individual, Jermeck Jones, as having contact with Doris Washington. This prompted Howard's motion for a new trial pursuant to N.C. Gen. Stat. § 15A-270 and, following a hearing in state court, resulted in the December 2016 Order granting Howard a new trial. The Order is 25 pages long and single-spaced. Among its many factual findings is a statement that Howard is "factually innocent" of the murders of Doris and Nishonda Washington. (Doc. 87-3 at 25.) Howard has advised the court that he does not seek to admit the entire text of the December 2016 Order or its finding that Howard is "factually innocent," and that the parties intend to offer a proposed summary of the Order that can be provided to the jury. (Doc. 246 at 6.) To this extent, Defendants' motion to exclude any reference to a purported finding of factual innocence by Judge Hudson appears to be moot. But because Judge Hudson's statement of "factual innocence" is

---

[3] No sperm was detected on Doris Washington at the time.

4

dicta and purports to resolve what is otherwise a contested issue in this case, Howard himself or through his witnesses shall not mention this finding in Judge Hudson's December 2016 Order absent a further ruling of this court.[4]

---

[4] This result is consistent with North Carolina law. Section 15A-270, pursuant to which Howard's motion was filed, broadly grants a court that receives DNA results favorable to a defendant the power to enter "any order that serves the interests of justice," including vacating the judgment, discharging the defendant, resentencing the defendant, or granting a new trial. N.C. Gen. Stat. § 15A-270(c). However, as for judicial proceedings, it is the North Carolina Innocence Inquiry Commission ("NCIIC") that is charged with determining factual innocence. See N.C. Gen. Stat. § 15A-1417 (listing types of relief available when a court grants a motion for appropriate relief including "[f]or claims of factual innocence, referral to the North Carolina Innocence Inquiry Commission"). The statutes creating the NCIIC are detailed and comprehensive. See N.C. Gen. Stat. §15A-1460 et seq. Their purpose is to establish "an extraordinary procedure to investigate and determine credible claims of factual innocence." Id. § 15A-1461. The NCIIC has the power to, among other things, "conduct inquiries into claims of factual innocence." Id. § 15A-1466(2). If the NCIIC concludes there is "sufficient evidence of factual innocence to merit judicial review," a three-judge panel is appointed to "rule as to whether the convicted person has proved by clear and convincing evidence that the convicted person is innocent of the charges." Id. § 15A-1469(a), (h). As it relates to the December 2016 Order, there was no referral of Howard's case to the NCIIC and no finding of factual innocence by that body. Nor does the December 2016 Order make any finding based on the heightened "clear and convincing" standard. Rather, the Order finds that the results of the DNA testing are "favorable" to Howard. (Doc. 87-3 at 25.)

It does appear that, consistent with the long-standing practice in North Carolina state courts, the December 2016 Order was drafted by counsel for the prevailing party, in this case Howard, based on the text of the draft and other identifying information on the document, which might explain the inclusion of the purported finding of "actual innocence." A court's practice of having trial counsel prepare detailed findings, and adopting them wholesale, risks the trial judge abandoning his responsibility to independently determine a case and is expressly condemned in the federal courts. See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 571-72 (1985) (criticizing practice of courts adopting verbatim adoption of findings of fact prepared by prevailing parties, noting the Fourth Circuit's suggestion that "close scrutiny of the record" was warranted); Chicopee Mfg. Corp. v. Kendall Co., 288 F.2d 719, 724-25 (4th Cir. 1961) (finding that the practice of having the

## 2. Gubernatorial Pardon

The determination of the admissibility of Governor Cooper's Pardon of Innocence requires that this federal court wade into issues of North Carolina constitutional law with little guidance from North Carolina state courts. Howard proffers two arguments for admitting the pardon. First, he argues that it is relevant evidence needed to "complete the procedural story" of his criminal case and counter the fact of his initial conviction. (Doc. 189 at 3.) Second, he contends that the pardon is evidence of innocence that can prove "circumstantially that details in a falsified statement came from police" and thus is relevant to whether Dowdy fabricated evidence as well as to the issue of damages.[5] (Doc. 189 at 3-4.) Defendants counter that the pardon runs afoul of the

---

prevailing party prepare a written decision for the judge "involves the failure of the trial judge to perform his judicial function"). Here, the trial judge did not even correct references in the document to "undersigned counsel" in the Order. (See Doc. 211-2 at 2 n.3.) Accordingly, any reference to a finding of "factual innocence" is dicta as it exceeds the scope of a motion for a new trial under the state's DNA statute and appears inconsistent with an order granting a new trial.

Any reference to the December 2016 Order's textual findings also appears to be unwarranted under Federal Rule of Evidence 403, as the judge's decision makes findings on the very evidence that is to be presented in the present case. See Nipper v. Snipes, 7 F.3d 415, 418 (4th Cir. 1993) (finding abuse of discretion where trial court admitted prior judicial decision with findings of fact as evidence against defendant).

[5] Howard argues that there are "only two possible explanations for how witness Angela Southerland's statement included nonpublic details about the crime": either she did in fact witness the crime, or Dowdy "improperly fed that information to her." (Doc. 189 at 5.) Of course, this ignores a third option: that the witness learned facts from someone involved in the crimes and simply lied to investigators.

6

North Carolina Constitution, is hearsay, and should be excluded pursuant to Rule 403 of the Federal Rules of Evidence as its probative value is substantially outweighed by the danger of unfair prejudice and misleading the jury. (Doc. 211.)

Turning first to Defendants' assertion that the pardon "does not comply with the North Carolina Constitution" (Doc. 211 at 3), such an argument is unpersuasive. The North Carolina Constitution provides in relevant part: "The Governor may grant reprieves, commutations, and pardons, after conviction." N.C. Const. art. III, § 5(6). Defendants rely on the "after conviction" requirement to contend that, because Howard's conviction was vacated by Judge Hudson in 2016, there was no such "conviction" for which Howard could be pardoned in 2021. Thus, Defendants argue, Howard's pardon in 2021 was not "after conviction" as required by the constitution. (Doc. 211 at 3-8.) Howard argues that Defendants' claim is contrary to existing state judicial interpretation and practice.

As a federal court construing North Carolina law, this court applies the jurisprudence of North Carolina's highest court, the Supreme Court of North Carolina. _See_ _Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc._, 296 F.3d 308, 312 (4th Cir. 2002); _State ex rel. Martin v. Preston_, 325 N.C. 438, 449 (1989) (noting that "issues concerning the proper construction and application of North Carolina laws and the Constitution of North Carolina can only be answered with finality by" the North Carolina

7

Supreme Court). When that court has not spoken directly on an issue, this court must "predict how that court would rule if presented with the issue." Id. The decisions of the North Carolina Court of Appeals are the "next best indicia" of what North Carolina's law is, though its decisions "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (quoting Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992)). In predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted).

There is little case law interpreting the governor's pardon power. Both parties point to the nearly 150-year-old case of State v. Alexander, 76 N.C. 231 (1877), to support their claims. There, the defendant had been tried, found guilty by a jury, and sentenced by the state trial court to five years' imprisonment. Id. at 231-32. The defendant then appealed to the North Carolina Supreme Court, which at the time resulted in his conviction and sentence being vacated during the pendency of the appeal by operation of law. Id. The question became, as is the case here, whether the governor could properly use the pardon power to pardon an

8

individual whose conviction had been vacated — i.e., whether the "after conviction" clause in the state constitution prohibited pardons where convictions were vacated.

The Alexander court found the governor's use of his pardon power to be "after conviction," even though the defendant's conviction had been vacated, because the defendant had been tried and convicted by a jury prior to the issuance of the pardon. Id. at 233. The court observed that "nothing can be a conviction but the verdict of the jury." Id. It then reasoned that the "after conviction" clause was included in the state constitution to prevent the governor from issuing preemptory pardons before a defendant was publicly tried. The practice at the time the state constitution was written, the court noted, was to "exercise[] the power of pardon at any time," meaning "crimes were smothered. The facts were not brought to light. The person charged was not brought before the public and required to answer the charge." Id. at 232.

The "smothering of crimes" is of no concern in the present case. In 1995, Howard was subjected to a public trial, found guilty by a jury, and sentenced to 80 years of imprisonment. (Doc. 89-6 at 765:18-766:10; 777:8-778:23.) Although the superior court subsequently vacated his sentence and judgments, Howard was brought before the public and convicted by a jury who heard the allegations against him. As was the case in Alexander, Howard was

9

thus pardoned "after conviction" in that he was convicted in 1995 after a full trial and a guilty verdict returned by the jury, even if that conviction was subsequently vacated in 2016.

Defendants point to the dissent in Alexander to argue that "as a matter of both law and practice, there was no conviction from which [Howard] could seek a pardon." (Doc. 211 at 4.) After his conviction was vacated, they note, Howard was thereafter presumed innocent as if he was never tried in the first place. Defendants' argument follows that vacating a conviction erases the conviction as a practical and legal matter such that it never existed. Chief Justice Pearson, dissenting in Alexander, expressed a similar concern that once an individual "moves to set aside the verdict and have a new trial . . . his guilt is not established according to law." See Alexander, 76 N.C. at 238 (Pearson, C.J., dissenting.) Defendants reiterate this argument, noting that by vacating Howard's conviction, "the North Carolina Judiciary has not established Plaintiff's guilt or exonerated him of the charge." (Doc. 211 at 7-8.) It is, they say, as if Howard has never been convicted, and a subsequent pardon would fail to comply with the state constitution.

Principles of federalism counsel federal courts to proceed with caution when being asked to interpret a state constitution. See Bush v. Palm Beach Cnty. Canvassing Bd., 531 U.S. 70, 78 (2000) (recognizing that it is a "fundamental" principle of federalism

"that state courts be left free and unfettered by [federal courts] in interpreting their state constitutions." (quoting Minnesota v. Nat'l Tea Co., 309 U.S. 551, 557 (1940)); Carpenter v. Wichita Falls Indep. Sch. Dist., 44 F.3d 362, 367 (5th Cir. 1995) (noting that a federal court deciding state constitutional law claims "disregards principles of federalism; it ignores the superiority of state-court forums for state-law claims and denigrates the state's authority to fashion independent constitutional law.") overruled on other grounds by Rivet v. Regions Bank of Louisiana, 522 U.S. 470 (1998). This is especially true where the source of support is a single dissent from 1877 and the Defendants' position contravenes the seemingly routine practice over the years of North Carolina governors issuing pardons to individuals whose convictions had been overturned. (See Doc. 244 at 5 (collecting examples).) For these reasons, the court declines to find that Howard's pardon runs afoul of the North Carolina Constitution.

Turning to the questions of relevance and admissibility, Howard's remaining legal claims are for fabrication of evidence and failure to investigate under § 1983, a Brady-based claim for suppression of evidence, and a claim for intentional infliction of emotional distress under state law. Howard correctly admits that evidence of his innocence, including the pardon, "is not a required element of the claims" he maintains against the remaining Defendants. (Doc. 189 at 3.) This is because the focus of the

11

case is on the conduct of the Defendants leading up to Howard's trial in 1995, not on Howard's ultimate guilt or innocence or what new facts were later learned. Nevertheless, he argues that the pardon "provides critical factual context for evaluating the evidence of the alleged misconduct by the Defendants" and is "undoubtedly relevant to damages." (Id. at 4-6.) In support, Howard relies principally on two cases that involve a plaintiff seeking to admit a pardon. See Newsome v. McCabe, 2002 WL 548725 (N.D. Ill. Apr. 4, 2002), aff'd, 319 F.3d 301 (7th Cir. 2003); Tarlton v. Sealey, 2021 WL 1148951 (E.D.N.C. Mar. 25, 2021).

Both cases have facts similar to those in this case — the plaintiff was convicted and imprisoned, the conviction was later vacated by the state court, the state declined to re-prosecute, and the state's governor issued a pardon. Both courts admitted the pardon without offering extensive explanation. The Tarlton court stated that "pardons of innocence are as relevant to this action as the criminal judgments of conviction under which [plaintiffs] were sentenced" but provided no further analysis. See Tarlton, 2021 WL 1148951, at *1. The Newsome court offered slightly more, noting:

> The issue in this case was not, as defendants point out, whether Newsome was guilty or innocent of the crime. But that is what it would have become if the fact of Newsome's innocence . . . had been kept from the jury. Excluding that evidence would have been highly prejudicial to Newsome. It would have invited the jurors to draw the impermissible inference that he was actually

12

guilty, and, thus, absolve defendants of any misconduct."

Newsome, 2002 WL 548725, at *6. Any potential prejudice, the court concluded, could be cured by jury instructions. Id.

Here, while Defendants object to the pardon as inadmissible hearsay (Doc. 211 at 16-22), as Howard argues (Doc. 244 at 15-18), the pardon qualifies as a public record under Federal Rule of Evidence 803(8). The public records exception to the hearsay rule allows for the admission in a civil case of "factual findings from legally authorized investigation[s]" as long as the opponent "does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(iii). The pardon is a pronouncement of a public agency concerning factual findings of a legally-authorized investigation, and Defendants have not met their burden of showing that the pardon itself is untrustworthy. Cf. Sanford v. Russell, No. 17-13062, 2021 WL 1208888, at *3 (E.D. Mich. Mar. 31, 2021) (finding state's admission of innocence in state proceeding under state's Wrongful Imprisonment Compensation Act admissible under Rule 803(8)). Indeed, the district attorney for Durham County did not oppose the pardon request. (Doc. 189-4 at 2.) And Howard is correct that in a wrongful conviction lawsuit the procedural history of the original criminal case is relevant. But the issue seems closer than what Newsome suggests. The jury will know of Howard's

13

original conviction, and it will know that the conviction was overturned based on exculpatory DNA evidence that identified the actual contributor of sperm to one of the victims. It will also know that the State not only declined to re-prosecute Howard but instead dismissed all charges. Defendants contend that these facts "complete the story" of Howard's original criminal case and a proper jury instruction can explain that he enjoys the presumption of innocence like any other person so as to put him on an equal footing with everyone else. On the other hand, a presumption of innocence is not the same as a finding of innocence. This is especially true where the decision not to re-prosecute is based, even in part, on the passage of time and difficulty in marshalling evidence. (Doc. 189-1 at 2-4 (Dismissal Orders noting: "At this time there is insufficient evidence to prove the case beyond a reasonable doubt.").)

The probative value of evidence can be more or less significant depending on whether a fact is genuinely contested. See Old Chief v. United States, 519 U.S. 172, 184-85 (1997). At the hearing on these motions when the court pressed Defendants on whether they intended to argue at trial that Howard was in fact guilty of the crimes for which he has been pardoned, Defendants answered "I think at this point it would be - - yes, that we would." (Doc. 262 at 6:15-16.) Defendants also represented that at least one witness "and perhaps another witness or two" takes

14

the position that Howard may still be guilty of these crimes despite his pardon.  (Id. at 6:8-12.)  By all indications, Defendants will continue to argue Howard's guilt, particularly as Howard intends to argue his innocence.  Because Defendants will continue to argue Howard's guilt, the probative value of competing evidence suggesting Howard's innocence is heightened.  See Sanford, No. 17-13062, 2021 WL 1208888, at *2 (holding the probative value of competing evidence suggesting innocence was not substantially outweighed by the danger of unfair prejudice because there was still "a live dispute" about the plaintiff's innocence); Old Chief, 519 U.S. at 184.

As Howard urges, his guilt or innocence is relevant to whether any trial witness's statement was fabricated and by whom (as a jury might conclude that a witness might not have lied to investigators if Howard was in fact innocent), and to damages (as one who is wrongfully convicted may suffer the pain of knowing his incarceration is factually unwarranted).  See Parish v. City of Elkhart, Ind., 702 F.3d 997, 1003 (7th Cir. 2012) (overturning damages award in a wrongful conviction case because the district court "improperly limited the introduction of evidence relating to [plaintiff's] innocence, and that evidence was critical to the damages issue."); Sanford, No. 17-13062, 2021 WL 1208888, at *2 (in § 1983 case, finding evidence of plaintiff's settlement with state under Wrongful Imprisonment Compensation Act "relevant to

15

both liability and damages in any wrongful prosecution case where the factual premise of actual innocence remains in dispute"); Kluppelberg v. Burge, 84 F. Supp. 3d 741, 746 (N.D. Ill. 2015) (finding certificate of innocence admissible as relevant to neutralizing unfair prejudice to plaintiff and as to damages).

The persuasive value of the pardon is undoubtedly significant. The pardon of innocence represents the conclusion of the governor of North Carolina, the chief executive of the state, that Howard is in fact innocent.[6] A jury will presumably be moved by this evidence, and likely to a significant degree. As a result, there is a legitimate risk of the jury supplanting its decision with that of the governor.

Having carefully considered these arguments, the court finds that evidence of innocence is relevant to aspects of Plaintiff's proof burden and that evidence of the fact of the pardon bears

---

[6] The court need not resolve the full scope of the governor's pardon power and that scope *vis-à-vis* the NCIIC or any regulations the North Carolina General Assembly might enact. The pardon power is expressly set out in the North Carolina Constitution, and it is broad. See State v. Clifton, 481 S.E.2d 393, 399 (N.C. App. 1997) ("The North Carolina Constitution provides the governor with the exclusive prerogative to issue pardons."). However, the North Carolina Constitution reads: "The Governor may grant reprieves, commutations, and pardons, after conviction, for all offenses (except in cases of impeachment), upon such conditions as he may think proper, subject to regulations prescribed by law relative to the manner of applying for pardons." N.C. Const. art. III, § 5(6) (emphasis added). There is scant case law interpreting the "subject to" clause. A recent North Carolina Court of Appeals case points to two statutes that "arguably fall" within that clause, including N.C. Gen. Stat. § 147-21, although it did not expressly decide the issue. See News & Observer Pub. Co. v. Easley, 641 S.E.2d 698, 704 (N.C. App. 2007).

16

some relevance to the overall procedural history of Howard's criminal justice experience. The probative effect of the pardon's conclusion that Howard is "innocent" of the crimes charged must be weighed against the possibility that it is substantially outweighed by the danger of unfair prejudice, confusion, misleading the jury, and unwarranted side litigation over the clemency office's process itself for Howard's pardon. Fed. R. Civ. P. 403. Here, Defendants cite to cases precluding findings by a governmental agency or court. See, e.g., Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1357-58 (4th Cir. 1995) (affirming the district court's decision that evidence from a report prepared by the Virginia Employment Commission was inadmissible because of "the prejudicial effect such an official report might have on the jury."); Carter v. Burch, 34 F.3d 257, 265 (4th Cir. 1994) (affirming the exclusion of a judicial opinion because it "decided the precise issue before the jury" and its probative value was substantially outweighed by its prejudicial effect, noting "[j]udicial findings of fact 'present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury.'" (quoting Nipper v. Snipes, 7 F.3d 415, 418 (4th Cir. 1993)). These cases are not on point, however, because they involved evidence to resolve the precise question before the jury, whereas Howard's guilt or innocence is not an element of the claims in the present case.

17

The court is therefore left with two options. On the one hand, it can preclude evidence of the pardon, as Defendants urge, in which case the jury may conclude, even with a proper limiting instruction, that Howard is in fact guilty of murder and arson -- a conclusion at odds with the governor's pardon that declares him legally innocent. See, e.g., State v. Keith, 63 N.C. 140, 143 (N.C. 1869) ("The effects of a pardon are well settled in law: as far as the State is concerned, they destroy and entirely efface the previous offence; it is as if it had never been committed. . . . [I]t is 'a remission of guilt,' not only of the punishment of guilt.") (citation omitted); see Jenkins v. Collard, 145 U.S. 546, 556 (1892) ("As repeatedly affirmed by this court, pardon and amnesty in legal contemplation not merely release offenders from the punishment prescribed for their offenses, but obliterate the offenses themselves."). Even mention of the pardon alone, without reference in some way to Howard's innocence, might lead jurors to conclude that Howard was guilty but granted a reprieve of sentence. See State v. Clifton, 481 S.E.2d 393, 400 (N.C. Ct. App. 1997) (stating: "In North Carolina a governor may issue two types of pardons: A pardon of innocence, a full pardon; and a pardon of forgiveness, a conditional pardon" and adopting the view of other courts that "the prior offense was blotted out and its consequences removed by the full pardon" i.e. by a pardon of innocence.); Byrum v. Turner, 171 N.C. 86 (1916) (stating that "[w]hen a full and

18

absolute pardon is granted it exempts the recipient from the punishment which the law inflicts"). Exclusion thus risks substantial prejudice to Howard and the potential of having the jury be misled.

On the other hand, the court can admit evidence of the pardon. While doing so would risk prejudicing Defendants, it would prevent the jury from assuming, wrongly, in the face of Defendants' arguments of continuing guilt that the dismissal of Howard's charges and decision not to retry him was based on some kind of technicality, passage of time, or witness unavailability such that he remains potentially responsible for the murders and arson. It would also permit the jury to focus on the central question of whether at the time of Defendants' initial investigation and Howard's trial the Defendants falsified evidence, as alleged. While there is a risk that the weight of the governor's pardon could be substantial, admission with a proper limiting instruction addressing that risk is preferable to excluding the pardon where, no matter what instruction is given, Defendants will invite the jury to conclude that Howard remains guilty of the offenses in an effort to absolve themselves of liability. Newsome, 2002 WL 548725, at *6 (concluding that precluding evidence of pardon would have invited jurors "to draw the impermissible inference that [the plaintiff] was actually guilty, and, thus, absolve defendants of any misconduct," and requiring limiting instruction).

19

While evidence of the pardon of innocence should be admitted, the court notes that the pardon expressly references the finding of factual innocence in the December 2016 Order.[7] The court has already held this to be inadmissible, and the parties have represented that they have agreed not to put it before the jury. To allow it via the pardon would allow through the back door that which is not permitted through the front.

Accordingly, as to all motions related to the pardon (Docs. 161, 186, and 210) the court will permit reference to the pardon

---

[7] By law, pardon applications must contain grounds for relief, presumably to ensure the governor has before him or her actual evidence of innocence during the pardon process. See N.C. Gen. Stat. § 147-21 (noting every pardon application "shall contain the grounds and reasons upon which the executive pardon is asked"). Here, Howard's pardon application contained an application from his post-conviction attorneys, a copy of his original indictment and judgment, and a copy of Judge Hudson's 2016 Order. (Doc. 211-2.) The application letter that Howard's counsel sent to the governor urged:

> In August 2016, exonerating post-conviction DNA testing and other newly discovered exculpatory evidence definitively proved his [Howard's] innocence, and the Senior Resident Superior Court Judge of Durham County overturned Mr. Howard's conviction and ordered his immediate release. In doing so, the Court made an explicit and unequivocal finding that Mr. Howard was factually innocent.

(Doc. 211-2 at 3 (emphasis added).) While it is unclear what other evidence, if any, Governor Cooper may have relied upon in issuing Howard's pardon, as Howard's counsel represented at the hearing on this motion that the nature of the governor's investigation is "secret," what is clear is that the pardon expressly relies on the dicta in the December 2016 Order:

> WHEREAS, in an order entered on December 1, 2016 Durham County Superior Court Judge Orlando F. Hudson, Jr., concluded as a matter of law that the existence of the newly discovered DNA evidence favorable to Howard showed that he is factually innocent and ordered that Howard's convictions be vacated, granted Howard's motion for a new trial, and released him from prison; . . .

(Doc. 189-2 at 2.) For the reasons already noted, this reference to the December 2016 Order's findings shall be precluded.

of innocence subject to the parties' filing of supplemental briefing by November 5, 2021, not to exceed 5 pages, as to how the pardon is to be characterized. Reference to the December 2016 Order's finding of "factual innocence," whether in the pardon or otherwise, will be precluded. The parties' motions are granted in part and denied in part, accordingly.

**B.  Charles Drago**

Defendants move to exclude the report and testimony of Howard's police practices expert, Charles Drago. (Doc. 147.) Defendants argue that Howard's counsel "wrote significant material portions of Drago's report" and therefore Drago did not provide substantial participation in preparing his report as required by Rule 26(a) of the Federal Rules of Civil Procedure. (Id. at 2-3, ¶¶ 3, 6.) Howard argues that the report-writing process meets the requirements of Rule 26(a) because, while counsel typed the report, Drago substantially participated in the drafting process and the report reflects Drago's expert opinions because Drago "reviewed, edited, and ultimately signed" the final report. (Doc. 208 at 1, 10.)

Federal Rule of Civil Procedure 26(a)(2)(B) provides that the disclosure of expert witnesses "must be accompanied by a written report -- prepared and signed by the witness." The advisory committee notes clarify that this Rule "does not preclude counsel from providing assistance to experts in preparing the reports, and

21

indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness." Fed. R. Civ. P. 26(a)(2)(B) advisory committee note to the 1993 amendments.

Courts have interpreted Rule 26 to bar counsel from "ghost writing" an expert's report. "Ghost writing a testifying expert's report is the preparation of the substance writing of the report by someone other than the expert purporting to have written it." Trigon Ins. Co. v. United States, 204 F.R.D. 277, 291 (E.D. Va. 2001). The key question is "whether counsel's participation so exceeds the bounds of legitimate assistance as to negate the possibility that the expert actually prepared his own report." Numatics, Inc. v. Balluff, Inc., 66 F. Supp. 3d 934, 942 (E.D. Mich. 2014) (citation and internal quotation marks omitted) (excluding report where expert spent less than 30 hours on the report, the majority of which was travel time; parts of the report were copied verbatim from other filings; the expert did not appear to understand legal terms; and testimony indicated the attorney drafted the report and the expert made only "fairly minor" changes); cf. United States v. Kalymon, 541 F.3d 624, 637 (6th Cir. 2008) (finding "nothing inherently nefarious" about and opting not to exclude reports where "experts explain that they

22

told Government counsel their substantive opinions, and then counsel reduced those opinions to writing for the experts' review and signature.").

Here, as Defendants have pointed out, the writing style, tone, and language of Drago's report in this case parallels that of a different expert's report in another similar wrongful conviction case in which Howard's counsel were involved, while it is notably dissimilar from reports Drago has written in similar cases involving different counsel. (Doc. 148 at 13-17.) In the main, it reads more like a brief, with hyperbolic phrases, than an expert report. Here are a few examples:

> The case record includes a number of extraordinary admissions from Dowdy demonstrating that Dowdy engaged in egregious deviations from minimally acceptable police practice. (Doc. 208-2 at 5.)

> Indeed, Dowdy's statement that there was no evidence indicating that the perpetrator had raped the victims is an astounding statement for an experienced sex crimes investigator to make given the overwhelming amount of evidence in this case. (Id. at 11)

> Dowdy engaged in blatant deviations from minimally acceptable police practice by failing to document many of the investigative steps he claims he took in this case. (Id. at 6.)

> There is ample evidence in the record indicating that Dowdy systematically failed to document exculpatory and impeachment evidence. (Id. at 25)

> The complete lack of documentation regarding the investigation into Nishonda's whereabouts and the alleged boyfriend would be a serious "red flag" for any minimally competent police supervisor suggesting that Dowdy may have misrepresented his investigation . . . To

23

the extent Dowdy did misrepresent his investigation, he
engaged in an egregious violation of minimally
acceptable police practice. (Id. at 13)

{T]there are massive contradictions in the witness
statements implicating Howard. (Id. at 18)

[T]here is also evidence indicating that Dowdy may have
engaged in direct suggestion during the photo
identification procedure . . . which not only would have
tainted the reliability of any photo identifications
made during that procedure but also constituted
egregious misconduct. (Id. at 18)

Dowdy's admitted conduct is an egregious departure from
minimally acceptable police practice and DPD [Durham
Police Department] policy. First . . . misrepresenting
the circumstances of a witness interview at trial and to
the prosecutor — as the undisputed evidence shows Dowdy
did here — is egregious police misconduct. Dowdy's
failure to disclose that over 30 minutes of his interview
with Southerland took place off tape is inexcusable and,
as discussed further below, constitutes not only a
potential Brady violation for failure to document and
disclose impeachment evidence, but also raises concerns
regarding fabrication of evidence, if the
misrepresentations were intentional. (Id. at 20)

More troubling, billing records provided by Howard's counsel

reflect that up to the date of his report Drago devoted a total of

37.25 hours to the case. (Doc. 148-8 at 2.) And yet his report

is over 30 single-spaced pages, and he claims to have reviewed

some 6,000 pages of documents in advance of preparing it. (Doc.

148-3 at 6-38.) All these factors strongly suggest that Howard's

counsel wrote significant portions of the report.

When asked who prepared his report, Drago testified at his

deposition, "I prepared the report." (Doc. 208-4 at 66.) When

asked more specifically who actually prepared it, however, he

24

stated: "what we did was -- what I did was I gave my opinions to [Howard's counsel]. We talked about the opinions. I wrote some things down. She wrote some things down that I had said. I edited it. I reviewed it and edited it, finalized it and so forth, sent it back, and it was finalized." (Id. at 66-67.) Drago confirmed that he spoke with Howard's counsel and "shared [his] opinions about what [he] had reviewed." (Id. at 67.) When asked whether counsel then prepared the written report and sent to him, Drago responded: "So she put down -- she listed some of the things that I had said. I added some things. I did edits on some of the things that [counsel] sent me, and comprised that, and so forth, and made sure that that was what we had discussed, and finalized it and sent it back, and that was the way it was produced." (Id.) Beyond this, however, the court's ability to understand whether Drago actually substantially prepared the report is limited, as Howard's counsel instructed Drago not to answer further questions designed to learn more about Drago's actual role, such as who actually typed the report. (See, e.g., id. at 67-68.)

One who instructs a witness not to answer in this district should tread lightly. The Local Rules of this court, which all admitted lawyers attest they have read and will follow, limit the bases on which counsel can direct a witness not to answer a question posed during a deposition to either privilege or a limitation on evidence directed by the court. See Local Civil

25

Rules, L.R. 30.1,
https://www.ncmd.uscourts.gov/sites/ncmd/files/2021_June_21_CIVR
ulesEffective.pdf (last accessed November 1, 2021). Otherwise,
the proper procedure is to lodge an objection and, if the inquiring
counsel wishes to proceed, adjourn the deposition as to those
topics and seek a protective order. See Redwood v. Dobson, 476
F.3d 462, 467-68 (7th Cir. 2007) (noting "counsel for the witness
may halt the deposition and apply for a protective order, see Rule
30(d)(4), but must not instruct the witness to remain silent.");
Johnson v. Statewide Investigative Services, Inc., 2021 WL 825653
at *3 (N.D. Ill. 2021) (instructing that if an attorney wanted to
object to questioning during a deposition on grounds other than
privilege, he "could have 'halt[ed] the deposition and appl[ied]
for a protective order.'" (quoting Redwood, 476 F.3d at 467 (7th
Cir. 2007)).

Howard has not identified any privilege applicable to Drago's
expert report. Rather, by virtue of a 2010 amendment, Rule 26
offers protection as to certain aspects of an expert's report,
such as actual drafts of the expert's report and certain
communications between the expert and counsel. See Fed. R. Civ.
P. 26(b)(4)(B) and (C) and advisory committee note. But the rule
does not exclude all inquiry into the substance of preparing the
report. For example, the rule expressly allows a party to inquire
as to "facts or data that the party's attorney provided and that

26

the expert considered in forming the opinions to be expressed" as well as "assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed." Fed. R. Civ. P. 26(b)(4)(C)(ii) & (iii). And just as the attorney-client privilege does not prevent inquiry as to matters outside the contents of a communication (such as the date, place, and length of a communication), see Spilker v. Medtronic, Inc., No. 4:13-CV-76-H, 2015 WL 1643258, at *6 (E.D.N.C. Apr. 13, 2015) (permitting disclosure of date, author, recipient, etc.); Vaughan v. Celanese Americas Corp., No. 3:06CV104-W, 2006 WL 3592538, at *3 (W.D.N.C. Dec. 11, 2006) (same), Howard has not identified any basis for precluding inquiry into similar topics relating to the preparation of an expert report. Cf. Powerweb Energy, Inc. v. Hubbell Lighting, Inc., No. 3:12-cv-220, 2014 WL 655206, at *4 (D. Conn. Feb. 20, 2014) (rejecting plaintiff's argument that an expert's emails constituted draft reports); In re Application of the Republic of Ecuador, 280 F.R.D. 506, 513 (N.D. Cal. 2012) (finding that notes, task lists, outlines, memoranda, presentations and letters drafted by a testifying expert and his assistants did not constitute draft reports).

Rule 26(b)(4)'s protection, akin to that of attorney work product protection, is similarly not boundless. An attorney acts within her proper role when she assists the expert in preparing the report by providing editorial guidance. But counsel cannot

27

provide or change the substance of an opinion with impunity. "[W]hen the record reveals the lawyer may have commandeered the expert's function or used the expert as a conduit for his or her own theories," the rule's protection cannot be used as a "shield against inquiry into the extent to which the lawyer's involvement might have affected, altered, or 'corrected' the expert's analysis and conclusions." Gerke v. Travelers Cas. Ins. Co. of Am., 289 F.R.D. 316, 328 (D. Or. 2013). And while each case turns on its own facts, an expert's statement that the report, as written, is now his because he adopted and signed it does not prevent further probing. Id.

Here, Defendants sought information as to who prepared the initial draft of the report and who prepared follow-up drafts, and counsel made clear he was not seeking information as to the contents of the drafts. (Doc. 208-4 at 67:25-68:6) ("I'm not asking about the content of the drafts. I'm asking about who is responsible for the preparation of the draft and how it goes from a draft to this report that's been presented in this case. I'm just trying to find out who is preparing the report.").) The problem here is that while Howard's counsel seemingly violated this court's local rules in instructing Drago not to answer, Defendants did not make a proffer or specifically indicate the range of questions they intended to ask. Instead, they represented they had "further questions . . . about the process," to which

28

Howard's counsel stated she would "continue objecting on that basis." (Doc. 148-1 at 192:15-193:21.) Thereafter, Defendants moved on to other questions but did not move to compel discovery, and the discovery period is now closed.

Howard's counsel argues that they have met the disclosure requirements in Rule 26, which serve primarily to give notice to opposing counsel of the expert's opinions so counsel can adequately prepare for trial and avoid unfair surprise. (Doc. 208 at 9.) Maybe. But that is beside the point and begs the question whether the opinions are truly those of the expert, as required by Rule 26(a)(2)(B).

No matter how one views it, the record raises the disquieting specter of excessive lawyer involvement and only serves to fuel public skepticism of the proper role of lawyering. Aspects of Drago's report are troubling. There is a strong inference that Howard's counsel wrote material portions of the report, particularly given its tone and style, as it reads more like a lawyer's brief. But the witness claims he provided opinions to counsel, who organized and articulated them in the final report. In the absence of any additional indication, the court cannot say that the report does not contain Drago's opinions as he expressed them to counsel. Cf. McClellan v. I-Flow Corp., 710 F. Supp. 2d 1092, 1127 (D. Or. 2010) (finding that counsel's involvement in drafting the expert report "approache[d] the outer limits of

29

acceptable assistance" but acknowledging that such involvement "may undermine its weight and credibility"); In re Asbestos Products Liability Litigation (No. VI), 714 F. Supp. 2d 535, 542 (E.D. Pa. 2010) (declining to strike testimony of the expert because although counsel drafted the supplemental report, the expert had previously provided opinions to counsel). However, any expert witness who is seemingly content with such an arrangement, as evidenced by the relatively little time spent in preparation in view of the work claimed to have been performed, will suffer the consequences of cross examination. And rightly so. Sunbeam Products, Inc. v. Homedics, Inc., 670 F. Supp. 2d 873, 883-84 (W.D. Wis. 2009) (finding that, while expert's report was not wholly ghost-written and expert testified he had reached all his opinions stated in the report, the process raised credibility issues for the jury). Had Defendants properly sought court intervention during the discovery period, the court may have reached a different result. But justice is invoked, not dispensed. And Defendants' failure to seek a remedy during the discovery period in order to develop a better record requires that they now hurdle the high bar of exclusion under Rule 26(a)(2)(B), which they have not done. Let there be no doubt, however: any lawyer who seeks to substantially prepare expert reports in the fashion noted here risks not only exclusion of the expert's testimony, but sanctions by the court.

30

For these reasons, the motion to preclude Drago's report and testimony will be denied. The court will, however, permit Defendants substantial leeway to cross examine Drago at trial on the process of his reaching his opinions in accordance with Rule 26, as it relates to his credibility.

### C. Dr. Marilyn Miller

Defendants move to exclude the report (Doc. 250) and testimony of Marilyn Miller, Ph.D., Howard's crime scene expert. (Doc. 149.) Although they conflate their arguments in their briefing, Defendants present two primary grounds for exclusion: 1) a charge that Miller's report, in similar fashion to that of Drago, was effectively ghost written by Howard's counsel such that she did not substantially participate in the report's creation as required by Federal Rule of Civil Procedure 26(a); and a <u>Daubert</u>/Rule 702 challenge, contending that Miller's testimony is not reliable because it is not supported by the evidence.

As to the first argument, Rule 26(a)'s requirements are not merely technical but exist in part to ensure the expert's opinions are her own, and that the expert is not a hired gun who "merely express[es] the opinions of the lawyers who hired" her. <u>Trigon</u>, 204 F.R.D. at 294. Such latter opinions would not be helpful to the trier of fact. <u>See</u> Fed. R. Evid. 702.

Here, the record suffers from the same limitations as with expert Drago; namely, Howard's counsel frequently objected during

31

Miller's deposition to defense counsel's questions about the process of creating the report and directed Miller not to answer. Unfortunately, as with Drago, there was also no subsequent resolution of the dispute through a motion to compel. However, what record evidence that does exist is troubling. At her deposition, Miller stated that she merely gave a "template" of her report to Howard's counsel. In relevant part, she testified:

> Q. Well, Mr. [Drago] testified that he had a conversation with the Plaintiff's lawyers. Then they prepared a report and sent it to him. Was that done in this case?
>
> A. No.
>
> Q. Did you actually type up your report?
>
> A. I have a template that I will often use for affidavit purposes. And then also -- so that part was written. And then we had a general conversation over the phone where --
>
> Q. And I don't want to know the details of it.
>
> A. Okay. That was the beginning of the interaction with the attorneys.
>
> Q. And so in the template that you provided to the attorneys for Mr. Howard, did that contain any opinions that you had formulated in this case?
>
> A. No.
>
> Q. And --
>
> A. What it did was it gave the outline of how I normally prepare affidavits. And that didn't necessarily follow civil guidelines.

(Doc. 149-1 at 54:16-55:14.) At this point, Howard's counsel objected "to any further inquiry" and instructed Miller not to

answer questions, including the following:

> So the affidavit, when it came back to you, did it contain opinions about this case? (Id. at 56:2-3.)

> So to just clarify, the template for your report, you sent that to Mr. Howard's attorneys. And when you sent that, it did not contain any of your opinions in this case, correct? (Id. at 56:20-24.)

> The template that you provided to Plaintiff's Counsel, was that returned to you with opinions that you ultimately have adopted? (Id. at 57:20-22.)

> Now the report is dated July 31, 2019. When did you send the template to Mr. Howard's attorney? (Id. at 58:3-5.)

> Who did you send your template to? (Id. at 58:12-13)

> When did you first receive your template back that contained any opinions that you have ultimately adopted? (Id. at 58:17-19.)

> In preparation of your report, the two references here, were they identified in the template of your report that you gave to Mr. Howard's attorneys? (Id. at 63:12-15.)

Further, Miller's billing records indicate she spent a mere 2.5 hours on the case through the preparation of her report. (Doc. 148-8 at 3.) This negligible amount of time, combined with Miller's testimony that she gave a "template" that did not contain any of her opinions to Howard's counsel, strongly indicates that Howard's counsel actually prepared Miller's report.

In response, Howard relies heavily on the fact that, before she was retained for this case, Miller was retained by Howard's post-conviction counsel and testified at his August 2016 post-conviction DNA hearing. In preparation for that prior work, Howard

33

says, Miller reviewed many of the same materials. Howard argues that, in the present case, Miller is "offer[ing] some of the same opinions she had already reached and testified to during Plaintiff's post-conviction proceedings in 2016." (Doc. 209 at 4.) In other words, Howard says, Miller did substantially participate in the creation of the report because, three years prior, she reviewed the same materials and gave the same opinions. (See id. at 19-21 ("[I]t is beyond any dispute that Prof. Miller had 'prior substantive input' in the opinions — again, because she formulated the opinions and testified to them years before her report was written. Counsel's assistance in summarizing the opinions she had already testified to — before Prof. Miller reviewed, edited, and signed the report under penalty of perjury as accurately reflecting her opinions — is perfectly permissible under Rule 26.").)

A careful review of Miller's 2016 testimony and 2019 report for this case does not fully support this contention. In her 2019 report, Miller offers three main opinions: 1) "the evidence collected and documented from the murders of Doris and Nishonda Washington indicates that sexual assaults were committed on both women at the crime scene close to the time of their deaths"; 2) "a detective or crime scene investigator with minimal competence and training based on minimally acceptable practices in crime scene investigation in 1991 would have searched for evidence of sexual

34

assaults and perpetrator DNA at the scene of the Washington murders"; and 3) the "evidence from the crime scene does not indicate that the fire was set primarily or for the sole purpose of destroying the bodies and hiding evidence on the bodies." (Doc. 250-1 ¶¶ 32-34.)

Miller can fairly be said to have previously testified as to the first opinion at the 2016 post-conviction hearing. When asked by Howard's post-conviction counsel at that hearing, "[D]o you have an opinion as to whether a sexual assault took place in connection with these murders at this crime scene?", Miller answered in the affirmative and testified, "[T]here was a sexual assault committed at this crime scene." (Doc. 209-1 at 133:21-134:2.)

Miller did not directly testify to the second opinion in 2016. The closest she comes is, when asked "do you have an opinion as to whether the killers would have left DNA in and on these women?", she responds affirmatively and states, "that would be clear evidence to look for." (Id. at 135:20-136:2.) However, in the context of the questioning, this opinion was offered to establish that DNA was recovered from the Washingtons and that it excluded Howard. This, after-all, was the purpose of the 2016 DNA hearing. She never testified that a detective with minimal competence and training would have looked for evidence of sexual assault. Nor would that have been likely since, unlike in this civil trial where

35

Dowdy is a Defendant, his competence was not an issue at the 2016 hearing. What makes this a slightly closer call is that later in that 2016 hearing, she did outline multiple actions that "could have been done" by the investigators, including collecting the bed sheet and searching it for fluids and hair, and she ultimately stated that "imposing the standards that I used as a crime scene investigator in the early '90s . . . I would have done more than what was done here." (Id. at 153, 165, and 174.)

As to the third opinion, when asked in the 2016 hearing why the perpetrators would set the apartment on fire, she responded, "To destroy any evidence that might be left and present, to disrupt it." (Id. at 151:24-25.) She stated that the Washingtons were "found in this crime scene that is attempted to be disguised by burning it down." (Id. at 146:24-25.) Later she spoke about "the fact that the scene has tried to be disrupted or destroyed with the fire" (id. at 172:4-5) and stated, "I can say there was a sexual assault, the victims were placed on this bed, there was a fire started to attempt to obliterate it, based only on the physical evidence I have" (id. at 174:10-13). This 2016 testimony refers to the destruction of the evidence, including the bodies and the rest of the crime scene. This is the natural reading of Miller's prior testimony that the fire was set "[t]o destroy any evidence that might be left and present." (Id. at 151:24 (emphasis added).) Now, Howard contends that Miller's opinion is that "that

36

no minimally trained crime scene investigator would conclude that the fire was set for either of those purposes ["to destroy the bodies or hide evidence]." (Doc. 209 at 5.)

Howard recognizes the inconsistencies between Miller's 2016 and 2019 opinions. His framing of Miller's key opinions in 2016 and in 2019 reveal differences in them (Doc. 209 at 4), and he contends that Miller was retained to provide "some" of the same opinions she reached in 2016 (id.).

To compound the problem, it is also apparent that the documents Miller reviewed prior to her 2016 testimony could not have included the documents she says she reviewed for her 2019 report. At the very least, four documents were not even in existence in 2016 -- the transcript of her own 2016 testimony, Dowdy's 2019 deposition transcript, Judge Hudson's December 2016 Order vacating Howard's conviction, and Howard's 33-page (175 paragraph) complaint in this case. These documents total some 500 pages of material alone, which Miller says she reviewed in the 2.5 hours she spent on the case through the preparation of her report. (See Docs. 1, 87-2, 87-3, 209-1.)

In sum, as with Drago, Miller's report reveals substantial concerns. Despite counsel's assertions before this court, both in briefing and at the hearing, that Miller is merely reviewing the same documents and repeating the same opinions as in 2016, the record simply does not support this claim. Miller provided a

37

"template" to Plaintiff's counsel containing <u>none</u> of her opinions; her billing records indicate she spent a total of 2.5 hours through the preparation of her report; her report states she reviewed at least four new documents that she would not have been able to review prior to her 2016 testimony, totaling about 500 pages, during these 2.5 hours; and her report contains opinions she did not express in 2016.

As the cases cited by Defendants indicate, once an expert purports to have prepared and signed a report, the opponent bears the burden of proving that the expert did not substantially participate in preparing it. See <u>Trigon</u>, 204 F.R.D. at 295 ("The burden of proving ghost writing rests with [the opponent of the evidence]."); <u>Manning v. Crockett</u>, 1999 WL 342715, at *4 (N.D. Ill. May 18, 1999) (denying a motion to exclude expert testimony and noting that a renewed motion must be "accompanied by evidence supporting the conclusion that [the expert] lacked significant personal involvement in the preparation of his report"). Based on the record, the court finds that Defendants have met that burden here as to Miller's third opinion.

Given that Miller testified as to her report's first opinion (Doc. 250-1 ¶ 32) both in 2016 and in 2019, and because she gave similar testimony in 2016 as to the report's second opinion, she will be permitted to testify as to those opinions in this case. Even though counsel drafted Miller's report, counsel appears to

38

have done so by importing these earlier opinions – of which Howard's counsel was aware -- into the report, and Miller has offered those as her own at this time. In this respect, the opinion can fairly be said to be Miller's, and Howard has demonstrated that his counsel's drafting was substantially justified. Indiana Ins. Co. v. Hussey Seating Co., 176 F.R.D. 291, 293 (S.D. Ind. 1997) (stating that "pursuant to [Federal] Rule [of Civil Procedure] 37(c), a party's failure to comply with rule 26(a) results in an 'automatic and mandatory' exclusion of expert testimony, unless the party to be sanctioned can show that the violation was 'justified or harmless.'"); Marek v. Moore, 171 F.R.D. 298, 302 (D. Kan. 1997) (considering ghost-writing under Rule 37(c)(1)'s "substantial justification" or "harmless" test, but finding it was not to an impermissible level).[8]

However, Miller will not be permitted to testify as to her third opinion. (Id. ¶¶ 33-34.) Not only did she not testify to that opinion in 2016, which is the only basis now offered to justify counsel's drafting of the opinion portion of her report,

_____

[8] While these cases pre-date Rule 26's 2010 amendment, some courts have continued to apply a similar standard. See, e.g., Harmon v. United States, 2017 WL 4098742 (D. Md. 2017) (relying on Indiana Insurance Company's finding that the failure to comply with Rule 26 was "harmless"); Mullen v. South Denver Rehabilitation, LLC, 2020 WL 6680358 (D. Co. 2020) (finding the same where counsel drafted a report after substantive conversations with the expert). As the Fourth Circuit has noted, "the basic purpose of Rule 37(c)(1) [is] preventing surprise and prejudice to the opposing party." S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596 (4th Cir. 2003).

39

she testified to just the opposite. Nor is there any indication that she somehow communicated this new opinion to Howard's counsel in advance. Rather, this opinion must have originated with counsel.[9] But even if it were later adopted by Miller, that would not cure the defect. See <u>Manning v. Crockett</u>, 1999 WL 342715, *3 (N.D. Ill. 1999) (noting that "preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it" conflicts with Rule 26(a)(2)(B)); <u>Tindall v. H & S Homes, LLC</u>, 2012 WL 3241885, *2 (M.D. Ga. 2012) (explaining that an expert merely adopting a report prepared by counsel would "clearly exceed the level of assistance contemplated by Rule 26.").

Defendants' second argument is that Miller's opinions are not reliable under Federal Rule of Evidence 702. Because the court has excluded Miller's third opinion, only the first and second opinions will be considered as to this challenge.

Rule 702 provides four requirements that a witness qualified as an expert must meet in order to testify: (1) the expert's specialized knowledge will "help the trier of fact to understand

---

[9] This is further evidenced by Miller's difficulty explaining the basis for this opinion during her deposition. For example, Miller's report concluded that the fire in the Washingtons' apartment was not set to destroy evidence and the evidence showed the victims' clothes were removed during the sexual assault. (Doc. 250-1 at ¶ 34.) At deposition, however, Miller knew of no evidence indicating when the victims' clothing was removed (Doc. 149-1 at 74), admitted that she had no evidence to conclude when the clothes were removed (<u>id.</u> at 113), and could not opine on whether the victims were wearing clothes at the time the semen was deposited (<u>id.</u> at 77.)

the evidence;" (2) the testimony has a sufficient factual basis; (3) the testimony is the result of reliable methodologies; and (4) the expert reliably applied the methodologies to the facts. Fed. R. Evid. 702(a)-(d). The "proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence" pursuant to Federal Rule of Civil Procedure 104(a). See Fed. R. Evid. 702 Advisory Committee notes to 2000 amendment; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Sardis v. Overhead Door Corp., --- F.4th ---, 2021 WL 3699753, at *8 (4th Cir. 2021) (noting that the Federal Rule of Evidence Advisory Committee has recently stated that judges must "apply the preponderance standard of admissibility to Rule 702' requirements.") (quoting Advisory Comm. on Evidence Rules, Agenda for Committee Meeting 17 (Apr. 30, 2021). Proponents need not show by a preponderance that their experts are correct, but rather that "their opinions are reliable." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3d Cir. 1994); see also Daubert, 509 U.S. at 589 (1993). Reliability is a "flexible" inquiry focused on "the principles and methodology" used by the expert to ensure that the expert's opinion is "based on scientific, technical, or other specialized knowledge and not on belief or speculation." Daubert, 509 U.S. at 594-95; Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999).

Defendants argue that Miller's opinions are not reliable

41

because they are not supported by the evidence. Her first and second opinions are related. Her first opinion is that "the evidence collected and documented from the murders of Doris and Nishonda Washington indicates that sexual assaults were committed on both women at the crime scene close to the time of their deaths" (Doc. 250-1 ¶ 32); and her second opinion is that a minimally competent crime scene investigator "would have searched for evidence of sexual assaults and perpetrator DNA at the scene of the Washington murders" (id. ¶ 33). Defendants largely challenge her conclusions that the sexual assaults were committed "at the crime scene" and "close to the time of their deaths." (Doc. 150 at 9.) They point out the following: Miller cannot identify when the sperm/semen was deposited in the victims, as that is beyond her expertise; Miller cannot say where either victim was at the time of their sexual encounter, including in their apartment; Miller cannot say whether either woman was clothed when the sexual encounter took place; Miller cannot say when their bruises were inflicted; Miller cannot place the physical trauma in relation to the timing of the sexual encounters; Miller claims the presence of cream-colored fluid found in Nishonda's vagina was "highly suggestive" of a sexual assault and not consensual sex based on an "association I am making" because of the bodies being found nude, even though she conceded it could have come from a consensual act; Miller does not dispute the testimony of Dr. Thompson, the medical

42

examiner, that there is no evidence the sperm found in Nishonda's anal cavity was deposited at the time of her death; and Miller concedes that the sperm found in Nishonda's anal cavity could have drained from her vagina. (Doc. 150 at 9-14.)

Howard responds that Defendants misrepresent Miller's experience, which is as a crime scene investigator who opines on what a minimally-trained investigator would have done. (Doc. 209 at 9-10.) As to the first opinion, Howard contends that Miller opines only that "the evidence *indicates* Doris and Nishonda were sexually assaulted." (Id. at 11.) Howard argues that "Defendants misconstrue Prof. Miller's opinion that the evidence *indicates* that Doris and Nishonda were sexually assaulted for an opinion, which she does not offer, that it *definitively establishes* that." (Id. at 12.) Howard also notes that Miller relies on the totality of the evidence, not any particular piece of it. (Id.) Finally, Howard argues that the predicates for Miller's opinions (such as that the sperm in Nishonda was deposited within 24 hours of her autopsy, and that the vaginal laceration in Doris was caused by an object at or near her death), are set out by the medical examiner.[10]

---

[10] As to Nishonda, the medical examiner noted "examination of the external genitalia reveals minimal erythema of the labia and of the mucosa of the distal vagina. There is a moderate amount of cream-colored fluid within the vagina." (Doc. 87-18 at 2.) The medical examiner also noted "no spermatozoa are identified on examination of smears of the mouth and vagina. Spermatozoa heads are identified in a smear of the anus." Id. at 6. Miller combines the medical examiner's discovery of a cream-colored fluid in Nishonda's vagina with his finding that the anal smears revealed spermatozoa heads to conclude that "the spermatozoa was deposited within 24 hours of the autopsy." (Doc. 250-1 at

43

(Id.)

As a former crime scene investigator and current professor of forensic science, Miller offers her opinion as to the evidence at the crime scene of the Washington murders. (Doc. 149-1 at ¶¶ 32-33.)  This opinion is relevant to the claim that Defendant Dowdy both reported to prosecutors and testified at trial that there was no evidence that either Doris or Nishonda was sexually assaulted and that he never investigated the Washington murders as sexual assaults.  Miller's opinion as to what evidence would be important to a crime scene investigator and why will assist the trier of fact to understand the underlying evidence of the Washington murders to reach a conclusion about Dowdy's subsequent actions in investigating the crime.  As such, it is relevant under Rule 702. Belville v. Ford Motor Co., 919 F.3d 224, 232 (4th Cir. 2019) (noting that an expert's opinion is relevant if it has "a valid scientific connection to the pertinent inquiry").

But Howard's explanation for how she articulates her first opinion is unsatisfactory, as the standard for admissibility and for liability in this instance is not "definitiveness," but rather a "preponderance."  It is unclear whether by "indicates" Miller

¶ 32b.)  As to Doris, the medical examiner stated at Howard's 1995 trial that "something would have had to have been placed inside the vagina … to [cause] some pressure put upon it to cause that tear." (Doc. 87-13 at 19-21.)  Miller claims that the medical examiner "concluded from autopsy that an object had to have been inserted into Doris Washington's vagina."  (Doc. 250-1 at ¶ 32e.) While the medical examiner did not state that in his autopsy report, he did testify to that effect in Howard's 1995 trial.

44

means that the evidence "is consistent with" or "supportive of" a sexual assault, or rather that "more likely than not" a sexual assault occurred.  If it is the latter, Miller has not demonstrated by a preponderance that she has a sufficient factual basis for, or applied a reliable methodology to render, a probability opinion.  As Defendants point out, there are simply too many factual questions Miller cannot answer.  For example, Miller's report concludes that the evidence from the Washington murders indicates that sexual assaults were committed at the crime scene "close to the time of their deaths."  (Doc. 250-1 ¶¶ 32-34.)  In her deposition, however, Miller was unable to identify how long the sperm was deposited in either victim, admitted that any opinion as to the time sperm was deposited was beyond her expertise, and does not know where the victims were when the sperm was deposited. (Doc. 149-1 at 69-71.)

Thus, Miller may opine as to what a crime scene investigator would have regarded to be important evidence and what steps should have been taken to conduct the investigation.  To the extent Defendants argue that facts upon which Miller relies are either disputed or unknown to her, that goes to the weight of her opinions and is properly the subject of cross-examination.  See Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir. 2017) ("[Q]uestions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness' assessment, not

45

its admissibility.") (alterations, citation, and quotations omitted).

Accordingly, Defendants' motion to preclude Miller's report and testimony is granted in part as to Miller's first opinion, denied as to her second opinion, and granted as to her third opinion.

### D. Dr. Moira Artigues

In two separate motions, Defendants move to exclude certain testimony from Dr. Moira Artigues, a psychiatrist designated by Howard as an expert witness. (Docs. 151, 153.)

Defendants first move to preclude Dr. Artigues's testimony and report to the extent it purports to analyze or explain Howard's demeanor during his deposition or at trial. (Doc. 151.) Howard opposes the motion. (See Doc. 205.) At the court's direction following the hearing on July 23, 2021, the parties conferred and on July 30, 2021, submitted a joint filing that reports they have resolved this motion. (Doc. 255.)[11] This motion (Doc. 151) will

---

[11] The parties have agreed that Dr. Artigues (1) may testify about the symptoms of Post-Traumatic Stress Disorder ("PTSD") and her observations of how those symptoms were displayed during her personal interviews with Howard, to the extent those observations are consistent with her report; (2) may testify generally that she was provided and watched a copy of Howard's deposition testimony dated 10/01/2019 and she observed symptoms during his deposition similar to those she observed in her personal interviews with Howard; and (3) may not testify about or analyze any particular testimony from Howard at his deposition or trial, and neither Dr. Artigues nor Howard's counsel may present or refer to any particular testimony from Howard's deposition or any particular testimony from Howard while Dr. Artigues is testifying. (Doc. 255.)

46

therefore be deemed moot.

Defendants also move to exclude the report and testimony from Dr. Artigues to the extent it states or implies "that she has reached an expert conclusion through her examination of [Howard] that [he] has suffered harm arising from the alleged 'wrongful' nature of his imprisonment as distinguished from harm that arose from a lengthy period of incarceration generally." (Doc. 153 at 1-2.)[12] Defendants do not contest the admissibility of Dr. Artigues's diagnosis of PTSD, nor do they contest Dr. Artigues's attribution of that condition to Howard's incarceration. Rather, they narrowly challenge the conclusion that the condition was caused by his <u>wrongful</u> incarceration.

This inquiry is governed by Federal Rule of Evidence 702, the standards of which have already been set out. Defendants challenge the reliability of Dr. Artigues's opinions. "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." <u>Cooper v. Smith & Nephew, Inc.</u>, 259 F.3d 194, 200 (4th

---

[12] In this motion, Defendants also move to preclude the introduction of testimony from Dr. Artigues that states or implies that Howard "has been exonerated or adjudged innocent or . . . wrongfully convicted or incarcerated." (Doc. 153 at 1.) For the reasons stated earlier in this opinion, Dr. Artigues shall not refer to any finding of "actual innocence" in the December 2016 Order by the governor's Pardon of Innocence. As the parties agree, however, Dr. Artigues may opine based on the assumption that Howard was wrongfully convicted, should a jury so conclude. (Doc. 246 at 27.)

47

Cir. 2001) (quoting Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999)). To guide this "gatekeeping" function, the Supreme Court has identified several non-exhaustive factors useful for evaluating the reliability of proposed expert testimony, which include:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

Id. at 199 (citing Daubert, 509 U.S. at 592–94). Howard must establish the admissibility of Dr. Artigues's testimony by "a preponderance of proof." Id. However, "[t]he trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." In Re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig., 892 F.3d 624, 631 (4th Cir. 2018). And while "the holding of Daubert is as readily applicable in cases involving psychologists as in those in which the proffered expert testimony is of a more scientific nature," United States v. Guild, No. 1:07cr404, 2008 WL 153764, *2 n.1 (E.D. Va. Jan. 14, 2008), courts have also "recognized a particular need to employ a 'flexible' test in areas outside of the hard sciences," Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n, 295 F. Supp. 3d 540, 551 (D. Md. 2017) (citing United States v. Simmons, 470 F.3d 1115, 1122-23 (5th Cir. 2006)). Once an expert's opinion

48

crosses Rule 702's preponderance threshold, the "conventional devices" of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," are "the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert, 509 U.S. at 596).

Defendants do not challenge Dr. Artigues's qualifications and do not contend her conclusion that Howard suffers from PTSD is inadmissible. (See Doc. 154 at 9.) Rather, they contend that Dr. Artigues has no basis to conclude that Howard suffered a particular harm based upon his "wrongful" incarceration, (id.), and that she did not conduct a differential diagnosis to exclude the effects of incarceration generally from those of "wrongful" incarcerations, (Doc. 237 at 3). They further criticize the literature regarding the effects of wrongful incarceration on which Dr. Artigues relied because "without a comparison group of interviews with people who were imprisoned who did not have their convictions overturned[,] they provide no scientifically reliable basis to determine which if any of those symptoms are unique to people whose convictions were wrongful." (Id. at 4; Doc. 154 at 10-12.) Howard responds that Dr. Artigues reliably performed a differential diagnosis in determining the cause of Howard's PTSD and that the literature upon which she relied, which has been published in peer-reviewed journals, represents reliable qualitative research. (Doc. 206 at 12-16.)

49

In her report, Dr. Artigues purports to conduct a differential diagnosis in evaluating Howard.[13] Specifically, she compares the symptoms she observed in Howard to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) criteria for PTSD and finds he meets the diagnostic criteria for that condition. (Doc. 152-1 at 14-15.) She also eliminates other potential causative factors, such as his early exposure to violence, by examining his prior mental health examinations to determine the time of the onset of symptoms. (Id. at 12-13.) Up to this point, Defendants do not challenge the propriety of Dr. Artigues's methodology. (See Doc. 237 at 2-3.)

Dr. Artigues then goes on to compare Howard's symptoms with those described in selected research literature regarding the effects of long incarcerations on innocent individuals, concluding that Howard has "suffered in the ways that the literature regarding exonerees has shown."[14] (Doc. 152-1 at 16-19.) For example, Dr.

---

[13] A differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem . . . by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999).

[14] Defendants have not argued that Artigues is improperly bolstering her opinion by so testifying nor is it apparent precisely how Artigues intends to present such testimony, so the court does not consider that potential issue. United States v. Tran Trong Cuong, 18 F.3d 1132, 1144 (4th Cir. 1994) (stating that an expert may not bolster the reliability of his own opinion by testifying about a non-testifying expert witness' credentials and opinion).

50

Artigues states that Howard has an "exaggerated sense of fairness" that is accompanied by profound mistrust of others — so much so that he quit his job because he discovered a coworker was paid less than he was; fears being out in public because of the feeling of notoriety those wrongfully incarcerated have because they believe everyone knows who they are; questions reality as those wrongfully accuse start to believe they must have committed the crime others say they have committed; has lost members of his family while incarcerated both due to death and because people perceive him as a criminal and distance themselves away from him; suffered physical and psychological deterioration; struggled with reentering society; and fears interaction with law enforcement because they might wrongfully accuse him again. Defendants challenge this conclusion.

Dr. Artigues is certified by the American Board of Psychiatry and Neurology in both General and Forensic Psychology and is a current member of the Psychiatry and Law Committee of the North Carolina Psychiatric Association. (Doc. 154-1 at 2.) She has extensive experience working with incarcerated populations and conducting examinations for the purpose of litigation. (Id.) In preparing her report, she met with Howard for examination and interviews on five occasions over eight months. (Id.) She also interviewed one of Howard's life-long friends and reviewed multiple documents, including filings pertinent to these

51

proceedings, including Howard's medical records from his time both within and outside of prison. (Id. at 2-3.)

In concluding that Howard suffers PTSD as a result of his wrongful incarceration, Dr. Artigues's report relies on a body of peer-reviewed research literature that examines and discusses commonalities in the mental health of individuals wrongfully incarcerated. While at least one article discusses, tangentially, how such populations compare with other incarcerated individuals, see Leslie Scott, "It Never, Ever Ends": The Psychological Impact of Wrongful Conviction, 5 Am. U. Crim. L. Br. 10, 13 (2010), Defendants are correct that no study systematically compares these groups.[15] Even so, the court finds Dr. Artigues's testimony relevant and reliable. There is no indication that the peer-reviewed literature on this issue is unreliable in its evaluation of the symptoms of the wrongfully incarcerated; certainly, Defendants provide no such evidence. See also Daubert, 509 U.S. at 594 (finding that reliability is enhanced if the research is "subject[ed] to the rigors of peer review and publication"). The

---

[15] The other studies relied upon by Dr. Artigues are as follows: Kathryn Campbell & Myriam Denov, The Burden of Innocence: Coping With a Wrongful Imprisonment, 46 Canadian J. Criminology & Crim. Just. 139 (2004); Kathryn Campbell & Myriam Denov, Miscarriages of Justices: The Impact of Wrongful Imprisonment, 13 Just Rsch. (2014); Adrian Grounds, Psychological Consequences of Wrongful Conviction and Imprisonment, 46 Canadian J. Criminology & Crim. Just. 169 (2004); Adrian Grounds, Understanding the Effects of Wrongful Imprisonment, 32 Crime & Just. 1 (2005); Saundra D. Westervelt & Kimberly J. Cooke, Framing Innocents: The Wrongly Convicted As Victims of State Harm, 53 Crime Law & Soc. Change 259 (2009).

lack of a control group alone does not warrant exclusion here. See United States v. Batiste, No. 06-20373-CR, 2007 WL 5303052, at *5 (S.D. Fla. Oct. 26, 2007) ("[A]lthough there is no control group in the radicalization process, there is an existing data field for the radicalization process, as well as a consensus in the literature regarding the validity of this process."). Dr. Artigues has significant experience and qualifications, has conducted a sufficient examination of Howard and the other relevant sources, and has come to her conclusion based upon both the peer-reviewed literature and her expert judgment.

In light of the above, Dr. Artigues may testify, based on her own observations, professional judgment, and familiarity with the peer-reviewed literature, that Howard's PTSD symptoms are consistent with those observed by other researchers in wrongfully incarcerated populations. She has demonstrated, by a preponderance, that her opinion will assist the trier of fact and is based on sufficient facts and data. Moreover, she has applied the standards set out in the DSM-5, which are reliable, and reliably applied them here to Howard's situation. Notably, she is not attempting to parse out attribution of any PTSD symptoms, but rather is merely opining that Howard's symptoms are "consistent with" those of individuals wrongfully convicted. To the extent Defendants contest the rigorousness of the underlying studies on which she relies, as well as the bases for her opinion, these

53

challenges are properly the subject of cross-examination.  See also Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999) (finding that doctor's explanations as to conclusions not ruled out related to the opinions' weight and not admissibility). For this reason, Defendants' motion is denied.

### E.   Suzanna Ryan

Howard moves to exclude testimony from Suzanna Ryan, a forensic DNA consultant designated by Defendants as an expert witness. (Doc. 155.)  In substance, Ryan, who holds a bachelor of science degree in biology and a minor in chemistry, and who has over 20 years' experience in forensic serology and DNA analysis, testifies to the likelihood that Doris Washington's sexual activity did not occur in close proximity to her death.[16]

Howard's principal challenge is the reliability of Ryan's conclusion regarding time since intercourse ("TSI") between Jermeck Jones and Doris Washington.  Ryan's report concluded, in relevant part, "In my opinion, the lack of AP [acid phosphatase] activity, combined with the fact that there are likely only a very few sperm cells present in the vaginal swabs, is an indication that sexual activity between Jermeck Jones and Doris Washington

---

[16] Ryan agrees with Howard's expert, Meghan Clement, that given the sperm present on the vaginal smear from Nishonda Washington, "sperm 'would have been deposited less than 24 hours prior to her time of death', thus making it more likely than not that the sexual contact was recent." (Doc. 207-1 ¶ 8.)

likely occurred several days prior to the vaginal swab sample being collected," which was at Doris Washington's autopsy on the morning of November 27, 1991, approximately 9 hours after her death. (Doc. 156-3 ¶ 7.) Ryan has two bases for this opinion. The first is the lack of evidence of sperm on the vaginal swabs taken from Doris Washington. According to Ryan, "the amount and quality of sperm cells in the vaginal canal decrease in a fairly linear fashion as time-since-intercourse (TSI) increases, with 'few' or no sperm cells typically detected after ~ 72 to 96 hours." (Id.) Ryan relies on the fact that the State Bureau of Investigation ("SBI") and the medical examiner did not observe any sperm on two slides of fluid taken from Doris's vagina.[17] (Doc. 259-2 at 184:19-25, 190:17-23, 191:2-18.) The second basis is the fact that in March 1993 -- about 15 months after the murders -- the SBI conducted an acid phosphatase ("AP") test on Doris Washington's vaginal swabs, which was negative. AP is an enzyme found in high concentrations in semen, higher than in other bodily fluids. (Doc. 156-3 ¶ 7; Doc. 253-1 at 94:2-5.) In an AP test, a reagent is added to the sample. After a set period of time -- such as 30 seconds, 1 minute, or 2 minutes, depending on the lab's protocols -- either the color on the sample has changed (a positive test) or the color has not changed (a negative test). (Doc. 253-2 at 46:16-48:11.)

---

[17] Howard does not appear to challenge this finding. (Doc. 253-1 at 4.)

55

The analyst might also test the reagent on both a positive control (a known semen stain) and negative control (a clean swab) to ensure the reagent is working. (Id. at 48:12-49:17.) The AP test is a presumptive test for the presence of semen.

Howard argues that Ryan's conclusion -- that sexual activity between Jones and Doris Washington "likely occurred . . . several days prior" to the swab being collected -- lacks a reliable basis for two main reasons: 1) the AP test itself is unreliable; and 2) the test is even less reliable in this case because Ryan does not know the standard (i.e., the cut-off time) the SBI used in conducting the test. (Doc. 156 at 2, 5.)

For his first argument, Howard cites a 2017 study published in the Journal of Forensic Sciences by David G. Casey et al. entitled "The Persistence of Sperm and the Development of Time Since Intercourse (TSI) Guidelines in Sexual Assault Cases at Forensic Science Ireland, Dublin Ireland" (the "Casey study"). (Doc 156-7.) The study appears to be one of the leading studies on TSI, containing a large sample size (over 5,500 swabs) and with robust statistical analysis. Ryan herself lists the Casey study as a source she consulted in preparing her report (Doc. 156-3 ¶ 5), and at her deposition she acknowledged the paper's strengths as a recent study with a large dataset that was published in a reputable journal (Doc. 253-2 at 117:21-122:1.) In relevant part, the Casey study concludes:

56

> The use of AP reaction time to inform one's expectations
> of the presence or absence of sperm on swabs, to estimate
> the time since intercourse . . . is unsafe and unreliable
> . . . Our analysis has very clearly demonstrated the
> dangers of relying on the AP reaction time on vaginal
> swabs and that such an approach could be misleading to
> the courts.

(Doc. 156-7 at 8.)  Pertinent here, as evidenced by Table 16 from

the study (reproduced below), the authors found that in analyzing

AP results for sperm-positive swabs at a cut-off time of less than

60 seconds, nearly all intervals from 0 to 48+ hours TSI had a 50%

or less positivity rate:

TABLE 16—*The proportion of sperm-positive swabs with an AP < 60 and their 95% CI.*

| TSI (h) | Proportion of AP < 60 (positive swabs only) | 95% confidence interval |
|---------|---------------------------------------------|-------------------------|
| 0–6     | 0.5                                         | (0.45, 0.55)            |
| 0–12    | 0.57                                        | (0.51, 0.63)            |
| 6–12    | 0.41                                        | (0.34, 0.49)            |
| 18–24   | 0.41                                        | (0.33, 0.50)            |
| 24–48   | 0.31                                        | (0.23, 0.40)            |
| 48+     | 0.45                                        | (0.23, 0.68)            |

(Doc. 156-7 at 6.)  Only the 0-12 TSI interval had a statistically

significant positivity rate greater than 50% (95% confidence

interval of 0.51, 0.63).  The 0-6 hour TSI was exactly 50%, but

the low end of the 95% confidence interval could not exclude less

than 50% (95% confidence interval of 0.45, 0.55).  In other words,

according to the Casey study, more than half of the swabs that

were positive for sperm required an AP test time of at least 60

seconds to show a positive result, regardless of when sexual

intercourse occurred.  Thus, if an analyst used an AP cut-off time

of less than 60 seconds, it was more likely than not that a sperm-

57

positive swab would still report a negative AP result in all but two of the time intervals.  (Id. at 7.)  More to the point here, as for Ryan's opinion that sexual activity occurred "several days" before the swab was collected from Doris Washington, Table 16 shows that well fewer than half -- only .31 (24-48 hours TSI) and .45 (48+ TSI) -- of such slides would show a positive AP test result at less than 60 seconds, with statistical confidence intervals as low as .23 and only as high as .40 for 24 to 48 hours TSI and .68 for 48+ TSI.  Thus, according to this study, if using an AP test of less than 60 seconds, more often than not there is a false negative.

Howard argues that the reliability of Ryan's opinion is further undermined by the fact that Ryan does not know the cut-off time the SBI used for its AP test on Doris Washington's swab. (Doc. 253-2 at 245:15-17.)  Howard also argues that the SBI notes do not give a clear indication whether the controls were working; there is what Howard characterizes as a scribble through the notation for the positive control, (see Doc. 156-6 at 4-5), which he contends might indicate the reagent was not working properly. Therefore, to the extent Ryan's opinion of "likelihood" is based on the AP test, Howard contends, it suffers from two deficiencies: an AP test in which randomness cannot be rejected in more than 50% of the cases (at less than 60 seconds); and the lack of knowledge

of the AP time used by the SBI to reach its AP result.[18]

Finally, Howard notes that while in her report Ryan wrote that sexual activity between Jones and Doris Washington "likely" occurred "several days prior" to the vaginal swab being collected (Doc. 156-3 ¶ 7), at her deposition, when asked what she meant by "several days," she testified, "I would say at least one to two, at a minimum, possibly even longer" (Doc. 253-2 at 191:20-21). In direct response to Howard's counsel's question, "What do you mean by likely?" Ryan responded:

> "Because it's difficult to be 100 percent positive about things, I have to -- even the studies are generalities; right? There's what we typically expect to see. We've already talked about there's these outliers and things like that. I can't say this absolutely happened two days prior or it absolutely happened. You know, this is what it's consistent with, though. When I look at these results, AP negative, likely low number of sperm cells, that is consistent with a longer time since intercourse. Can I say that that's 100 percent what happened? No, because of the factors that we just talked about, because I wasn't, you know, I wasn't there, and these are just based on generalities, but that is completely consistent with what I would expect if the person had sexual intercourse with a person one, two, even up three days prior."

(Id. at 198:2-18; see also id. at 193:21-25 ("The fact that there's no AP activity and there was [sic] no sperm cells visualized, yet we're still able to get a result, that is completely consistent with a more extended time since intercourse interval.").) Howard therefore argues that Ryan cannot testify to a probability opinion

---

[18] Whether the AP time the SBI employed could have been determined by further inquiry of the SBI is unclear.

because the results are only "consistent with" her opinion.

Defendants respond that as for the reliability of AP testing, Ryan testified in her deposition that "when [Casey and others] talk about historically, I think they're referring to the fact that many years ago, AP was originally thought to be a little bit more specific than what we realize it is now." (Doc. 259-2 at 251:10-13.) Ryan does not dispute the import of the Casey study, which concludes that reliance on AP results to determine TSI could be "misleading" to a court. (Doc. 156-7 at 8.) She agrees that she would not "use the reaction time of AP to try to indicate a time since intercourse" and states she is not doing so here. (Doc. 259-2 at 249:5-17)[19] She also acknowledges that the AP test is "a presumptive test" and that "you have to do a confirmatory test to confirm that." (Id. at 251:16.) While the AP test is important because it is not positive, Ryan testified, she bases her TSI opinion on the fact that "there are likely only a very few sperm cells present on the vaginal swabs." (Doc. 156-3 ¶ 7.) One piece of evidence for TSI, she contends, is sperm quality. Sperm breaks down in a linear fashion over time, resulting in visible differences, including the loss of tails. (Doc. 156-3 ¶ 7; Doc.

---

[19] Ryan does agree with Howard's expert, Meghan Clement, who acknowledges that if AP testing is done on a swab that was collected within 12 hours of intercourse -- as Howard alleges occurred here -- "[t]ypically the only time we would see AP tests come out negative [is] if the woman was menstruating . . . But within 12 hours, generally we would see a positive AP test." (Doc. 253-1 at 115:14-19.)

60

253-2 at 115:4-116:10.)  Ryan testified at her deposition, citing the Casey study, that "24 hours would probably be the longest time . . . that I would typically expect to see [sperm] tails present." (Doc. 253-2 at 115:23-25.)  When Doris Washington's swabs were analyzed by the medical examiner and the SBI, sperm cells were not observed.[20]  (Doc. 87-19 at 2; Doc. 87-17 at 9.)  Ryan opines that, because male DNA was detected however, "it is likely - though unconfirmed - that a small number of sperm cells were present" in her vaginal swab.  (Doc. 156-3 ¶ 7.)

As to the AP time used by the SBI in its analysis of Doris Washington's swabs, Ryan acknowledges that she does not know the SBI's protocols.  (Doc. 156-4 at 245:15-17.)  However, Ryan, who was trained in conducting AP tests, conducted many herself, and has worked thousands of DNA cases in various laboratories (id. at 46:8-10; Doc. 259-2 at 77:20-24), testified that "normally most labs are using two minutes" for a cut-off time to observe AP reaction.  (Id. at 254:2.)  She further testified that "I can't say that every single lab in the country is using two minutes, but that is kind of a normal or accepted time." (Id.)  She also cites literature to support her opinion that two minutes is "generally accepted."  (Doc. 259-2 at 256:23-257:25; Doc. 156-5 (marked as

---

[20] Howard's expert, Meghan Clement, also agrees that the medical examiner and SBI did not observe any sperm.  (Doc. 253-1 at 3-4, 15.)

Ryan deposition Exhibit 102).)[21]  In her opinion, based on her training and experience, it would "really surprise me if somebody is using a 30-second cutoff."  (Id. at 240:5-6.)

As to the controls, Ryan responds that the SBI worksheet reflects that controls were in fact used, which would have been necessary to properly conduct an AP test, and that what Howard contends is a "scribble" through the reference to a control appears more likely to be the laboratory technician's markings to acknowledge that she conducted her positive and negative controls. (Doc. 156-4 at 222:22-25.)

As discussed above, on a Rule 702 challenge, Defendants bear the burden of establishing the admissibility of Ryan's testimony by "a preponderance of proof."  Cooper, 259 F.3d at 200.  While the Supreme Court has identified several non-exhaustive factors to consider in determining if an expert's opinion is reliable, id. at 199, the principal inquiry under Rule 702 is whether there is evidence, judged by a preponderance, that the expert's testimony is based on sufficient facts or data, is the product of reliable principles and methods, and is the product of a reliable application of the principles and methods to the facts of the case. While these factors may be contested, the court is mindful that

---

[21] The problem with a longer cut-off time beyond two minutes, Ryan testified, is the risk of false positives, as "there are other bodily fluids that contain acid phosphatases and there are other things that can give a positive."  (Doc. 259-2 at 256:13-14.)

"[t]he trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." In Re Lipitor, 892 F.3d at 631 (citation omitted).

The court, having read the entirety of Ryan's deposition submitted by the parties as well as the key studies at issue, finds that Defendants have carried their burden of proving that Ryan has met the prerequisites of Rule 702's admissibility standard by a preponderance. Howard's principal challenge is to Ryan's use of AP reaction time, which he says the 2017 Casey study demonstrates is unreliable as the basis for estimating TSI because it has a high rate of error. Ryan agrees that using the AP result to determine TSI would be unreliable.[22] This appears to be consistent with the Casey study's conclusion that AP reaction time "performs poorly" as a "sensitivity test for the presence of sperm." (Doc. 156-7 at 7.) But that is not what she is doing. Rather, Ryan is basing her TSI opinion on the lack of reported sperm cells observed on Doris Washington's vaginal swabs – what she calls the "gold

---

[22] It is noteworthy that the Casey study is less definite in its conclusions, stating: "Our findings suggest that the AP reaction underestimates the expectation of sperm-positive vaginal swabs and supports our previous suggestion that we should not rely on AP reaction times as an indicator or sperm-negative vaginal swabs." (Doc. 156-7 at 6 (emphasis added).) On the other hand, Casey found that an AP time of less than 30 seconds was "a very good indicator of the presence of sperm" (88% to 95% expectation of observing sperm). (Id.) This is consistent with Ryan's opinion.

standard" - as well as the fact that the AP result was negative.[23] (Doc. 259-2 at 57:5-24.) Based on her training and experience, which includes microscopic visualization and has not been challenged, she opines that semen would be detectible in a linear fashion after intercourse and "few" or no sperm cells would typically be detected after 72 to 96 hours. (Doc. 156-3 ¶ 7.) She also relies on the fact that 24 hours after intercourse is "probably" the longest one would expect to observe sperm tails (Doc. 253-2 at 115:23-24), and no tails were reported here (mainly because no sperm were identified).[24]

Moreover, Howard's challenges to the AP time focus largely on an assumption that the SBI used a cut-off of less than two minutes, yet Ryan testified (supported by literature)[25] that two minutes is the standard used my most laboratories in the nation. (Doc. 253-2 at 254:2.) All of this is consistent with the Casey study, which concluded that "AP reaction time is an unsafe and unreliable

---

[23] The testimony of Howard's expert, Clement, that "within 12 hours, generally we would see a positive AP test" (Doc. 253-1 at 19) is consistent with Ryan's consideration of the AP test result.

[24] Ryan acknowledges that she has no information about the quality of any sperm cells because none was identified. (Doc. 259-2 at 193:10-14.) However, this does not render her opinion unreliable. The Casey study, relied on by Howard, similarly concluded that "Our findings show that the expectation of finding sperm with tails after 24 h is very low . . . and that sperm with tails on vaginal swabs are more likely to be detected within 12 h TSI." (Doc. 156-7 at 5.)

[25] Ryan cited a literature review, Providing Evidence Based Opinions On Time Since Intercourse (TSI) Based On Body Fluid Testing Results of Internal Samples, by R. Dziak et al., published in the 44 Canadian Society of Forensic Science Journal 2 (2011).

predictor of sperm on intimate swabs." Doc. 156-7 at 1. Here, Ryan is relying on visual observations of the medical examiner and SBI to confirm the absence of any observable sperm. The negative AP result is consistent with that conclusion. Thus, Ryan's testimony is based on sufficient facts and data - the testing conducted by the medical examiner, SBI, and the DNA testing by LabCorp.

Defendants have also demonstrated that Ryan has reliably applied her principles and methods to that data to arrive at reliable opinions. The fact the AP test has variability is certainly important and subject to cross-examination, but the court cannot say that Ryan's inclusion of the negative AP result reported by the SBI in conjunction with the facts relating to the clinical reviews' failure to observe sperm renders the opinion invalid scientifically. The AP test is subject to positive and negative controls, is used routinely in forensic testing, and is subject to extensive peer-reviewed literature supporting its use as a presumptive test. Indeed, Ryan would have to consider the AP test result, no matter what it was. Howard's challenges to it here are largely based on higher rates of error in the AP test where the cut-off time is less than two minutes. But this is an assumption, not supported by any evidence, that the SBI did not use what Ryan describes as a standard laboratory two-minute cut-off. So, while there is a higher rate of error in some AP cut-

65

off times, it cannot be said that the SBI used a shorter time here. More importantly, the AP test is only a presumptive test for the presence of any sperm, and even the Casey study reveals that the shorter the TSI, the more likely the AP would test positive and more sperm would be detected microscopically. (Doc. 156-7 at 8.) So, any rate of error in the negative AP result does not seriously undermine Ryan's opinion. See United States v. Bonds, 12 F.3d 540, 560 (6th Cir. 1993) (affirming admission of DNA evidence although there were deficiencies in calculating the rate of error, because "the error rate is only one in a list of nonexclusive factors that the Daubert court observed would bear on the admissibility question.").

While a preponderance of evidence supports Ryan's opinion as to a time since intercourse, the court must also ensure that the expert does not overstate her opinion. See Fed. R. Evid. 702 advisory committee note to 2000 amendment (recognizing that on occasion an expert may "unjustifiably extrapolate[] from an accepted premise to an unfounded conclusion"); Gen. Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (observing that the trial judge may find that there is "simply too great an analytical gap between the data and the opinion proffered"). Here, Ryan's report opines that "sexual activity between Jermeck Jones and Doris Washington likely occurred several days prior to the vaginal swab sample being collected." (Doc. 156-3 at ¶ 7.)156-3 at 5 (emphasis added).)

66

Yet in her deposition, when asked what she meant by "several days," Ryan testified, "I would say at least one to two, at a minimum, possibly even longer." (Doc. 253-2 at 191:20-25.) Again, she later testified, "I think the most likely time period, it would be one to two days." (Id. at 192:21-23.) Otherwise, she has "less certainty" because she does not know how many sperm cells were present. (Id.) And because while she assumes some sperm cells were present because the DNA test was positive, there must have been few of them because no sperm cells were microscopically identified. (Id. at 192:21-193:25.) Therefore, knowing that the presence of sperm declines linearly from TSI, the only TSI opinion to which she can reliably testify as more likely than not is one to two days.[26] Accordingly, her testimony will be so limited.

Accordingly, the court, exercising its gatekeeper function over expert testimony, finds that Defendants demonstrated by a preponderance of evidence that Ryan's opinion that it is "likely" that sexual activity occurred "one to two days prior" to the collection of the swabs is the product of reliable principles and methods that have reliably been applied to the facts of this case. Having met the admissibility threshold for that more limited opinion, any limitations to her testimony or questions as to her

---

[26] Notably, this more limited opinion is also consistent with the Casey study, which suggested a guideline that "at a TSI of up to 48 h, the expectation of obtaining sperm on vaginal swabs can be considered high." (Doc. 15607 ay 9.)

67

bases are properly the subject of cross-examination.

Howard challenges two other opinions offered by Ryan. First, Howard challenges Ryan's opinion (Doc. 207-1 ¶ 11) that it was "possible" that sample switching could have occurred during the medical examiner's autopsy of both victims because the autopsies were performed "on the same day, in the same facility, with the same individuals attending." (Doc. 156 at 20-21.) Howard contends that it is contrary to her deposition testimony and lacks a factual basis. (Id. at 21.) Defendants do not offer any explanation in response.

Ryan only purports to identify potential sources of error in the medical examiner's analysis. For example, she notes that switched results could occur if "the swabs and smears were collected and not immediately labeled" or the wrong information was recorded "multiple times on multiple samples and the error [was] not [] detected." (Doc. 207-1 ¶ 11.) While she opines such is possible, she concedes she does not offer any opinion as to a preponderance. Howard does not contend that such errors are not possible. Thus, while Ryan will be permitted to point out possible sources of error in any case, she may not offer any opinion that such occurred here as she has no evidence that it did.

Second, Howard challenges Ryan's testimony that several issues "may need further examination to clarify," such as why Nishonda's vaginal and rectal smears detected sperm cells, but her

68

samples did not detect male DNA at the quantitation stage of analysis, because she noted in deposition that the outcome of those issues would not undermine the results of the tests. Howard argues that these observations are irrelevant and confusing. (Doc. 156 at 20-22.) Defendants do not offer any explanation in response as to how Ryan's testimony on these unclarified issues is relevant but state they "do not concede they have withdrawn the opinions." (Doc. 238 at 12.)

It goes without saying that where Defendants bear the burden of demonstrating admissibility of an expert opinion by a preponderance, a failure to respond is of little assistance. Ryan testified in her deposition that these were items that "don't necessarily make sense to me" and stated in her report these items "may need further examination to clarify." (Doc. 156-4 at 63; Doc. 156-2 at 4.) It is difficult to discern the purpose of such statements. To the extent Ryan claims there are items she does not understand, such as these, she will be permitted to testify to that, and why.

Howard's motion to exclude Ryan is thus granted in part and denied in part, as noted.

### F. Other Act Evidence

Howard moves to exclude evidence regarding certain other acts of his, including his prior criminal convictions and arrests, prior drug use, instances of being shot, prison disciplinary history,

69

and alleged domestic disputes.  (Doc. 165.)  After the filing of the motion, the parties subsequently agreed to exclude any evidence of Howard's prison records and alleged domestic disputes, but they have been otherwise unable to agree.  (Doc. 246 at 7.)

Federal Rule of Evidence 404(b) prohibits evidence of "any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  However, such evidence "may be admissible for another purpose" such as proving motive, opportunity, intent, or identity.  Fed. R. Evid. 404(b)(2).  The Fourth Circuit employs a four-part test to determine the admissibility of other act evidence: "(1) The evidence must be relevant to an issue, such as an element of an offense . . . (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable.  And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice."  United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997).  However, other act evidence that is "intrinsic" to the case is outside the scope of Rule 404(b).  See United States v. Denton, 944 F.3d 170, 186 (4th Cir. 2019) ("Acts that are intrinsic to the charged offense . . . do not fall under Rule 404(b)'s limitations on admissible evidence.") (citation omitted). "Bad acts are intrinsic to the charged offense when they are

inextricably intertwined," when "both acts are part of a single criminal episode," when the bad acts are "essential to the story of the crime," or when they provide "context to the charged offense." Id. (citations omitted).

Howard's motion contains both specific acts and general descriptions of types of "other acts" evidence he believes Defendants may introduce at trial. Because the court cannot rule on general descriptions, only that evidence actually identified by Howard will be addressed.

As to arrests, Howard seeks to exclude evidence that he was arrested the morning after the murders for trespassing in Few Gardens.[27] Defendants represent that Howard was arrested for trespassing in Few Gardens over 75 times prior to the Washington murders. This evidence is admissible under Rule 404(b)(2), as it is relevant, probative, and reliable. At the criminal trial, a number of witnesses testified that they saw Howard the day of the Washington murders in Few Gardens arguing with Doris Washington and leaving the Washingtons' apartment that night around the time of the murders. Howard's frequent presence in Few Gardens is relevant to proving identity, including by those trial witnesses who claimed to recognize him, as well as opportunity, among other

---

[27] Howard also points to a 2009 arrest for misdemeanor assault sworn out by a co-worker. (Doc. 166 at 8.) Defendants do not appear to oppose this.

things. It is reliable as it is based on law enforcement encounters recorded at the time and easily passes the Rule 403 balancing test.

Howard moves to exclude evidence that Darrell Dowdy spoke to him while he was in the hospital recovering from a gunshot wound. Howard also seeks to preclude evidence of instances of his being shot multiple times prior to the Washington murders. (Doc. 166 at 10.) Defendants argue that "Dowdy questioned [Howard] in connection to this case while he was in the hospital recovering from [gunshot] wounds. [Howard] had been shot by someone known to be a part of the New York Boys and Dowdy went to speak with him to see if he could identify 'O'. The testimony at trial was that during that same conversation Dowdy and Plaintiff also discussed Doris and Nishonda Washington." (Doc. 213 at 8 (citations omitted).) To the extent the evidence of prior gunshots occurred during Dowdy's investigation, such as the hospital visit, this evidence is intrinsic to Dowdy's investigation, which is at issue in this case. Otherwise, prior instances of being shot bears little relevance to the issues for the jury and runs afoul of Rule 403 by suggesting that Howard was involved in violent activity. Therefore, the motion to preclude instances of being shot is denied as to any intrinsic conduct during the course of Dowdy's investigation; the motion will otherwise be granted subject to Defendants demonstrating why such evidence is relevant and

72

otherwise admissible at trial.

Howard moves to exclude evidence that he sold Doris Washington drugs as well as his prior drug use. Howard argues that while his alleged drug activity on the day before and the day of the Washington murders is relevant,[28] any other drug related activity is irrelevant because it does not make the existence of any consequential fact more or less probable. (Doc. 166 at 6.) Defendants contend that Howard's prior drug use and drug involvement is admissible because it was testified to at his criminal trial and is "so intertwined with the facts and investigation of the criminal case that [it] must come in." (Doc. 213 at 2.)

While the admissibility of evidence in the underlying criminal trial is not a relevant factor, such evidence is intrinsic to Dowdy's investigation of the Washington murders and is relevant as it is probative of why Howard was a suspect because it tends to demonstrate his presence at Few Gardens, known for being a haven for drug distribution and use, and to describe the nature of his relationship with Doris, who was allegedly a drug user and seller, as well as potential motive. (Doc. 262 at 111-112 (Howard's counsel acknowledging admissibility of prior drug use).) The

---

[28] Howard concedes that testimony "he was addicted to drugs and using drugs with others in Few Gardens on the night of the Washington murders" is admissible. (Doc. 166 at 1-2.)

73

probable value is also not substantially outweighed by unfair prejudice.

As for Howard's identified prior convictions, which are represented to include breaking and entering, larceny, and cocaine possession, Defendants argue this evidence is admissible because Howard testified to it at his criminal trial and because it is "highly relevant" to Dowdy's investigation. (Doc. 213 at 2.) However, Defendants make this argument generally for all the other act evidence they seek to admit, and they do not articulate why Howard's prior convictions were relevant to Dowdy's investigation. Admitting such evidence in this civil trial could risk violating Rule 404(b)'s prohibition on character evidence, i.e., a jury might conclude that Howard was guilty of the Washington murders because he had committed other crimes. Nor is this evidence likely admissible to impeach Howard if he testifies in this case. Federal Rule of Evidence 609 limits evidence of convictions that are more than ten years old -- as are all of Howard's prior convictions -- for impeachment purposes unless their probative value "substantially outweighs" their prejudicial effect. Fed. R. Evid. 609(b). Defendants have not demonstrated any probative value of these convictions and, given their age (Howard's last conviction was in 1991, 30 years ago), the risk of prejudice is high. The motion will therefore be granted subject to Defendants providing

74

an articulated reason why any prior conviction sought to be introduced was relevant to Dowdy's investigation at the time.

Next, Howard seeks to preclude any evidence that he had previously been incarcerated. Neither side has indicated what the facts are about any prior incarceration.

Depending on the bases for his claim for damages, evidence of Howard's prior incarceration might be relevant. In his briefing and at the hearing, Howard relied on Smith v. Baltimore City Police Dep't, 840 F.3d 193 (4th Cir. 2016). In Smith, the Fourth Circuit reversed a verdict in favor of two police officers in an unlawful arrest case when the trial court allowed evidence of the plaintiff's three prior arrests solely for purposes of damages. Id. at 196. The Fourth Circuit did so because there was no record that the three prior arrests were "remotely similar" to the arrest at issue in that case; the plaintiff was claiming damages that flowed only from that specific arrest (and not, for example, damages because she was more fearful of police generally, to which the prior arrests might be relevant); and the defense counsel's questioning suggested the evidence was sought primarily to show character and propensity. Id. at 203. Although not directly on point, Smith is instructive. This is especially so in light of the Fourth Circuit's recent admonitions that prior acts are more likely to be relevant when there is sufficient "factual similarity and temporal proximity" between the prior acts and the conduct at

75

issue.  United States v. Hall, 858 F.3d 254, 260 (4th Cir. 2017);
see also United States v. McBride, 676 F.3d 385, 397 (4th Cir.
2012) ("The more closely that the prior act is related to the
charged conduct in time, pattern, or state of mind, the greater
the potential relevance of the prior act.").

Another consideration is the testimony of Howard's damages
expert, Dr. Artigues.  In her forensic psychiatric evaluation of
Howard, Dr. Artigues concludes that Howard has PTSD, and the "main
traumatic stressors" are the "long wrongful incarceration and the
experiences he had during that incarceration."  (Doc. 154-1 at
12.)  She so concludes after discussing and excluding other
potential causative factors, including Howard's "exposure to
violence that predated his wrongful incarceration" and injuries
sustained from being shot.  (Id. at 12-13.)  It is unclear whether
any prior incarceration, and the extent of it (which the parties
have not indicated), contributed to her analysis.  For now,
Defendants have not demonstrated the relevance of any period of
prior incarceration.  Thus, the court will preclude evidence of
Howard's prior period(s) of incarceration subject to a
demonstration by Defendants that, based on the nature of the
evidence at trial, it is relevant to a claim at issue and passes
the Rule 403 balancing test.

As to any unresolved basis for this motion, specific instances
of other act evidence will be considered on a case-by-case basis

76

at trial, subject to the rulings in this order.

### G. Inculpatory Hearsay

Howard moves to exclude "hearsay evidence that purportedly incriminates [him] in the Washington murders." (Doc. 173.) It is not clear what evidence Defendants might seek to offer or that Howard wants to exclude. Howard gives as an "example" a "crimestoppers" tip contained in Dowdy's investigative file that stated Howard and others killed the Washingtons. (Doc. 174 at 2.) Defendants oppose the motion, arguing (albeit perfunctorily) that Dowdy's investigative file is admissible if the proper foundation is laid. (Doc. 212 at 2.)

The motion is denied at this time. The motion is far too vague. Such evidence might be admissible not for the truth of the matter asserted but for a non-hearsay purpose, e.g., to explain the investigatory actions that Dowdy took or did not take. It is possible that such evidence might also fall within an exception to Rule 803.[29] As the court stated at the hearing, such evidence will be taken on a case-by-case basis if offered at trial.

### H. Assistant District Attorney Opinions

Howard moves to exclude certain opinion testimony from Assistant District Attorneys ("ADAs") Michael Nifong and Mary

---

[29] Dowdy's investigative file could represent his present sense impression (Rule 803(1)), his then-existing state of mind (Rule 803(3)), or otherwise be admissible as a public record (Rule 803(8)).

77

Winstead, who handled aspects of pre-trial proceedings and, as to Nifong, Howard's criminal trial itself in 1995.[30] (Doc. 176.) Specifically, Howard seeks to exclude any testimony from Nifong and Winstead as to Howard's credibility or guilt, Dowdy's credibility, and how the Washington murders occurred. Citing Cameron v. City of New York, 598 F.3d 50 (2d Cir. 2010), Howard argues the admission of such evidence would violate "bedrock principles of evidence law that prohibit witnesses (a) from vouching for other witnesses, (b) from testifying in the form of legal conclusions, and (c) from interpreting evidence that jurors can equally well analyze on their own." See id. at 54 (vacating jury verdict in part where two ADAs and a police lieutenant were allowed to give their opinions on defendant police officers' credibility). Defendants reply that a "blanket exclusion" of the ADAs' testimony is premature and that such evidence might be relevant and admissible depending on how the case unfolds at trial. (Doc. 228 at 2.)

As with several other motions, the exact evidence Howard surmises Defendants may seek to admit, and thus which he seeks to exclude, is not clear. Assuming both Howard and Dowdy testify, Nifong and Winstead would not be able to testify as to either's

---

[30] Specifically, Winstead appears to have been assigned to the Washington murder case shortly before Howard was arrested in November 1992; signed the indictments issued for his arrest; and left the Durham DA's office in spring 1994, before Howard's trial. (Doc. 225-1 at 22:1-23:25.) Nifong was the lead prosecutor at Howard's 1995 trial.

78

credibility.  See Cameron, 598 F.3d at 61 ("[a]s a matter of law, the credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial.") (internal citation omitted).  But Nifong and Winstead, like any witness, are permitted to testify on the basis of their direct, personal experience with the case.  This could include lay opinions on certain issues if relevant to the case and if the requirements of Rule 701 of the Federal Rules of Evidence, which governs lay opinion testimony, are met.[31]  For example, in Cameron the Second Circuit suggested that one of the ADAs could testify on retrial that it was her decision to prosecute the plaintiff and that the defendants did not aggressively seek prosecution, since that would be relevant to whether defendants had the requisite malice for a malicious prosecution charge.  Cameron, 598 F.3d at 67.

Although there is no malicious prosecution claim here, proof of bad faith remains a contested fact in this case, and Nifong and Winstead may testify to Dowdy's actions if probative of whether he acted with such a state of mind.  Further, given the nature of the remaining claims against the Defendants, Howard squarely alleges that they fabricated and suppressed evidence.  Thus, it can fairly

---

[31] Rule 701 permits opinion testimony by lay witnesses when the opinion is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

79

be said that Defendants' character for truthfulness has been attacked. This issue is more fully dealt with below with respect to another motion in limine filed by Howard to exclude good character evidence of the Defendants. (Doc. 196.) Accordingly, as Defendants argued at the hearing on these motions (Doc. 262 at 126-28) and with a proper foundation, Nifong and Winstead could testify to Defendant's good character for truthfulness, as permitted under Federal Rule of Evidence 608.

Finally, Howard argues that the ADAs lack personal knowledge of certain matters (Doc. 180 at 3). Of course, as with any witness, Nifong and Winstead must have personal knowledge of any matter to which they seek to testify. See Fed. R. Evid. 602.

Accordingly, this motion is granted in part and denied in part, as discussed above.

## I. Defendants' Character

Howard moves for an order "clarifying that evidence of Defendants' misconduct in this case does not open the door for good character evidence, and precluding Defendants from introducing evidence of their good character because there is no basis for doing so." (Doc. 196.)

As stated at the hearing, this motion will be denied. Rule 404(a) of the Federal Rules of Evidence generally prohibits the use of character evidence to show conformity with that trait. See Fed. R. Evid. 404(a) ("Evidence of a person's character or

80

character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). Rule 608 prohibits rehabilitation for a witness's character for truthfulness unless it has been attacked. <u>See</u> Fed. R. Evid. 608(a) ("[E]vidence of truthful character is admissible only after the witness's character for truthfulness has been attacked."). Relying on the latter, Howard argues that he "will not contend that Defendants have reputations for dishonesty or that their misconduct in this case was the result of their dishonest characters." (Doc. 197 at 1.) As Defendants respond, though, Howard's claims allege that Defendants fabricated and suppressed evidence and did so in bad faith or in reckless disregard for the truth. The very nature of these claims constitutes an attack on Defendants' character for truthfulness. Indeed, as Defendants point out in prior briefing before the court, Howard has charged that Dowdy "lied" during his investigation. (<u>See</u> Doc. 216 at 2.)

Courts in the Fourth Circuit have permitted an officer defendant in a civil rights suit in which the plaintiff has alleged the officer fabricated evidence to introduce evidence of the officer's good character for truthfulness. <u>See</u> <u>Gell v. Town of</u> <u>Aulander</u>, 2009 WL 166379, at *4 (E.D.N.C. Jan. 22, 2009) ("In a civil case where a finding for the plaintiff would be tantamount to a finding that the civil defendant committed a criminal act,

defense counsel may present evidence of the defendant's good character or reputation for a pertinent trait as though it was a criminal action.")[32]; <u>Washington v. Buraker</u>, 2006 WL 1049506 at *1 (W.D. Va. April 13, 2006) (denying plaintiff's motion in limine to prevent defendant from introducing evidence as to defendant's good character or reputation in a wrongful conviction civil case where plaintiff alleged defendant police officer fabricated evidence against him). This accords with the advisory committee notes to Rule 608 which state, "Opinion or reputation that the witness is untruthful specifically qualifies as an attack under the rule, and evidence of misconduct, including conviction of crime, and of corruption also fall within this category." Fed. R. Evid. 608 advisory committee note to the 1972 amendments.

Accordingly, given the nature of Howard's claims, which attack Defendants' character for truthfulness, Defendants will be permitted to introduce "evidence of truthful character" in response if Howard presents sufficient evidence of misconduct by Defendants. <u>See</u> Fed. R. Evid. 608(a).

---

[32] In <u>Gell</u>, the court was considering a motion to exclude an expert opinion that the North Carolina SBI had a reputation for "integrity and ability" in a § 1983 case where the plaintiff alleged the SBI officer defendant fabricated evidence. The court deferred ruling on the issue out of concern that the expert's opinion would bolster other possible SBI witnesses whose credibility had not yet been attacked, but the opinion reveals the court was inclined to allow it as to the actual SBI defendant. <u>Gell</u>, 2009 WL 166379, at *9.

**J. Dowdy's Belief that Doris Washington Engaged in Prostitution**

Howard moves to preclude Dowdy's opinion that Doris Washington engaged in prostitution. (Doc. 184.) This motion stems from testimony Dowdy gave at his 2019 deposition in this case in which he stated he believed Doris Washington engaged in prostitution.[33] Howard argues that there is no admissible evidence to support this opinion, that Dowdy's opinion is based on hearsay and not personal knowledge, and that any probative value would be outweighed by unfair prejudice. (Doc. 185 at 1-2.) Defendants oppose the motion, arguing there is admissible and relevant evidence to support this opinion. (Doc. 227.)

As the court noted at the summary judgment stage, there was some evidence at the very least that Doris Washington allowed her house to be used for prostitution. As the court acknowledged in its order at that time, "Dowdy knew from [Roneka] Jackson's first interview that Howard and Doris Washington had argued the evening of the murders over what was described as Howard's anger over Doris allowing Howard's girlfriend to prostitute herself at Doris's

---

[33] Specifically, Dowdy testified, "The information I received about Ms. Washington also indicated that she possibly sold her body for drugs." (Doc. 87-2 at 177:3-4.) Later, when questioned extensively by Howard's counsel about the source of this information, he stated, "That was information from the neighborhood, that Doris actually sold her body for drugs" and "This information would have been from the street. It would be around the area." (Id. at 187:14-15, 18-20.) However, it does not appear that this information was in Dowdy's investigative report. (Id. at 188:2-189:7.)

83

apartment." Howard, 487 F. Supp. 3d at 424. And there is at least a factual dispute at this point as to whether Doris Washington herself personally engaged in prostitution. Defendants cite Natasha Mayo's testimony at Howard's criminal trial, in which she responds to the prosecutor's questions as follows:

> "Q. Why? Why was [Howard] mad at you for you just being down there?
>
> A. Because Doris kept a lot of company and it was men in and out and I would try to -- she would try to talk me -- you know we would be talking about trying to get something else from one of the other guys.
>
> Q. I don't know if the jury quite understands or even that I quite understand. What do you mean by something else?
>
> A. Try to do something to get drugs.
>
> Q. You mean something sexual?
>
> A. Yes.
>
> Q. Would Miss Washington ask you to do that?
>
> A. She didn't really come out and ask me but she said it in so many words."

(Doc. 251-1 at 462:9-24.) In reply, Howard points to Mayo's deposition testimony for the proposition that "Natasha Mayo — who actually knew Doris — testified that Doris did not engage in prostitution." (Doc. 185 at 2.) The relevant portion of the deposition reads:

> "Q. And do you remember ever -- do you ever remember Ms. Washington herself sleeping with men for drugs?
>
> A. I don't. I can't remember.

Q. That was something she would ask other women to do?

A. Yeah.

Q. But she wouldn't do that herself?

MR. OSTRANDER: Objection.

THE WITNESS: No.

BY MS. McCARTHY:

Q. To your knowledge did she ever sleep with men for drugs?

A. No."

(Doc. 185-1 at 22:14-23:1.) At his deposition, when asked about prostitution occurring at Doris Washington's house, Howard himself stated, "I just knew from being in the projects that every girl who have a house in the projects, they use their house for prostitution. If they don't sell out of it, they find somebody to prostitute out of it." (Doc. 227-1 at 145:13.)

It is hard to read too much into these snippets of transcript. It is certainly plausible that Howard's reference to "every girl" using her house for prostitution means literally every girl, including Doris Washington. It is also plausible that Mayo's testimony at trial about Washington trying "to do something to get drugs" referred to prostitution. And her deposition (taken 24 years after the criminal trial) could as easily be read for the proposition that Doris Washington did not prostitute herself at all, that she did not prostitute herself for drugs, or that Mayo

85

simply cannot remember.

This evidence is certainly relevant, in particular to Howard's failure to investigate claim. Howard contends the Washingtons were sexually assaulted in connection with their deaths and that any minimally-trained detective would have searched for evidence of sexual assault at the crime scene. Dowdy's belief that Doris Washington engaged in prostitution goes to the reasonableness of his investigation and his state of mind. To the extent Howard argues that this evidence is hearsay (Doc. 185 at 2), the court will address any hearsay arguments at trial depending on the nature of the evidence and the purpose for which Defendants seek to introduce it. But it may be admissible for a non-hearsay purpose, such as to explain Dowdy's state of mind and why he took (or failed to take) the actions he did.

The motion will therefore be denied at this time.

**K. Leading Adverse Witnesses**

Howard moves for an order permitting examination by leading questions of certain witnesses he may call during his case-in-chief at trial. (Doc. 191.) Howard initially sought to ask leading questions of Defendants Dowdy and Smith; current or former Durham Police Department employees Scott Pennica, Michele Soucie Clark, and John Pradka; and former Durham prosecutors Nifong and Winstead. The parties have agreed to permit Howard to ask leading questions of Dowdy, Smith, and Nifong, but were unable to reach an

86

agreement as to Pennica, Clark, Pradka, and Winstead. (Doc. 246 at 14.)

Pursuant to Federal Rule of Evidence 611(c), the court "should allow" leading questions "when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c)(2). Pennica, Clark, Pradka, and Winstead are not themselves adverse parties, and there has been no showing of hostility at this time. Nor can these witnesses fairly be construed as "identified with an adverse party." As Defendants correctly point out, neither the City of Durham nor the DPD is a named Defendant in this action at this point, so their employees are not presumptively adverse. (Doc. 230 at 3.) Further, there is little evidence that the non-party witnesses are "identified" with either Dowdy or Smith. Pradka testified he did not know Dowdy on a personal level during their time at DPD, that he had "very little contact with Darryl Dowdy," and that he "never worked with" him. (Doc. 230-1 at 39:20-40:2.) Pradka retired from DPD in 2002. (Id.) Pennica and Clark were not sworn officers with DPD until 1999, well after the investigation and criminal trial. (Docs. 230-2 at 15:5; 230-3 at 9:16.) Winstead, a Durham ADA, worked on the Washington murder cases from about 1992 until 1994, before Howard's trial, and at her deposition did not recall meeting Dowdy. (Doc. 230-4 at 22:17-23:3; 25:11-19.)

Howard relies heavily on Ellis v. City of Chicago, 667 F.2d

87

606 (7th Cir. 1981), for the proposition that, "[i]n a § 1983 case alleging police misconduct, employees and former employees of the police department 'clearly qualif[y] as witnesses identified with an adverse party for purposes of Rule 611(c).'" (Doc. 193 at 2 (quoting Ellis, 667 F.2d at 613).) Ellis found (non-reversible) error when the trial court refused to permit the plaintiff to ask leading questions in his direct examination of two police officers employed by the City of Chicago. However, in that case the City of Chicago was a named defendant. Further, the officers worked closely with another individual named defendant through all relevant stages of the case. See id. ("These police officers were employees of defendant City of Chicago at all times during the litigation and were each present during portions of the incident which gave rise to this lawsuit. Moreover, the record indicates that both officers had worked closely with defendant Frank Kusar during the period of their employment."). The same cannot be said here.

Accordingly, as stated at the hearing, Howard's motion will be denied. Should any witness prove hostile during examination at trial, the court will entertain a renewed motion to permit leading questions.

L.    **Destruction of Evidence**

Defendants move to preclude any argument that Dowdy destroyed any notes or investigative materials, including the audio tape of

88

his interview with Angela Southerland, arguing that there is no evidence to support willful destruction. (Doc. 167.) Defendants argue, "[a]ll of the evidence developed in the case, including the testimony of Dowdy, has shown that he turned his notes over to DPD and they were subsequently lost by DPD. Given the age of the documents, it is more than likely that the boxes that contained the notes were lost when DPD moved headquarters." (Doc. 169 at 5.) Howard responds that there is evidence that Dowdy either never created certain "missing" notes or he failed to maintain them -- specifically notes about his investigation into Nishonda Washington's whereabouts -- and that an inference can be drawn that Dowdy destroyed both the notes and the Southerland tape. (Doc. 233 at 1.)

This motion will be denied. There is a factual dispute as to what happened to certain investigative materials, including notes Dowdy allegedly took and the audio tape from his interview with Southerland, and indeed if such materials even exist. Both sides are entitled to present their evidence, and the jury, as the factfinder, will decide the issue. To the extent Howard seeks an adverse inference instruction due to spoliation as to the Southerland tape (Doc. 233 at 10), that request is denied as premature pending the proof presented at trial.

**M. Mary Winstead Opinions**

Defendants move to preclude any argument or testimony from

89

Mary Winstead, former Durham ADA, regarding DPD document retention policies. (Doc. 170.) The parties agree that Winstead is not qualified to testify about DPD document retention policies. (Doc. 246 at 22.) Howard argues that she should be permitted to testify about how DPD officers documented and communicated evidence to ADAs, and that such testimony is relevant to Howard's claims. For example, Howard seeks to ask Winstead about the "standard practice" of how DPD officers "communicate their investigation," including possible Brady material, to the district attorney's office. (Doc. 225 at 4-5.) Defendants argue that Winstead lacks personal knowledge of DPD policies, which are also irrelevant to establishing "whether any constitutional right of [Howard's] was violated." (Doc. 172 at 1.)

Framed as such, the motion will be denied. It is clear that Winstead, a former ADA, cannot testify about DPD policies because she lacks personal knowledge to do so. However, she can testify as to her experience as a prosecutor working with the DPD and to her personal knowledge and experience of DPD's standard practices in interacting with the Durham DA's office. Specific issues regarding the scope of her testimony can be addressed as they arise at trial.

### N.    The Manner of Roneka Jackson's Death

Defendants move to exclude testimony or argument that the manner of Roneka Jackson's killing by the New York Boys is evidence

that the New York Boys killed the Washingtons. (Doc. 178.) Howard opposes the motion, arguing this evidence, and evidence of other murders the gang committed, is relevant to show Jackson's motive to falsely implicate Howard, her ties to the New York Boys, that it was more likely the New York Boys committed the Washington murders, and that Dowdy's failure to investigate the New York Boys was in bad faith. (Doc. 220.)

Defendants' motion appears to be limited to evidence or argument that the "manner in which [Jackson] was killed by . . . the 'New York Boys' is evidence that the New York Boys likewise killed the Washingtons." (Doc. 179 at 1.) They do not appear to be opposing evidence that Jackson had connections to the New York Boys, that she was working as a confidential informant, or that she was killed.

Given the more limited scope of this motion, the court's primary concern is the relevance of the manner of Jackson's death. Jackson was murdered in August 1995, well <u>after</u> Howard's trial in March 1995 and the Washington murders in November 1991. Because she was alive during Howard's trial, Defendants could not have known the violent nature of her death when they allegedly suppressed or fabricated evidence. Howard argues that the specific manner of Jackson's death is relevant for two reasons: 1) that the New York Boy's reputation for violent murders made it "more probable" they killed the Washingtons, which is "highly probative

91

context independent of any relation to one of Plaintiff's claims"; and 2) the murder can "flesh out" other evidence of the gang's pattern of violent conduct. (Doc. 220 at 10-11.)

The first argument runs afoul of Rule 404(b). As discussed, Rule 404(b) prohibits evidence of a "crime, wrong, or other act" to prove that person's conformity to a character trait, although the evidence may be admissible for another purpose such as proving motive, intent, or identity. See Fed. R. Evid. 404(b). Such evidence is admissible if it is relevant, necessary (i.e., probative of a claim or element), and reliable, and if its probative value is not substantially outweighed by confusion or unfair prejudice. See Queen, 132 F.3d at 997. Here, the "other act" -- Jackson's violent murder -- is too dissimilar to the Washington murders. Jackson's murder occurred four years later, in a different city (New York City versus Durham), and with a different method of killing. Admitting it for the purpose of proving the New York Boys were violent and to imply that they killed the Washingtons would tread too closely to the argument that "because this gang committed one violent murder, they committed another," exactly what Rule 404b) guards against. Cf. Roe v. Howard, 917 F.3d 229, 246 (4th Cir. 2019) (404(b) evidence is "plainly admissible" when defendant's treatment of one live-in housekeeper from Yemen evinced a plan or pattern of behavior in her treatment of another).

92

The second argument runs afoul of Rule 403. There is little probative value to this evidence since Jackson's murder occurred <u>after</u> Defendants' investigation and Howard's trial, the events giving rise to this litigation. This trial is about whether the Defendants acted improperly at the time of Howard's trial. The fact that Jackson was violently murdered by the New York Boys in New York City several months later risks substantial unfair prejudice and confusion of the issues.

Accordingly, this motion will be granted to the extent Defendants seek to exclude testimony or argument about the manner of Roneka Jackson's death, including that the New York Boys killed Jackson.

**O.   Roneka Jackson's Status as a Confidential Informant**

Defendants move to exclude testimony or argument that Roneka Jackson was a confidential informant prior to 1994. (Doc. 181.) Howard opposes the motion. (Doc. 232.)

This court's summary judgment order noted that "Jackson's status as a paid informant was <u>Brady</u> material." <u>Howard</u>, 487 F. Supp. 3d at 417 (citing cases). There is no dispute that Jackson was officially registered as a confidential informant by 1994. The issue is whether there is any evidence that she was an informant before then. Such evidence would be relevant to Howard's <u>Brady</u> claim, as the longer Jackson served as a paid informant with DPD, the more likely it may be that Dowdy might have learned that

fact and would have had the duty to disclose it before Howard's trial.  See id. ("Dowdy does not dispute Jackson's connections with DPD . . . and acknowledges that they were never disclosed to Howard, but he maintains that he never knew about these connections at the time of Howard's trial.").

At the hearing, the parties disputed the nature of Jackson's confidential informant status and when the duty of disclosure required by Brady is triggered.  Specifically, Defendants argued that the duty to disclose a confidential informant does not arise unless the informant is officially registered or paid and that the evidence shows Jackson was not officiality registered until 1994. Howard argued that there is evidence that Jackson was an informant for the DPD as early as 1991 and that when Jackson became an informant is a factual question for the jury.

The court directed the parties to file supplemental briefing addressing when the duty to disclose a confidential informant arises under Brady, which has now been filed.  (Docs. 256, 257.) The parties appear to agree that when an informant receives some form of payment or benefits for the information she provides, Brady is triggered.  See Banks v. Dretke, 540 U.S. 668, 691 (2004) (witness's "paid informant status" is Brady material).

The court need not resolve the precise moment at which Brady is triggered and will assume for present purposes that it is when

94

an informant receives payment or benefits for information.[34]   There is a question of fact as to whether Jackson was being paid for information she gave prior to being officially registered as a confidential informant in 1994.

Betty Boswell Johnson, a former DPD officer who was one of Jackson's "handlers," testified that Jackson became an informant in 1994, when she was about 19 years old.  (Doc. 80-13 at 84:6-85:18.)  Boswell says that before that point, Jackson "was someone I knew on the street that I'd see once in a while."  (Id. at 84:12-13.)  Specifically, Boswell testified that before Jackson became an official informant, Jackson had informally provided information to Boswell about various crimes in the area.  Boswell states that Jackson "gave me a little information in the past . . . just passing-by stuff.  Nothing -- I mean, no money, no controlled buys. It was more like just a kid in the neighborhood who may have seen something and she would tell me."  (Doc. 88-16 at 185:9-18.)

However, Paul Martin, the former head of DPD's organized crime division and Boswell's supervisor, testified that Jackson began working as an informant when she was 17 years old, and that when she died in 1995 at age 21, she had been working with DPD for four

---

[34] There is some case law suggesting a significant history of providing information may itself be sufficient.  See Monroe v. Angelone, 323 F.3d 286, 315 (4th Cir. 2003) (finding a Brady violation when the state did not disclose the fact that a key witness had a "history of providing information to the authorities before she testified against [the defendant]").

95

years (i.e., since 1991).  (Doc. 87-7 at 71:2-9, 74:21-75:22.)  He testified that she would have been paid to provide information during this time.  (Id. at 71:10-12, 75:20-22.)  Martin states he "wasn't involved in the actual interplay" but had been "told by Betty Boswell that [Jackson] was an informant as early as 17." (Doc. 87-7 at 75:23-25.)

While a close call, there is a factual dispute over when Jackson was a paid informant for DPD.  Accordingly, this motion will be denied.

## P.  Jermeck Jones's Invocation of the Fifth Amendment

The parties have filed cross-motions regarding Jermeck Jones's testimony and his invocation of the Fifth Amendment when questioned about his role in the Washington murders and involvement in the New York Boys gang.  (Docs. 163, 201.)

Jones was deposed in October 2019 and generally responded "Plead the Fifth" to each question.  (See Doc. 231-1.)  The parties "agree the jury should be informed in some manner that Jones asserted his Fifth Amendment privilege in response to questions about the Washington murders, [but] they have been unable to agree about the admissibility of any of Jones's testimony."  (Doc. 246 at 5.)

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  "This prohibition allows a person to assert

96

his or her Fifth Amendment privilege and refuse to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings, but it does not preclude in a civil case the admissibility of the assertion of the Fifth Amendment privilege or an adverse inference." Cargill, Inc. v. WDS, Inc., 2018 WL 1525352, at *11 (W.D.N.C. Mar. 28, 2018) (citations and quotations omitted). Indeed, "The Supreme Court has long recognized that there exists a 'prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" United States v. Mallory, 988 F.3d 730, 740 (4th Cir. 2021) (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)).

Here, as stated at the hearing, the court will permit Jones to be called to testify and to invoke his Fifth Amendment right against self-incrimination. This is a civil case, "[a]nd a non-party's silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree than a party's invocation of the privilege." Id. (quotations and citation omitted). The court will handle each question on a case-by-case basis. Should Howard's counsel call Jones to testify, they are admonished not to inject improper argument into their questions because they know Jones will invoke his Fifth Amendment privilege, and that all questions

97

are subject to the rules of evidence, particularly Rule 403. <u>See</u> <u>United States v. Branch</u>, 537 F.3d 328, 342 (4th Cir. 2008) (in the context of a criminal trial, noting that "placing [the witness] on the stand solely to invoke his Fifth Amendment privilege" could lead to "unfair prejudice in the form of both unwarranted speculation by the jury and the [opposing side's] inability to cross-examine" the witness). To the extent the parties come to an agreement regarding the use of Jones's deposition testimony in lieu of calling him to testify, the court will consider that evidence at trial.

### Q. **Eric Shaw's Testimony**

Defendants move to preclude any testimony from Eric Lamont Shaw. (Doc. 188.) The primary basis for this motion is the court's ruling in its summary judgment opinion that Shaw's deposition testimony -- in which he testified that he did not make certain statements implicating Howard in the Washington murders that Dowdy attributed to him -- could not be considered in assessing whether Dowdy's fabrications may have caused Howard's conviction because Shaw never testified at Howard's criminal trial nor was his allegedly fabricated statement introduced or otherwise used. <u>Howard</u>, 487 F. Supp. 3d at 410-11. From this, Defendants argue that Shaw's testimony cannot be the basis for Howard's fabrication claim. Howard opposes the motion, arguing that Shaw has relevant and admissible testimony even if he did not testify

at Howard's criminal trial. (Doc. 224.)

Howard is correct. Shaw testified that he was a member of the New York Boys, and at his deposition he spoke to his and others' involvement in the gang. (See Doc. 87-6.) This includes testimony that Doris Washington sold drugs for the New York Boys, that Roneka Jackson was affiliated with the gang, and that Howard allegedly was not involved with gang. (Id. at 13:6-8, 20:3-5, 25:19-26:4.) This evidence is all potentially relevant to the remaining failure to investigate and Brady claims.

At the hearing, the parties disagreed on whether Shaw could testify about Jermeck Jones's alleged involvement in the Washington murders, with Defendants arguing there is no evidence that Shaw had firsthand knowledge of who Jones was. At his deposition, Shaw stated he recognized a photograph of Jermeck Jones, although he did not know his name. In relevant part, the deposition transcript reads:

> R. Okay. And you recognize the man in this picture from your time working with the New York Boys, right?
>
> A. Yes, ma'am.
>
> Q. Now, he -- do you recall the name of this man?
>
> A. No, ma'am.
>
> Q. Okay. I'll represent to you his name is -- his real name is Jermeck Jones. Do you know if he went by any nicknames?

A.  Uh-huh.  They had a nickname.  You don't know people
real names in what we come from, you just go by the
nicknames.  I can't place the nickname.

Q.  Okay.  But, you're certain you remember this man?

A.  Yes, ma'am.

(Id. at 29:16-30:3.)  Based on this testimony, Defendants have not

demonstrated that Shaw does not know Jermeck Jones.  Defendants'

motion will be denied, and if Shaw testifies to a proper foundation

for knowing Howard, Defendants will be permitted to cross-examine

Shaw on that, and any other issue.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the pending motions are granted

in part and denied in part as follows:

1.  Defendants' motion to exclude the pardon of innocence

(Doc. 210) is GRANTED IN PART AND DENIED IN PART.  Plaintiff's

motion to admit the pardon and a summary of the December 2016 Order

(Doc. 186) is GRANTED IN PART AND DENIED IN PART.  Reference to

the entry of the December 2016 Order is permitted as noted herein,

but there can be no reference during trial to any finding of

"factual innocence" in that order.  Reference to the pardon of

innocence will be permitted, subject to the parties' submission of

briefing by November 5, 2021 addressing how the pardon should be

characterized, with any proposed limiting instruction.  There

shall be no reference to the pardon's reliance on the December

2016 Order's finding of "factual innocence."

2.  Defendants' motion to exclude Charles Drago's report and testimony (Doc. 147) is DENIED.

3.  Defendants' motion to exclude Marilyn Miller's report and testimony (Doc. 149) is GRANTED IN PART as to her first opinion, DENIED as to her second opinion, and GRANTED as to her third opinion, as noted herein.

4.  Defendants' motion to exclude testimony from Dr. Moira Artigues (Doc. 151) is DENIED AS MOOT. Defendants' motion to exclude testimony from Dr. Artigues regarding Howard's alleged "wrongful conviction" or "innocence" (Doc. 153) is DENIED, subject to the limitations set out in this opinion.

5.  Plaintiff's motion to exclude Suzanna Ryan's testimony (Doc. 155) is GRANTED IN PART as to her opinion of "several days" as noted and otherwise DENIED.

6.  Plaintiff's motion to exclude evidence of Howard's other acts is GRANTED IN PART and DENIED IN PART to the extent noted herein, subject to future rulings by the court depending on the evidence offered at trial.

7.  Plaintiff's motion to exclude purportedly inculpatory hearsay evidence (Doc. 173) is DENIED.

8.  Plaintiff's motion to exclude opinion testimony from the Durham assistant district attorneys (Doc. 176) is GRANTED IN PART and DENIED IN PART to the extent noted herein.

9. Plaintiff's motion to preclude Defendants from introducing evidence of their good character is DENIED to the extent noted herein.

10. Plaintiff's motion to preclude Darryl Dowdy's opinion that Doris Washington engaged in prostitution (Doc. 184) is DENIED.

11. Plaintiff's motion to permit leading questions (Doc. 191) is DENIED without prejudice.

12. Defendants' motion to preclude argument that Defendant Dowdy destroyed the Southerland tape or his notes (Doc. 167) is DENIED.

13. Defendants' motion to preclude any argument or testimony from Mary Winstead regarding DPD document retention policies (Doc. 170), to the extent not agreed to by the parties, is DENIED.

14. Defendants' motion to exclude testimony or argument that the manner in which Roneka Jackson was killed by the New York Boys (Doc. 178) is GRANTED to the extent noted herein.

15. Defendants' motion to exclude evidence or argument that Roneka Jackson was a confidential informant prior to 1994 (Doc. 181) is DENIED.

16. Plaintiff's motion to permit evidence of Jermeck Jones's invocation of the Fifth Amendment (Doc. 163) is GRANTED and Defendants' motion to exclude evidence or argument regarding Jermeck Jones's assertion of his Fifth Amendment privilege (Doc. 201) is DENIED to the extent noted herein.

17.  Defendants motion to preclude any testimony from Eric Lamont Shaw (Doc. 188) is DENIED.


                                    /s/   Thomas D. Schroeder
                                   United States District Judge
November 2, 2021