IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DARRYL ANTHONY HOWARD,       )
                             )
            Plaintiff,       )
                             )
     v.                      )          1:17cv477
                             )
DARRELL DOWDY,               )
                             )
            Defendant.       )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This is a wrongful conviction case that, after a nearly four-week jury trial in November 2021, resulted in a $6 million verdict for the Plaintiff, Darryl Howard. Before the court is Dowdy's renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) (Doc. 339), which is fully briefed. For the reasons set forth below, Dowdy's motion will be denied.

## I.   BACKGROUND

On November 27, 1991, Doris Washington and her 13-year-old daughter, Nishonda, were found dead in their Durham, North Carolina apartment after the local fire department responded to reports of a fire. Doris died from a blunt force strike to the abdomen; Nishonda was strangulated. Medical evidence suggested both had some form of prior sexual activity. Defendant Dowdy conducted the investigation by the Durham Police Department ("DPD"), and eventually Howard was charged with the murders and arson. In 1994,

DNA evidence ruled Howard out as a contributor to any sexual activity involving the victims, and he was released from custody pending trial. Howard was tried for the crimes in March 1995, and following testimony by multiple witnesses including Howard himself, a jury convicted Howard and sentenced him to 80 years of imprisonment. But in 2009, Howard took advantage of a new state law and sought and obtained retesting of the semen and sperm taken from the victims, which linked the DNA contributed to Doris Washington to an individual named Jermeck Jones; based on this, Howard obtained a December 2016 state court ruling granting him a new trial. The State thereafter dismissed all charges, and this lawsuit followed. On April 30, 2021, North Carolina Governor Roy Cooper issued Howard a Pardon of Innocence.

Trial commenced on November 8, 2021, and concluded on December 1, 2021, when the jury returned a verdict in favor of Howard and awarded him $6,000,000.00 in compensatory damages. (Doc. 327.) Howard presented 13 witnesses, either in person or by deposition. Three bases for liability were submitted to the jury, all pursuant to 28 U.S.C. § 1983: whether Dowdy fabricated two pieces of evidence in the criminal trial -- a taped statement from a witness named Angela Oliver[1] and evidence regarding Dowdy's investigation

---

[1] Angela Oliver went by various names during the Washington homicide investigation and Howard's 1995 criminal trial, including: Angela Southerland, Theresa Simpson, and Angela Rogers. (Doc. 72-1 at 283:4-11, 305:23-306:13.)

into whether Nishonda Washington was sexually assaulted; whether Dowdy suppressed evidence by failing to disclose that a state witness in the criminal trial, Roneka Jackson, was a confidential informant for the DPD and was associated with the New York Boys gang; and whether Dowdy engaged in a bad faith failure to investigate the source of the semen found in Nishonda Washington in order to cover up his fabrication of evidence with respect to Angela Oliver.

At the close of evidence, Dowdy moved for judgment as a matter of law on all three issues, arguing principally that Howard had failed to carry his burden in proving his suppression or inadequate investigation claims and had failed to show that the alleged fabrication of Angela Oliver's statement could have been a but-for or proximate cause of Howard's conviction. (Doc. 324; Doc. 334 at 248:10-249:1.) The court reserved ruling. (Doc. 334 at 271:13-24.)

The jury was charged on November 30, 2021, and deliberated until the following day. In returning its verdict, the jury found that Dowdy had denied Howard's constitutional right to due process by fabricating evidence and by engaging in a bad faith failure to investigate. (Doc. 327.) However, the jury found that Dowdy had not suppressed evidence of the state witness's status as a confidential informant with connections to a local gang. (Id.) On the same day, the court ruled on Dowdy's motion for judgment as

3

a matter of law.  (Doc. 329.)  The court denied Dowdy's motion as to suppression, finding it moot in light of the jury's verdict. The court further denied Dowdy's motion as to Howard's fabrication and bad faith failure to investigate claims after determining there was sufficient evidence from which a jury could have reached the verdict it returned.  (Doc 336 at 11:8-14.)  The court entered judgment on December 7, 2021 (Doc. 330), which it amended on December 9 (Doc. 331).[2]

## II.  ANALYSIS

Dowdy renews his motion for judgment as a matter of law based on two arguments.  First, he contends that Howard failed to proffer sufficient evidence from which the jury could have concluded that the fabrication of Angela Oliver's testimony at Howard's criminal trial was a but-for and proximate cause of his conviction in 1995. (Doc. 340 at 6.)  Second, he asserts that there is insufficient evidence to support Howard's bad faith failure to investigate claim.  (Id. at 16.)

### A.  Standard of Review

"To challenge the sufficiency of the evidence in a civil jury trial . . . a party must comply with Federal Rule of Civil Procedure 50," which "sets out two different stages for such a challenge."

---

[2] The difference between the two is the amended judgment enumerates the jury's monetary award of $6,000,000.00 rather than entering judgment in favor of Howard "in accordance with the verdict" as in the initial judgment.

<u>Belk, Inc. v. Meyer Corp.</u>, 679 F.3d 146, 154 (4th Cir. 2012). Rule 50(a) "allows a party to challenge the sufficiency of the evidence before a case is submitted to the jury," whereas Rule 50(b) "sets forth the requirements for challenging the sufficiency of the evidence after the jury verdict and entry of judgment." <u>Id.</u> at 155. Judgment as a matter of law is appropriate where a plaintiff has been fully heard on an issue but has failed to produce sufficient evidence for a jury to find for him. Fed. R. Civ. P. 50(a)-(b); <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 149 (2000). The standard for judgment as a matter of law mirrors the standard for granting summary judgment "such that 'the inquiry under each is the same.'" <u>Reeves</u>, 530 U.S. at 150 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986)); <u>see Dennis v. Columbia Colleton Med. Ctr., Inc.</u>, 290 F.3d 639, 644 (4th Cir. 2002) ("[a] Rule 50(b) motion for judgment as a matter of law follows the same standard as a Rule 56 motion for summary judgment). A motion under Rule 50(b) "tests the legal sufficiency of a claim, that is, assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim." <u>Belk, Inc.</u>, 679 F.3d at 155. Because the Defendant moved for judgment as a matter of law at the end of Howard's evidence and then renewed the motion at the end of all evidence, the court considers the record at each appropriate time, though Dowdy's briefing only addresses the trial

5

record as a whole, and the court is to "review the record as a whole" but "must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Reeves</u>, 530 U.S. at 151. All reasonable inferences must be drawn in favor of the nonmoving party, and the court is not permitted to make credibility determinations or weigh the evidence. <u>Id.</u> at 150. The limited review of the evidence is required by "the importance of the jury's role in trials . . . enshrined in the Seventh Amendment." <u>Burgess v. Goldstein</u>, 997 F.3d 541, 554 (4th Cir. 2021).

### B. Fabrication of Angela Oliver's Testimony

Howard presented two bases for his § 1983 claim that Dowdy denied his due process rights by fabricating evidence. First, Howard claimed that Dowdy fabricated statements from Angela Oliver by interrupting the tape recording of his 1994 interview of her in order to improperly feed her inculpatory information so that she would give false answers that implicated Howard in the Washington murders. Second, Howard claimed that Dowdy fabricated evidence regarding his investigation into whether Nishonda Washington was sexually assaulted by falsely advising the prosecutor that he had evidence that she had been staying with her boyfriend up until the evening before her murder, which would tend to rule out sexual assault as part of the crimes and explain the exculpatory DNA evidence found in Nishonda's rape kit.

At the outset, Howard correctly points out that Dowdy's Rule

6

50 motion does not challenge the sufficiency of the evidence presented in support of the second basis for Howard's fabrication claim –– that Dowdy fabricated his investigation into whether 13-year-old Nishonda Washington was sexually assaulted in connection with her murder. (Doc. 344 at 3.) The evidence at trial on this issue tended to show that Dowdy advised the prosecutor, Michael Nifong, that he had conducted an investigation into Nishonda's whereabouts before the murder and confirmed that she had returned home the day of the murder, thus tending to suggest prior consensual sexual conduct with an older boyfriend and tending to rule out sexual assault in connection with her murder. Evidence related to this claim is more fully discussed later in this memorandum opinion in connection with Dowdy's challenge to the verdict on Howard's bad faith failure to investigate.[3] Because this unchallenged ground provides an independent basis to support the verdict, on this basis alone the Rule 50 motion is denied. See, e.g., Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 313-14 (4th Cir. 2012) (affirming district court's denial of Defendant's Rule 50(b) and Rule 59 motions even though the jury's verdict was reversed on some claims, because the

---

[3] While the bad faith failure to investigate ground required Howard to prove that Dowdy acted with bad faith, this alternative basis for the fabrication of evidence ground did not require any proof of bad faith. See, e.g., Massey v. Ojaniit, 759 F.3d 343, 354 (4th Cir. 2014) (a § 1983 claim based on fabrication requires proof of a deliberate fabrication of false evidence that resulted in the deprivation of a plaintiff's liberty).

7

verdict was still independently supported by other claims).

As for the first ground, Dowdy's contention is also unpersuasive. The evidence at trial was as follows. On October 10, 1992, DPD officers, other than Dowdy, arrested Angela Oliver for prostitution. (Doc. 294-3 at 14:12-24.) After her arrest, those officers informed Dowdy that Oliver claimed to have been with Howard the night of the Washington murders. (Doc. 87-2 at 320:24-321:5.) The officers also told Dowdy that Oliver had information that only an individual who witnessed the murders would know. (Id. at 321:9-12.) At that point, Dowdy interviewed Oliver and audio-recorded their conversation. (Id.; Doc. 87-8 at 30.) The recording itself (which was in DPD possession) went missing after the criminal trial, and the only evidence of its contents comes from a transcription contained in Dowdy's file. The transcript reflects that Oliver informed Dowdy that she had seen Howard arguing with Doris Washington about drugs and money the day of the murders and she had seen Howard attack Doris at the time of the murders while Howard's brother, Harvey, was present in the apartment. (Doc. 88-32 at 2-3, 6-7, 10.)

However, there were discrepancies that called the validity of the transcription, and thus the taped interview, into question. Oliver's taped interview is approximately 10 minutes long; yet, Dowdy's contemporaneous notes reflect that the interview took place over 46 minutes. (Doc. 309 at 25:5-10.) At Howard's

criminal trial, Dowdy testified that he could not fully explain this timing difference. Dowdy justified the time difference by stating that he may have stopped the interview to "go[] back over what [Oliver] was saying" or "to clarify some information she may have been telling [him]." (Doc. 87-2 at 337:13-14, 338:1-2.) He also stated he must have written down the wrong time or been interrupted by other officers when he stopped the recordings. (Doc. 72-1 at 385:16-386:8, 401:15-402:11.) Dowdy reiterated these justifications to the civil jury in the present action. (Doc. 309 at 8:11-9:25; 34:12-19.)

Oliver testified at Howard's criminal trial. She was combative, recalcitrant (she had to be arrested to be brought to court as a material witness to testify), and evasive. She testified that Dowdy stopped the tape multiple times because he said she "wasn't talking right or something." (Doc. 289-2 at 308:8-11.) She told the criminal jury that she did not know anything about the Washington murders, even though her recorded statement reflected details which would only be known by a witness to the crime. (Id. at 308:25-309:2.) She also eventually adopted the taped recording as accurately reflecting the interview and, at different times in her testimony, prevaricated between testifying that the recording (and thus her statement) was truthful, truthful in part, and something she "d[id]n't want to talk about." (Doc. 72-1 at 300-305.) Importantly, Oliver was the only witness who

9

claimed to be present in Doris's apartment during the murders and to have observed Howard's alleged attack of Doris, including knowing about the injury to Doris's chest which caused her death and which was not publicly known at the time of her interview. Dowdy's repeated and inconsistent explanations for the time discrepancies in Oliver's taped statement called into question the veracity of the transcript of Oliver's taped statement. (Doc. 87-8 at 36.)

After years of attempting to locate Oliver after the criminal trial, Howard finally located and deposed her in this case shortly before trial, and portions of her videotaped deposition were played to the jury during Howard's direct case. Oliver's testimony was combative, evasive, and fraught with inconsistencies.[4] But these issues of credibility were for the jury to assess, and her testimony is viewed at this stage in the light most favorable to Howard.

When asked directly by Plaintiff's counsel whether she had ever witnessed any part of the Washington murders, Oliver responded, "I never witnessed any murder in my life." (Doc. 294-3 at 10:13-16.) In fact, Oliver denied being present at the scene of the Washington murders that night. (Id. at 10:19-23.) As to

---

[4] For example, Oliver claimed to be unable to read but is recorded on the tape and testified at the criminal trial that she was able to read well. (Doc. 294-3 at 8:25-9:23.) She also adopted the taped interview as accurate during the criminal trial (Doc. 72-1 at 300:14-25), though in this case she renounced it.

10

her taped statement to the contrary, Howard's counsel asked "[i]f you did not witness the homicide, how did you learn the details that you -- that are contained in [the transcribed statement] from your interview [with] Darrell Dowdy?" (Id. at 17:15-18.) Oliver responded, "He [Dowdy] must have let me know. I was locked up for the solicitating. Solicitating ain't going to carry that much time. Why would I know or worry about a murder?" (Id. at 17:19-22.)

Oliver was also asked directly about Dowdy stopping the tape multiple times during their interview. When asked, "what was Detective Dowdy doing?" she responded, "Trying to convince me that I seen something that I didn't see." (Id. at 39:10-12.) And when asked, "Is that when Detective Dowdy was providing you information about the . . . crime?" (id. at 39:18-21), Oliver replied, "Exactly. Because trust me, I don't know nothing about this, man. I was trying to tell you then, I'm telling you now." (Id. at 39:22-24.) Thus, there was sufficient evidence from which a jury could find fabrication by a preponderance.

It is true that the level of detail Oliver provided in her lengthy oral and written statement contrasted with her apparent inability to coherently express herself in her videotaped deposition. While the jury may have wondered whether and how Oliver could have been successfully coached with so much detail given her obvious limitations, and while the evidence of the three

11

"clicks" (Doc. 72-1 at 402:1-11) on the tape reflective of stopping were demonstrated to have occurred at the beginning of the statement and not throughout, these were issues for the jury. The jury could also consider the fact that the physical tape recording of Oliver's original statement, which was left in DPD custody during trial, is missing.

Dowdy argues that Howard "failed to present evidence allowing a jury to find that the alleged fabrication of Oliver's statement was the but-for or proximate cause of Plaintiff's conviction." (Doc. 340 at 6.) Dowdy argues that this is so because there were "several other witnesses who provided inculpatory testimony" that the criminal jury considered, and Howard did not establish that his convictions were a reasonably foreseeable result of Oliver's fabricated statement. (Id. at 9, 13.) Howard responds that the jury "had ample bases to support its finding that Defendant Dowdy's fabrication of evidence caused Plaintiff's wrongful conviction." (Doc. 344 at 2.)

In evaluating whether Howard produced sufficient evidence as to the causation element, the court must determine if the jury reasonably found in favor of Howard after concluding that "the facts [shown] by [Howard] demonstrate that the loss of liberty," that is, Howard's conviction for the Washington murders, "resulted from [Dowdy's] fabrication of evidence." Washington v. Wilmore, 407 F.3d 274, 283 (4th Cir. 2005). Howard was required to show

12

"both but-for and proximate causation." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012). For but-for causation, there must be sufficient evidence that "the alleged wrongful act(s) caused [Howard's] loss of liberty." Gilliam v. Sealey, 932 F.3d 216, 238 (4th Cir. 2019). For proximate cause, Howard was required to produce sufficient evidence at trial from which the jury could reasonably conclude "the conviction was a reasonably foreseeable result of the initial act of fabrication." Massey v. Ojaniit, 759 F.3d 343, 354 (4th Cir. 2014) (internal quotations omitted). In construing the evidence in the light most favorable to Howard, the court must draw all reasonable inferences in his favor. Burgess v. Goldstein, 997 F.3d 541, 552 (4th Cir. 2021). Under these standards, it is apparent that Howard sufficiently carried his burden.

The jury heard from Michael Nifong, the lead prosecutor in Howard's criminal trial. Nifong testified, without objection, that he could not "imagine that we could have obtained a conviction without [Oliver's] testimony." (Doc. 319 at 171:11-15.) When asked by Dowdy's attorneys on cross examination whether he remembered Oliver being brought to testify before the criminal jury, Nifong responded, "yes . . . she was a very important witness." (Id. at 205:21-206:1.) Nifong further noted that Dowdy had not reported having threatened or coerced Oliver to give her statement and, if he had, Nifong "had a duty to report that to the

13

Court and to the defense counsel." (Id. at 172:1-173:3.)

Critically, Nifong's testimony came after Oliver's video deposition was played for the jury and in which she stated plainly that the reason she knew details of the murder was because Dowdy "must have let [her] know" as she "never witnessed any murder in [her] life." (Doc. 294-3 at 10:13-19; 17:15-22.) Dowdy himself testified in Plaintiff's case that before the criminal trial he believed he could only obtain a successful conviction for the Washington murders "[a]fter Angela [Oliver's] statement to me." (Doc. 316 at 164:16-23.) Dowdy "did not think or believe [he] could make -- have a conviction" without Oliver's statement. (Id. at 164:24-165:3.) According to Dowdy, Oliver was the key to Howard's conviction, because she "verified the fact that she was there [at the scene of the murders]" and verified the other information Dowdy "already had." (Id. at 165:4-6.) In contrast, the jury heard from Oliver, who plainly testified that she was never at the scene of the crimes the night of the murders, that she never witnessed a murder, and that Dowdy fed her information in her statement. (Doc. 294-3 at 10:13-19; 17:15-22.)

Dowdy contends that Howard fails to demonstrate causation, pointing to other evidence the State presented at the criminal trial which he argues was sufficient to support the guilty verdict. However, much of the evidence was largely circumstantial. For example, Dowdy notes Roneka Jackson testified that she heard Howard

14

threaten to kill Doris Washington the day of the murders and saw him and his brother exit the apartment later that night. (Doc. 340 at 13.) He also highlights Rhonda Davis's testimony that she went to visit Doris at her apartment about 11:30 p.m. and Howard answered the door to say, "we're busy." (Id. at 14; Doc. 72-1 at 199:17-23.) But this was 88 minutes before the fire department was called. (Doc. 72-1 at 53:11-23.) Another witness, Terry Suggs, testified that he saw Howard near the Washington apartment approximately three to five minutes before he saw smoke from the apartment fire. (Doc. 340 at 14; Doc. 72-1 at 212:3-14.) Kelvin Best told the jury that he saw Howard and his brother exiting Doris's building that evening carrying a television. (Id.; Doc. 72-1 at 228:6-25.) Dwight Moss testified that he heard Howard threaten to kill Doris earlier that day for "messing up" a drug deal and that he saw Howard about 11:30 p.m. that evening leaving the backside of Doris's apartment; the fire department was called to the scene at 12:58 a.m. (Id. at 14-15; Doc. 72-1 at 53:11-23, 242:17-243:18.) Gwendolyn Roper Taylor testified that she overheard Howard at a drink house that he had killed the Washingtons. (Id. at 15; Doc. 72-1 at 333:2-24); see generally, Howard v. City of Durham, 487 F. Supp. 3d 377, 392-98 (M.D.N.C. 2020).

Each of these witnesses carried arguable credibility issues, ranging from prior drug use and criminal histories to

15

inconsistencies in their stories, which were put before the criminal jury. Id. Nevertheless, Dowdy relies on these witnesses as well as Robbie Davis, who testified that he heard Howard state that Doris was going to kill Nishonda for being away with an older man (Doc. 72-1 at 273:1-24), and Durham Fire Chief Milton Smith, who testified that Howard told him he and his brother Kenny "did this thing" in reference to the murders, to argue that there was insufficient causation evidence to allow Howard's claim involving Oliver's statement to go to the jury. (Doc. 340 at 16.) According to Dowdy, "the wealth of inculpatory evidence against [Howard] described above plus Howard's own admission that he was at the scene of the crime near the time of the murders" forecloses the conclusion that Oliver's statement was the but-for cause of his conviction. (Id.)

However, the jury in the criminal trial also heard from Howard, who testified in his defense and denied being present or involved in the murders. (Doc. 72-1 at 498:1-7; 536:5-17.) Further, Howard called one of his girlfriends, Natasha Mayo, to the stand, who generally corroborated Howard's testimony that he was not in the Washington apartment the night of the murders and that he was not involved in the homicides or arson. (Id. at 480:1-10.) In sum, the State put on eight witnesses who all presented circumstantial inculpatory evidence, while Howard himself testified he had no involvement in the homicides and put forth

16

another witness who corroborated his testimony.  In addition, the 1994 jury had to evaluate Oliver's recorded statement with her testimony at trial.  Oliver's statement provided a layer of credibility beyond that offered by the State's other witnesses; she knew details of the crime that were not publicly disclosed, adding credence to the suggestion that she was at the scene of the crimes and witnessed Howard commit them.

The civil jury could therefore rely on the two witnesses most intimately involved with Howard's criminal prosecution -- the lead prosecutor on the case, Nifong, and Defendant Dowdy, the lead detective, both of whom acknowledged in this case that they were unlikely to have obtained a conviction without Oliver's testimony. While Dowdy now points to other inculpatory testimony by other witnesses at Howard's criminal trial, Oliver's testimony not only put Howard at the scene of the Washington murders, but detailed how Howard committed those murders with information known only to the medical examiner and not released to the public.  She was the only witness who purported to observe Howard inflict Doris Washington's blunt-force chest injury which caused her death and to specifically place Howard, who otherwise was a frequent trespasser onto the grounds of the Washingtons' apartment complex (and thus seen there commonly by all the witnesses who testified), in the Washingtons' apartment during the murders.  A reasonable jury could conclude that it was not only reasonably foreseeable

17

that Oliver's fabricated statement proximately caused Howard's convictions for the Washington murders, but that the convictions would not likely have resulted but for her testimony.

For these reasons, the court therefore finds that, after viewing the evidence in the light most favorable to Howard, he has produced sufficient evidence from which a reasonable jury could conclude that Oliver's statement was fabricated and the but-for and proximate cause of his wrongful conviction.

### C. Inadequate Investigation

In addition to his claim of fabrication, Howard alleged that Dowdy failed to investigate the source of semen found in Nishonda Washington in a bad faith effort to cover up his fabrication after DNA excluded Howard as the contributor of the semen. Dowdy responds, in contrast, that Howard failed to produce any evidence that, after Oliver gave her statement, "Dowdy intentionally failed to follow up on an existing lead that pointed to an alternative suspect for the Washington murders." (Doc. 340 at 18-19.)

In general, there is no independent constitutional right to the investigation of a third party. Sattler v. Johnson, 857 F.2d 224, 227 (4th Cir. 1988). However, a claim for a due process violation for failing to perform an adequate investigation exists where an officer takes bad faith actions to shield his wrongful acts, including fabricating testimony. Gilliam, 932 F.3d at 240-41. Howard thus needed to produce sufficient evidence at trial

18

from which a reasonable jury could conclude that Dowdy's failure to investigate the source of the semen found in Nishonda was the product of a bad faith attempt to shield his fabrication of Oliver's statement. Put another way, Howard claims that Dowdy's failure to investigate Nishonda's murder as contemporaneous with a sexual assault (anal rape of a 13-year-old) was purposeful because Dowdy had "tunnel vision" to prosecute Howard and knew that details indicating a sexual assault occurred as part of the crimes would be inconsistent with Oliver's transcribed, and allegedly fabricated, statement blaming Howard for a murder that did not involve any sexual assault.

Dowdy points to Gilliam v. Sealey to argue that Howard's evidence fails to sufficiently support the inadequate investigation claim. (Doc. 349 at 6); 932 F.3d 216, 240-42 (4th Cir. 2019), cert. denied, 140 S. Ct. 2641 (2020). Gilliam stemmed from the wrongful conviction of two teenage boys who brought suit against the law enforcement officers who investigated the underlying crime, alleging the officers coerced confessions from the boys and then failed to adequately investigate other suspects. On September 24, 1983, the victim, Sabrina Buie, went missing. Id. at 222. Two days later, her body was discovered in a field with overwhelming evidence that she had been sexually assaulted. Id. While processing the crime scene, law enforcement officers discovered three beer cans, three match sticks, one cigarette butt,

19

and two wooden sticks coated with blood.  Id.

Three days after discovery of Buie's body, officers fingerprinted and questioned Henry McCollum, a potential suspect, at the police station.  Id.  At the conclusion of the questioning, McCollum, an intellectually disabled 19-year-old, signed a confession drafted by the interviewing detectives.  Id. at 233. The confession also implicated McCollum's brother, Leon Brown, as participating in the crime.  Id.  After signing the confession, McCollum and Brown were arrested and charged with murder.  Id. Despite arguments that the confessions were coerced, a jury found McCollum guilty of rape and first-degree murder and sentenced him to death.  Id. at 224.  A separate jury found Brown guilty of rape and sentenced him to life in prison.  Id. at 225.

In 2009, roughly 17 years after his conviction, Brown sought assistance from the North Carolina Innocence Inquiry Commission, which accepted both Brown's and McCollum's cases.  Id.  During its investigation, the Commission discovered DNA evidence on the cigarettes located near Buie's body which matched the DNA of Roscoe Artis, a man known to law enforcement officers during the Buie murder investigation.  Id.  Artis was convicted of rape and murder in a crime "strikingly similar to Buie's murder" when the body of another woman was found just one month after Buie's.  Id.  As is the case here, the DNA tested from the scene of Buie's murder did not match McCollum or Brown, and the only DNA evidence that was

20

tested after the fact matched someone else -- Artis.

Documents recorded prior to McCollum and Brown's first trials listed Artis as a suspect in the Buie murder. Id. at 228. On October 5, 1984, three days prior to McCollum and Brown's first trial, investigators submitted Artis's fingerprints to the State Bureau of Investigation to compare with those found on the beer can at the Buie crime scene. Id. However, the investigators canceled the fingerprint request on the same day, and the comparison was never completed. Id. This, despite the fact that an additional witness had come forward and informed the investigators that she "witnessed Artis attacking Buie on the night of the murder, and that she attempted to intervene[,] but Artis frightened her away." Id. Although the witness testified that she provided this information to one of the investigators, Detective Sealey, the detective's contemporaneous investigation notes did not reflect her testimony. Id.

Additionally, investigators interviewed L.P. Sinclair, a friend of McCollum and Brown's, who originally claimed he did not know anything about Buie's death. Id. However, when the State Bureau of Investigation marked him as a suspect and ordered analysis of his fingerprints, Sinclair changed his story and testified that McCollum had confessed to him the day after Buie's murder. Id. Sinclair's fingerprints were not analyzed after he changed his testimony.

21

Relevant to the claims in this case, McCollum and Brown sued the investigators, alleging violations of their right to due process when the investigators failed to sufficiently investigate Artis and Sinclair in connection with Buie's rape and murder. Id. at 240. McCollum and Brown argued that the investigators had failed to test whether Artis's or Sinclair's fingerprints matched the print found on the beer can at the crime scene. Id. In affirming the district court's denial of the defendants' motion for summary judgment, the Fourth Circuit noted that McCollum and Brown's claims were that the investigators' "failure to investigate was a result of their bad-faith suppression of evidence." Id. at 241. That claim could amount to a due process violation if "the jury concluded that [the investigators'] actions after [McCollum and Brown's] arrests -- including failing to adequately investigate Artis and the crime scene . . . -- were done in bad faith in order to shield [the investigators'] wrongful acts related to [McCollum and Brown's] coerced or fabricated confessions." Id. In other words, had the investigators failed to analyze Artis's or Sinclair's fingerprints in bad faith to shield their coercion of McCollum or Brown's confession, then McCollum and Brown could establish a due process violation.

Dowdy argues that Howard "did not produce similar evidence that, after Oliver gave her statement, Dowdy intentionally failed to follow up on an existing lead that pointed to an alternative

22

suspect for the Washington murders." (Doc. 340 at 18-19.) However, <u>Gilliam</u> does not require "an existing lead" that points to another suspect. All <u>Gilliam</u> requires is sufficient evidence from which a jury could conclude that Dowdy failed to investigate material evidence -- here, the whereabouts of Nishonda and her boyfriend -- in an effort to shield his fabrication of Oliver's statement, and Howard has satisfied that requirement.

The autopsy of Nishonda Washington reveled sperm in her anus. (Doc. 87-18 at 6.) In February 1993, DPD obtained samples of Howard's DNA to test against this sperm. (Doc. 87-8 at 46.) A DNA test from March 1993 excluded Howard as the source of the sperm. (Doc. 87-21.) Dowdy thus understood at that time, before trial, that if the killer had had sex with Nishonda, Howard was not the killer. (Doc. 87-2 at 183:24-184:4.) The question then was whether the killer had sex with Nishonda before her death and, if so, who he was.

Dowdy provided Nifong an answer to the first question -- that Nishonda had been away from the Washington apartment with her boyfriend for four or five days and returned the night before the murders. (Doc. 72-1 at 423::8-19; Doc. 309 at 97:13-20.) Based on this information, Nifong proceeded to trial and presented this information to the criminal jury. (Doc. 319 at 158:3-25.) Dowdy's theory at the time was that the semen located in Nishonda's anus was her boyfriend's (Doc. 309 at 97:21-98:1), which meant that the

23

killer did not have sex with Nishonda prior to the murders. According to Dowdy's representations to Nifong, the DNA testing of the sperm in Nishonda did not exclude anyone from being the murderer, because it came consensually from Nishonda's unidentified boyfriend. Dowdy admitted on the stand before the civil jury that he testified in the criminal trial that the semen found in Nishonda was consensual based on his "thought . . . that she was with her boyfriend" prior to the murders. (Id. at 151:10-24.) At Howard's criminal trial, Dowdy testified definitively that he did not suspect Nishonda had been sexually assaulted, because she was with "her boyfriend" for "almost a week" prior to the murders, and only returned mere hours prior to her murder. (Doc. 72-1 at 422:25-423:19.)

However, Howard produced evidence which called into question the validity of Dowdy's investigation. For instance, Dowdy wrote in his report that a witness, Ella Moore, informed him that Nishonda had been away for four days and returned on Sunday –– two days before the murders. (Doc. 87-8 at 9-10.) Despite this, Dowdy consistently noted that Nishonda "returned the day of the homicide." (Doc. 309 at 99:23-25.) In fact, none of the witnesses Dowdy listed in his report corroborated his timeline.[5] Dowdy later

---

[5] For instance, another witness Dowdy interviewed was Alice Gordon, who stated that she had not seen Doris or Nishonda for a week prior to the murders. (Doc. 309 at 164:7-165:16.) Gordon provided no information as to when Nishonda came home, and the only witness who does provide that information is Moore. (Id. at 165:15-20.)

24

suggested that he may have prepared notes of conversations with neighbors following Nifong's request shortly before Howard's criminal trial; however, those notes are missing. (Doc. 87-2 at 178:18-181:22.) Furthermore, he explained to the civil jury that handwritten notes are not given to the prosecutor, so anything relevant from those interviews would have to be in Dowdy's report, otherwise the prosecutor would not know of the information obtained in those interviews. (Doc. 309 at 72:7-12.) But Dowdy never submitted any handwritten notes to the prosecutor or otherwise included them in his report because, he maintained, they failed to turn up any new evidence. Therefore, the only evidence included in Dowdy's report indicated that Nishonda returned on Sunday, and nowhere is there any evidence that she returned Tuesday evening. Nevertheless, Dowdy told the prosecutor that Nishonda had returned on Tuesday, and the prosecutor relied on that in his questioning of Dowdy and his representations to the criminal jury at trial. (Doc. 72-1 at 423:8-19; Doc. 309 at 106:5-20.) In the present case, Dowdy relied only on his own testimony to support his representation of Nishonda's whereabouts.

The timing of Nishonda's return was critically important. At Howard's criminal trial, the jury was told that the sperm found in Nishonda's rape kit had been deposited within approximately 24 hours of the autopsy, which took place at 10:00 a.m. the day after the murders. (Doc. 72-1 at 80:17-25.) In the present case, the

25

jury heard testimony from two DNA experts, one from each side, who both concluded that the sperm had most likely been deposited within 24 hours of the time the samples were taken at autopsy. (Doc. 306 at 127:11-21; 187:6-22.) If Nishonda had returned on Sunday, as Dowdy's report indicates, she would have returned two days prior to the murders and, whether or not she was with a boyfriend, she would have returned far outside the 24-hour window of likelihood established by the sperm found at autopsy. Yet, Dowdy told the prosecutor that he had investigated Nishonda's whereabouts and concluded she was with her boyfriend, returning only on the evening of the murders even though his report reflected contradictory evidence that she returned on Sunday, outside the likely window established by the analysis of sperm at her autopsy.

Dowdy conceded that any potentially relevant information had to be included in a police report. (Doc. 309 at 128:16-22.) He acknowledged that evidence as to whether or not Nishonda had a boyfriend would be relevant and would have been part of the police file. (Id. at 128:23-129:2.) However, his file contains no evidence about Nishonda's boyfriend or her returning to the Washington apartment within 24 hours of the autopsy as indicated by the sperm. (Id. at 129:3-6.) When asked at trial why there was no such evidence, Dowdy testified that "[t]here was a detective who was actually assigned to follow up on the aspect of [Nishonda's] boyfriend. Detective A.J. Carter, in particular, did

26

the follow-up in reference to the boyfriend and the whereabouts of Nishonda Washington." (Id. at 129:8-16.) This was the first time in the 26-year history of this case that Dowdy disclosed the identity of a Detective Carter or otherwise indicated that Carter was the one who investigated Nishonda's whereabouts. In fact, Howard presented to the jury Dowdy's responses to interrogatories seeking the names of all persons with knowledge of the case, and of the 21 persons named, Carter is not one of them. To complicate matters, Dowdy indicated that Carter is deceased and his files are likely missing due to the passage of time. (Id. at 132:10-15.)

Dowdy's representations led Nifong to elicit his testimony at Howard's criminal trial that he had determined Nishonda's whereabouts for the time prior to her murder, that she was with her boyfriend, and she returned the evening immediately prior to her murder.[6] (Id. at 96:2-20.) This explained away the semen found in her body and, more importantly, the fact that Howard's DNA did not match it. In the present case, Dowdy conceded that, based on the information he had, he "thought" Nishonda was with her boyfriend prior to the murders. (Id. at 151:10-15.) Dowdy also professed that he had no memory of talking to any other witnesses in this case beyond those listed in his report. (Id. at

---

[6] It is not entirely clear how Nifong was permitted to elicit this hearsay testimony from Dowdy in the state trial as to what neighbors told him about when Nishonda returned home.

65:2-6.) Given Dowdy's inconsistent explanations as to Nishonda's whereabouts over the course of this case, the competing evidence that discredits his conclusion that Nishonda returned hours before she was murdered, and the fact that Dowdy understood the prosecutors were relying on his statements that Nishonda was with her boyfriend prior to the murder, Howard presented sufficient evidence from which the jury could conclude that Dowdy inadequately investigated Nishonda's boyfriend as the source of the semen found in her anus at the time of her murder.

The jury also could have reasonably concluded that Dowdy purposefully failed to adequately investigate this aspect of the case to shield his fabrication of Oliver's statement. Had Dowdy investigated Nishonda's boyfriend and determined – as the only evidence in his report supported -- that Nishonda had returned days, rather than hours, before her murder, it would have seriously undermined the state's case by leaving unexplained the semen found in Nishonda's anus. This would have called into question the validity of Oliver's testimony, because at no point did Oliver's original statement – or any other evidence – suggest that Howard sexually assaulted Nishonda. Thus, because a reasonable jury could conclude that failure to tie the semen to the alleged boyfriend would seriously undermine Oliver's original statement, it could conclude that Dowdy inadequately investigated Nishonda's whereabouts and her alleged boyfriend in an attempt to shield his

28

fabrication of Oliver's statement from more intense scrutiny.  As such, Dowdy's renewed motion as a matter of law will be denied.

Dowdy next presents an ancillary argument that the format of the jury instructions and the verdict sheet warrant a new trial, because "the jury was not asked to separately answer a question as to whether Oliver's statement was fabricated."  (Doc. 340 at 19.)  Dowdy frames this request for a new trial pursuant to Rule 50(b)(2).  (Id. at 5.)  However, as the court has already stated, Dowdy's Rule 50 motion is unpersuasive.  Pertaining to the jury instructions, Dowdy states "if the Court does not grant judgment as a matter of law for the defendant, it should order a new trial as to this issue."  (Id. at 20.)  Therefore, as Dowdy seems to separate his request for a new trial from his renewed motion as a matter of law, and because the court has denied his motion as a matter of law, the court construes Dowdy's argument as a request pursuant to Federal Rule of Civil Procedure 59.  Pursuant to Rule 59, a district court may grant a new trial if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."  Bilenky v. Ryobi Techs., Inc., 115 F. Supp. 3d 661, 668 (E.D. Va. 2015) (quoting Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996)), aff'd, 666 F. App'x 271 (4th Cir. 2016).  "The

29

decision to grant or deny a motion for a new trial lies at the heart of the district court's sound discretion and 'will not be disturbed absent a clear showing of abuse of discretion.'" <u>Gibson v. Total Car Franchising Corp.</u>, 223 F.R.D. 265, 276 (M.D.N.C. 2004) (quoting <u>Wilhelm v. Blue Bell, Inc.</u>, 773 F.2d 1429, 1433 (4th Cir. 1985) <u>cert.</u> <u>denied</u>, 475 U.S. 1016 (1986)).

As to Howard's fabrication claim, the court instructed the jury that Howard alleged that Dowdy fabricated two pieces of evidence –– Oliver's taped statement and Dowdy's investigation into whether Nishonda was sexually assaulted. (Doc. 328 at 11.) The jury instructions expressly informed the jurors that "[a]lthough Plaintiff alleges two separate fabrications of evidence, you may find the Defendant liable based on either or both pieces of evidence as long as you unanimously agree that the Plaintiff has proven by a preponderance all the elements as to that piece of evidence." (<u>Id.</u>) For Howard's bad faith failure to investigate claim, however, the court instructed the jury, "[i]f you do not find the Defendant liable for fabrication with respect to Angela Oliver, as set out earlier in these instructions, then you may not find the Defendant liable on this claim." (<u>Id.</u> at 15.)

The verdict form posed two questions. The first asked:

    1.   Has Plaintiff Darryl Howard proven by a preponderance of the evidence that Defendant Darrell Dowdy violated 42 U.S.C. § 1983 by

30

> denying him his constitutional right to due
> process by:
>
> a. Fabrication of evidence:          _____
> b. Suppression of evidence:          _____
> c. Bad faith failure to investigate: _____

(Doc. 327.)  The second question asked, if the jury answered yes to any part of the question above, what amount of compensatory damages Howard should recover of Dowdy.  (Id.)

The jury answered "yes" to questions 1(a) and 1(c).  (Id.) In finding that Howard had carried his burden and proven both his fabrication of evidence claim and his bad faith failure to investigate claim, the jury awarded Howard $6,000,000 in compensatory damages.  (Id.)  Because the jury was instructed that the inadequate investigation claim required the jury to have found that Oliver's statement was fabricated and the jury's verdict form reflects a finding that Dowdy fabricated evidence but does not enumerate which specific evidence the jury found he fabricated, Dowdy argues the court should order a new trial as to the bad faith failure to investigate claim.  (Doc. 340 at 20.)

"A jury is presumed to follow the instructions of the court." Stamathis v. Flying J, Inc., 389 F.3d 429, 442 (4th Cir. 2004). "[A]bsent some specific 'reason to doubt that the jury . . . adhered to the district court's directive,'" the court must assume the jury followed the instructions.  United States v. Runyon, 707 F.3d 475, 497 (4th Cir. 2013) (quoting United States v. Castillo-

31

<u>Pena</u>, 674 F.3d 318, 322 (4th Cir. 2012)).  With respect to Howard's bad faith failure to investigate claim, the court expressly instructed the jury that "[i]f you do not find the Defendant liable for fabrication with respect to Angela Oliver, as set out earlier in these instructions, then you may not find the Defendant liable on this claim."  (Doc. 328 at 15.)  Dowdy has provided no evidence or explanation that calls into the doubt the presumption that the jury understood and followed this instruction, and thus the court will not disturb the jury's verdict.

In his reply brief, Dowdy argues that the verdict form was structured such that there was a "lack of a clear indication from the jury that it decided in Plaintiff's favor with respect to the claim of fabrication of Oliver's statement."  (Doc. 349 at 8.)  To the extent Dowdy now objects to the verdict form, he has waived that complaint by having failed to raise that objection before the jury retired to deliberate.  <u>See</u> Fed. R. Civ. P. 49(a)(3); <u>AG Sys., Inc. v. United Decorative Plastics Corp.</u>, 55 F.3d 970, 973-74 (4th Cir. 1995) (noting that a party's failure to object to the form of special interrogatories waives that challenge on appeal).

Dowdy's argument that the verdict sheet is insufficiently detailed is also lacking in merit.  In his own proposed jury instructions, Dowdy made no mention of Oliver's statement regarding Howard's bad faith failure to investigate claim.  Rather, Dowdy proposed an instruction which read in part that Howard must

32

prove the following:

> 1. That Defendant Darrell Dowdy deliberately suppressed material exculpatory evidence from the prosecutor and/or deliberately fabricated material evidence.

> 2. That Defendant Darrell Dowdy then deliberately in bad faith failed to conduct an adequate investigation to shield such fabrication and/or suppression of evidence.

> 3. That such deliberate failure to investigate resulted in Plaintiff Darryl Howard's conviction and imprisonment.

(Doc. 281 at 26.) Unlike the court's final jury instructions, Dowdy's proposed instructions did not advise the jury at all that Howard's bad faith failure to investigate claim required the jury to have found that Dowdy fabricated Oliver's statement.

In addition to the jury instructions, Dowdy also advocated for the court to structure the verdict form in a way that is similar to that to which he now objects. Dowdy's proposed verdict form included three simple questions:

> 1. Did Plaintiff Darryl Howard prove by a preponderance of the evidence that Defendant Darrell Dowdy deliberately caused Plaintiff Darryl Howard to be deprived of his constitutional right to a fair trial?

> Yes _____        No _____

> 2. Did Plaintiff Darryl Howard prove by a preponderance of the evidence that Defendant Milton Smith[7] Deliberately caused Plaintiff Darryl Howard to be deprived of his constitutional right to a fair trial?

---

[7] Milton Smith was dismissed as a Defendant by Howard just before trial. (Doc. 305.)

33

Yes _____        No _____

If you answer Issue No. 1 or No. 2 in favor of Plaintiff Darryl Howard, proceed to answer Issue No. 3.  If you answer Issue No. 1 and No. 2 "No" in favor of Defendants Darrell Dowdy and Milton Smith, that is your verdict and you shall not answer Issue No. 3.

3.  In accordance with the Court's instructions regarding compensatory damages, please state the amount, if any, of damages Plaintiff Darryl Howard has proven by a preponderance of the evidence.

$ _____

(Doc. 279 at 1-2.)  Dowdy's proposed verdict form made no mention of Oliver's testimony and, in fact, did not separate out Howard's claims at all.  Rather, Dowdy requested that the court group all of Howard's claims together, which is exactly the basis for Dowdy's present criticisms of the finalized verdict form.  Not only did Dowdy advocate for this in his pre-trial filings, but Dowdy's counsel also reiterated orally his desire that the verdict form not separate the factual bases for Howard's claims.  (See Doc. 335 12:17-13:4 (Dowdy's counsel explaining, "On the verdict sheet, Your Honor, as we have stated before, we do object to having the various factual contentions of the constitutional right violation being separated."))  As such, because Dowdy not only never objected to the exclusion of special interrogatories about the fabrication of Oliver's statement, but he in fact advocated against the inclusion of the special interrogatory for which he now advocates, his motion to set aside the verdict and alternatively for a new

34

trial on Howard's bad faith failure to investigate claim will be denied. See Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 170-71 (4th Cir. 2018) (holding a party is foreclosed from objecting to a jury instruction it proposed and the court adopted).

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Dowdy's renewed motion for judgment as a matter of law (Doc. 339) is DENIED.


                                        /s/   Thomas D. Schroeder
                                   United States District Judge

May 26, 2022